IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| PETER J. HIDALGO, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 06-cv-1513 (JR) |
| FEDERAL BUREAU OF INVESTIGATION, | ) |
| Defendant. | ) |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)     I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C.  I have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law.  In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy.  From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters.  I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)     In my official capacity as Section Chief of RIDS, I supervise approximately 205 employees who staff a total of ten (10) units and a field operational service center unit whose

collective mission is to effectively plan, develop, direct and manage responses to requests for access to the Federal Bureau of Investigation ("FBI") records and information pursuant to the FOIA; Privacy Act; Executive Order 12958, as amended; Presidential, Attorney General and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the FOIA request of plaintiff, Peter J. Hidalgo, which seeks release of records from the FBI's Miami Field Office ("MMFO") pertaining to a third-party, Manuel ("Manny") Sanchez.[1]

(4)    Mr. Sanchez was a paid FBI confidential informant/cooperating witness during an undercover investigation directed toward many foreign drug trafficking organizations which were

---

[1]    This is plaintiff's third FOIA case attempting to obtain access to the FBI's files concerning the informant. First, in Hidalgo v. FBI, Civ. A. No. 00-709 (JR) (D.D.C.) ("Hidalgo I"), plaintiff requested FBI Headquarters records about the informant. The first case was dismissed for failure to exhaust administrative remedies pursuant to the instructions in Hidalgo v. FBI, 344 F.3d 1254 (D.C. Cir. 2003). In the second case, Hidalgo v. FBI, Civ. A. No. 04-562 (JR) (D.D.C.) ("Hidalgo II"), plaintiff also requested records about the informant from FBI Headquarters. In that case, after the Court rejected defendant's "Glomar" invocation (Mem. Order, Sept. 29, 2005, at 3-5), the FBI found no responsive records in Headquarters files. In an order dated September 22, 2006, the Court found that the FBI's search for records at Headquarters was reasonable.

importing and distributing multi-kilograms of cocaine and marijuana into the Miami, Florida area. As a result of this undercover investigation, some drug traffickers were indicted and convicted for their crimes. Some of the indicted drug traffickers, however, are fugitives. Therefore, the FBI's drug trafficking investigation is dormant, but remains open and pending and is assigned to a SA. The informant's file in this case is directly related to the FBI's pending investigation. Moreover, many of the drug traffickers were unindicted, but additional enforcement action, including other investigative activity, indictment, and trial, may become necessary. The FBI's files related to drug trafficking investigation, including the informant's file in this case, contain a significant amount of incriminating evidence against the fugitives and the unindicted drug traffickers. Enforcement actions against these fugitives and unindicted drug traffickers is prospective.

(5)    During the years in which the informant participated in the undercover investigations, as well as during the trials of the drug traffickers, he, as well as his family, were in constant risk of physical harm. The informant's immediate and extended family were threatened by those involved in drug trafficking. The risk of harm to the informant and his family from the drug traffickers with whom he came in contact persists to this day because his cooperation with the FBI has become publicly known.

(6)    The FBI's long-standing policy is to routinely provide a "Glomar" or "neither confirm nor deny the existence of records" response in those instances in which an individual seeks access to information regarding a third party but fails to provide either a Privacy Act waiver from that third party or proof of death of that third party. In Hidalgo II, the FBI's initial

-3-

"Glomar" response was rejected by the Court's September 29, 2005 Memorandum Order, which

held that the informant's status as an FBI confidential informant is not protected from disclosure

pursuant to FOIA Exemption 7(C) and 7(D), 5 U.S.C. §§ 552(b )(7)(C) and (b)(7)(D).  Thus, the

FBI is unable to assert a "Glomar" response in response to plaintiff's FOIA request to the MMFO

for records concerning the informant.

     (7)    In accordance with <u>Vaughn v. Rosen</u>, 484 F.2d 820 (D.C. Cir. 1973), this

declaration, which is being submitted in support of defendant FBI's motion for summary

judgment, will provide the Court and plaintiff with an explanation for the procedures used in

searching for records responsive to plaintiff's request, review MMFO records responsive to

plaintiff's FOIA request, and justify for the FBI information which has been withheld in full or in

part.  The FOIA exemptions asserted by the FBI as grounds for nondisclosure of information

contained in this material are Exemptions 2, 6, 7(A), 7(C), 7(D), 7(E) and 7(F), 5 U.S.C. §§ 552

(b)(2), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E) and (b)(7)(F).

### PROCEDURAL HISTORY OF PLAINTIFF'S FOIA REQUEST

     (8)    By letter dated February 7, 2006, William R. Nifong, plaintiff's attorney,

submitted plaintiff's FOIA request dated February 3, 2006 to the MMFO.  <u>See</u> **Exhibit A.**

     (9)    Plaintiff seeks records concerning Manuel ("Manny") Sanchez, who was a paid

FBI confidential informant.  Plaintiff's letter states:[2]

---

     [2]    Plaintiff further requested that the FBI "in response to the material requested
specifically inform [him] if and to whom the file and/or any material therein contained has been
released to any identifiable individual or agency, their name, title, purpose and need for such
information, the date of such release, the specific material that was released, the person within
[the FBI] who released such information, and the specific reference for that authority, statute, or
regulation, governing such release . . . ."  <u>See</u> **Exhibit A.**

1)      This letter will serve as a formal request, pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a (d)(1) and the State Statutes governing Freedom of Information requests, for the full disclosure and release of all 'System of Records' and 'Data' contained in the Files of your agency. . . . [A]ll searches for Sanchezs' requested specific information are to include, but limited to Files referencing 'VESTRAC'. . .

2)      The Records and Files that are sought for Manuel (Manny) Sanchez, are maintained under the FBIs' agency records structure that includes 'Main' Files and 'Reference' ('Cross Reference') Files, and that in conjunction employs the following systems, but not limited to:  Central Record System ('CRS'); Automated case Support ('ACS'); Electronic Case File ('ECF'); Universal Index ('UNI'); Investigative Case Management ('ICM'); Universal Case File Number ('UCFN'); and General Indices ('Automated and Manual') to access the Files for Manuel (Manny) Sanchez in all FBI Field Offices.

3)      The following FOIA request specifically is for the agencys' compiled File of 'Manuel Sanchez' and Cross Reference Files under the name 'VESTRAC' containing, but not limited to:

(A).      Manuel Sanchez, FBI records entailing the exact date of Sanchez officially became a FBI Informant, and Subsequently a FBI paid Informant.

(B).      Manuel Sanchez, complete FBI payment history, and records of payments or rewards given by other Federal and State agencies to Sanchez while and in capacity of a FBI Informant.

(C).      Manuel Sanchez, FBI records entailing the non-payments of income taxes to the IRS on his Informant earnings and payments made by the FBI agency to Sanchez, or by other Federal and State agencies.

(D).      Manuel Sanchez, FBI records entailing the number of times the FBI agency and its agents has intervened on Sanchez behalf to prevent and avoid criminal prosecution(s) in connection to the income tax evasion or other criminal acts committed by Sanchez while working as a FBI Informant.

(E).      Manuel Sanchez, FBI records outlining the past 36 years of his criminal career and lengthly [sic] criminal conviction(s) history, in addition to any and all arrest records of Sanchez regardless of non-prosecution, as well as any pending criminal cases.

(F).      Manuel Sanchez, FBI records entailing any and all accusations of misconduct committed by Sanchez while working as a FBI Informant.

(G).      Manuel Sanchez, FBI records of any and all administrative sanctions imposed on Sanchez for dishonesty, false claims, or other type of deceit and misconduct.

(H).      Manuel Sanchez, FBI records of all case names, numbers, and Judicial Districts where Sanchez has testified under oath.

(I)      Manuel Sanchez, FBI records entailing all investigatory

reports, reports or evidentiary and/or Scientific information findings, wants, warrants, and/or detainers, final and closing investigation reports, any and all information, electronic Data associated to Sanchez.

**See Exhibit A.**

(10)    By letter dated March 3, 2006, FBIHQ advised plaintiff's counsel that it was returning a copy of his request pertaining to another individual, and asking for submission of proof of death of that individual. The March 3, 2006, letter stated: "Without proof of death, the disclosure of law enforcement records or information about another person is considered an unwarranted invasion of personal privacy. Such records, if they exist, are exempt from disclosure pursuant to Exemptions (b)(6) and/or (b)(7)(C) of the FOIA . . . ." Plaintiff's counsel was advised of the right to appeal to the U.S. Department of Justice ("DOJ"), Office of Information and Privacy ("OIP"). **See Exhibit B.** OIP is the administrative appellate authority within DOJ for FOIA matters.

(11)    By letter dated April 26, 2006, to OIP, plaintiff's counsel appealed the denial of plaintiff FOIA request. **See Exhibit C.**

(12)    By letter dated May 9, 2006, OIP acknowledged receipt of plaintiff's administrative appeal and assigned it appeal number 06-1908. **See Exhibit D.**

(13)    By letter dated October 27, 2006, FBIHQ acknowledged receipt of plaintiff request, and assigned it FOIPA #1061364. **See Exhibit E.**

(14)    By letter dated December 11, 2006, OIP advised plaintiff's counsel that it was closing the appeal since the case was in litigation. **See Exhibit F.**

### EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(15)    The Central Records System ("CRS") enables the FBI to maintain all information

which it has acquired in the course of fulfilling its mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files compiled for law enforcement purposes. CRS is organized into a numerical sequence of files, called FBI "classifications," which are broken down according to subject matter. The subject matter of a file may correspond to an individual, organization, company, publication, activity, or foreign intelligence matter (or program). Certain records in the CRS are maintained at FBIHQ, whereas records that are pertinent to specific field offices of the FBI are maintained in those field offices. While the CRS is primarily designed to serve as an investigative tool, the FBI searches the CRS for documents that are potentially responsive to FOIA/Privacy Act requests. The mechanism that the FBI uses to search the CRS is the Automated Case Support System ("ACS").

(16)    The ACS was implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ in order to consolidate portions of the CRS that were previously automated. ACS can be described as an internal computerized subsystem of the CRS. Because the CRS cannot electronically query the case files for data, such as an individual's name or social security number, the required information is duplicated and moved to the ACS so that it can be searched. More than 105 million records from the CRS were converted from automated systems previously utilized by the FBI. Automation did not change the CRS; instead, automation has facilitated more economic and expeditious access to records maintained in the CRS.

(17)    The retrieval of data from the CRS is made possible through the ACS using the General Indices, which are arranged in alphabetical order.[3] The entries in the General Indices fall

---

[3]    The General Indices, are not only automated but also include index cards which allow a manual search for records that pre-dated the implementation of ACS on October 16,

into two categories:

>> (a) A "main" entry -- A "main" entry, or "main" file, carries the name corresponding with a subject of a file contained in the CRS.

>> (b) A "reference" entry --"Reference" entries, sometimes called "cross-references," are generally only a mere mention or reference to an individual, organization, or other subject matter, contained in a document located in another "main" file on a different subject matter.

(18)　Searches made in the General Indices to locate records concerning a particular subject, such as Manuel ("Manny") Sanchez, are made by searching the subject requested in the index.

(19)　The ACS consists of three integrated, yet separately functional, automated applications that support case management functions for all FBI investigative and administrative cases:

>> (a)　Investigative Case Management ("ICM") – ICM provides the ability to open, assign, and close investigative and administrative cases as well as set, assign, and track leads. The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs"). When a case is opened, it is assigned a Universal Case File Number ("UCFN"), which is used by all FBIHQ, as well as all FBI field offices and Legats that are conducting or assisting in the investigation. Using the [fictitious] file number "123-MM-4567890," as an example, an explanation of the UCFN is as follows: "123 " indicates the classification for the specific type of investigation, i.e., National Foreign Intelligence Program; "MM" is the abbreviated form used for the OO of the investigation, which in this case is Miami; and "4567890 " denotes the individual case file number for the particular investigation.

---

1995.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository for the FBI's official text-based documents. ECF supports the universal serial concept in that only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 98.4 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(20)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") -- and, on occasion support employees -- assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, i.e., Manuel ("Manny") Sanchez.

-9-

## SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(21)    In response to plaintiff's request to MMFO, the FBI initiated a search in the CRS for responsive records using Mr. Sanchez's name to locate any main files or cross-references maintained at the MMFO. A search conducted by using the name "Manuel Sanchez" would cover a search with a six-way phonetic breakdown of Sanchez's first and last name, in addition to a basic search using the exact spelling of the name provided by plaintiff. A six-way phonetic search breaks down the name six ways, plus shows any variation of the first and/or last name that sound like, or are spelled differently than, the name entered. In particular, this name search looked for records relating to "Sanchez, Manuel,""Sanchez, M," and "Sanchez, Manny." This search was later expanded to include "Sanchez, Manolo" as an additional alias. MMFO's search also included the use of Manuel Sanchez's date of birth and social security numbers provided by plaintiff to facilitate the identification of responsive records. This search ultimately located one file responsive to plaintiff's request -- Mr. Sanchez's confidential informant file.[4]

## DESCRIPTION OF DOCUMENTS IN THE INFORMANT FILE

(22)    The informant's informant file contains approximately 2,993 pages of documents. Those pages fall into three categories -- informant contact and interview documents, informant funding documents, and internal FBI informant control documents. Attached at **Exhibit G** are eleven charts that account for the documents in the informant's informant file. There is one chart for every section of the file. At the top of each chart is a list that shows the total number of certain prevalent forms related to that chart, _e.g.,_ FD-209s (Memoranda for Recording Contacts With Informants; the file contains 1,072 FD-209s), FD-302s (Interview Forms; the file contains

---

[4]    A confidential informant file contains records pertaining to a particular confidential informant, regardless of whether the informant's activity is related to an investigation of one subject or multiple subjects.

1,025 FD-302s), and FD-794s (Draft Requests; the file contains 72 FD-794s). Below the listing

of prevalent forms, the remaining pages of documents are listed, described, and identified by

Bates stamp number. The applicable FOIA exemptions for each document are listed in the far

right column.

### Informant Contact and Interview Documents

(23)    The first category of documents found in the informant's file consist of two types

of FBI forms: the FD-209 and FD-302. The FD-209 is a cover sheet in the form of a

memorandum that accompanies each form documenting an interview with a confidential

informant and contains basic information about the investigation. The FD-209 contains: the

name of the FBI Special Agent ("SA") submitting the form; the name of the recipient Special

Agent in Charge ("SAC") of a field office; the date that the forms FD-209 and FD302 were

submitted; the informant's number; the date(s) of contact with the informant; the relevant

investigative file number(s); and a brief description of the interview. The FD-209 also contains a

statement that the attached interview is confidential. As noted in ¶ 22 above, the informant's

informant file contains 1,072 FD-209s.

(24)    The informant file also contains the FD-302, a form used to record information

obtained during an interview. The FD-302 contains the date of the interview, the place of the

interview, the relevant investigative file number(s), the SA's name who conducted the interview,

and the date the FD-302 was dictated or typed. As noted in ¶ 22 above, the informant's

confidential informant file contains 1,025 FD-302s.

### Informant Funding Information

(25)    The informant file contains numerous documents related to the payment of and

accounting for the money paid to the confidential informant by the FBI. These documents

include a total of 72 FD-794s.[5]  This informant file also contains many memoranda, FSA Blue

Slips,[6] teletypes,[7] and receipts related to the funding of this confidential informant.  <u>See</u> **Exhibit**

**G**.

<u>**Informant Management Documents**</u>

(26)    Finally, the informant file contains communications related to the management of

the informant.  <u>See</u> **Exhibit G**.  The management correspondence includes memoranda, airtels,[8]

Supervisory Cooperating Witness File Review Sheets, letters, teletypes, Electronic

Communications ("ECs"),[9] and e-mails.  <u>See</u> **Exhibit G**.

<u>**JUSTIFICATIONS FOR WITHHOLDING INFORMATION**</u>

(27)    One document (page 1603) in the informant's informant file was processed and

released in part to plaintiff with material redacted pursuant to Exemptions 2, 6, and 7(C).  The

remaining 2,992 pages of information in the informant's informant file are being withheld in full

pursuant to Exemptions 2, 6, 7(A), 7(C), 7(D), 7(E), and (7)(F).

<u>**EXEMPTION (b)(2)**</u>
<u>**INFORMATION RELATED SOLELY TO THE**</u>

---

[5]    The form FD-794 is used for submitting draft system transactions to an automated check writing system.

[6]    An FSA Blue Slip is used to expend funds to pay an Informant/Confidential Witness in an undercover operation.

[7]    A teletype was an interim summary of the activities of one field office of the FBI, and was designed to expeditiously alert other field offices and/or FBIHQ of a pertinent development in a case which would require prompt attention.  It usually required "same day" action and was transmitted by teletype machine to expedite its handling.

[8]    An "airtel" is similar to a teletype, but is transmitted by mail.

[9]    The EC is a Word Perfect macro which has replaced the traditional FBI correspondence (<u>i.e.</u>, Memoranda and Letters) as the primary vehicle of correspondence within the FBI.  The purpose of this document is to communicate within the FBI in a consistent format which can be uploaded onto and accessed from the FBI's internal computer network.

-12-

## RULES AND PRACTICES OF AN AGENCY

(28)    Exemption 2, 5 U.S.C. § 552(b)(2), exempts from disclosure information "related solely to the internal personnel rules and practices of an agency."

(29)    This exemption protects routine internal administrative matters and functions of the FBI which have no effect on the public at large.  Disclosure of this information could impede the effectiveness of the FBI's internal law enforcement procedures ("High 2").  Exemption 2 also protects from disclosure internal matters of a relatively trivial nature ("Low 2").

(30)    In this case, "High 2" has been applied to withhold internal documents that track the operational funds of the informant program, including the money that was dispensed to the informant.  Disclosure of this information would give drug traffickers insight into the financial workings of the confidential informant program.  Revealing such information would be harmful because armed with knowledge of the inner workings of the financial operations of the confidential informant program, drug traffickers could scheme in an attempt to circumvent laws and investigations related to enforcement actions against international drug trafficking through manipulation of the confidential informant program.  Disclosure could impede the FBI's effectiveness in administering its operations by enabling drug traffickers to exhaust the FBI's funding of a particular investigation.

(31)    "High 2" has also been invoked in conjunction with Exemption 7(D) to protect all permanent source symbol numbers,  informant file numbers, investigatory file numbers, and telephone numbers of FBI personnel that have not been publicly disclosed.  The release of this information would compromise the confidential nature of the FBI's relationship with its informants.

-13-

(32)    Permanent source symbol numbers are assigned to confidential informants who report information to the FBI on a regular basis pursuant to an "express" grant of confidentiality. The source symbol number is used as an administrative reporting too to protect the actual, sensitive identity of an informant in documents generated by the FBI. A source symbol number consists of a two-letter abbreviation which identifies the particular FBI field office where the symbol-numbered source is operating or has operated, followed by a sequentially assigned number. For example, using a fictitious symbol number, "NY 1234" for informant "JOHN DOE," the two letter abbreviation "NY" reveals that this is a source of the New York Field Office and the source is the 1,234th symbol-numbered source of that office. The symbol number would be used in all written reports in which DOE provided information to the FBI. Therefore, every time "NY 1234" was released, the reader of the document would know that the source behind the symbol number was the same individual reporting. Thus, every time "NY 1234" was used by the FBI in a record, the number would always identify JOHN DOE. Release of the source symbol number would indicate both the scope and location of FBI informant coverage within a particular geographic area.

(33)    Similar in usage to the permanent symbol number, confidential source file numbers are also assigned in sequential order to confidential informants who report information to the FBI on a regular basis pursuant to an express assurance of confidentiality. The confidential source file is unique to the particular confidential informant and is used only in documentation relating to that particular informant. The disclosure of the confidential file number in this case where the name of the source is known could have a chilling effect on the activities and cooperation of other FBI confidential informants. It is only with the understanding of complete confidentiality that these informants can be persuaded to continue their assistance in providing

-14-

information to the FBI in the future.

(34)    Finally, FBI is protecting pursuant to "High 2" investigatory file numbers used by FBI personnel as an internal administrative tool to facilitate and coordinate the FBI's law enforcement response requirements. These file numbers designate files that serve as repositories for the FBI's law enforcement data. In this case, the investigatory file numbers concern the details of investigations of international drug traffickers. This is a purely internal practice which allows the FBI to more efficiently direct correspondence, reports and other records concerning the investigation. Disclosure of the investigatory file numbers could provide a means of access to this information for the purpose of obstructing the FBI's investigation.

(35)    "High 2" has been invoked to protect internal telephone numbers of FBI SAs and support personnel. Telephone numbers relate to the internal practices of the FBI because it is a tool used by FBI personnel during the performance of their jobs. Disclosure of the telephone numbers could subject these individuals to harassing telephone calls which could disrupt official business (including impeding the ability of SAs to conduct and conclude law enforcement investigations in a timely manner). There is no genuine public interest in the disclosure of these numbers. Accordingly, the telephone numbers of FBI personnel are protected from disclosure by Exemption 2 because they are related solely to the FBI's internal practices, disclosure would not serve any public interest, and disclosure could impede the FBI's effectiveness.

(36)    The protection of the source symbol numbers, informant file numbers, telephone numbers of FBI personnel, and investigatory file numbers that have not been publicly disclosed is essential to maintaining the integrity of the FBI's confidential informant program. Release could endanger the lives of informants and their families and discourage cooperation by sources of

information. Accordingly, because these source symbol numbers, informant file numbers, telephone numbers, and file numbers that have not been publicly released are related to the FBI's internal practices, because disclosure would not serve any public interest, and because disclosure could impede the FBI's effectiveness, the FBI is withholding this information pursuant to Exemption 2.

## EXEMPTION (b)(6)
## CLEARLY UNWARRANTED INVASION OF PERSONAL PRIVACY

(37)    Exemption 6, 5 U.S.C. § 552 (b)(6), exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

(38)    The FBI has invoked Exemption 6 in conjunction with Exemption 7(C) to protect all the information in the informant file. In asserting Exemption 6 over all the information in the file, each piece of information was scrutinized to determine the nature and strength of the privacy interests of the informant. Disclosure of any of the documents in this file would reveal the details of his participation in the undercover operation. Revealing this information would expose the informant and his family to retaliation at the hands of the drug traffickers who learn that they were under the scrutiny of the FBI. Thus, the informant has significant personal privacy interests in preventing retaliation against himself and his family.

(39)    In withholding the information, the informant's significant privacy interests were balanced against the public's interest in disclosure. In making this analysis, the FBI considered the Court's finding in a related case that plaintiff had made a "not overwhelming" showing of public interest in knowing whether the FBI maintained records on the informant. Hidalgo II, Mem. Order, Sept. 29, 2005, at 5. In each instance, the FBI determined that the informant's

-16-

significant personal privacy interests in preventing retaliation against himself and his family outweighed any public interest in disclosure of the information in the file. Thus, the FBI determined that disclosure of this file would constitute a clearly unwarranted invasion of the informant's personal privacy.

(40)    The FBI is also asserting Exemption 6 in conjunction with Exemption 7(C) to withhold from disclosure the names and telephone numbers of SAs and FBI employees; names and/or identifying information of third parties of investigative interest or who provided information to the FBI; and names and/or identifying information of third parties merely mentioned in the documents. Disclosure of the names and identifying information such as telephone numbers of FBI SAs and employees could subject them to unauthorized inquiries by members of the media and the general public who seek access to this type of information. FBI SAs and employees could also become the targets of harassment by individuals involved in the investigation who carry a grudge against the FBI. Disclosure of the names and/ or identifying information about third parties who provided information to the FBI, were of investigative interest to the FBI, or were merely mentioned in the FBI's records in this context could cause unsolicited and unnecessary attention to be focused on them. Moreover, disclosure could embarrass them. The records at issue were examined to determine whether there was any public interest that outweighed the significant privacy interests in not having this information disclosed of the special agents, FBI employees, third parties of investigative interest or who provided information to the FBI, and third parties merely mentioned. The FBI could identify no discernible public interest. Accordingly, the FBI determined that the privacy interests in the information at issue outweigh the public interest.

-17-

## EXEMPTION (b)(7)
## THRESHOLD

(41)    Exemption 7 of the FOIA protects from mandatory disclosure records or information compiled for law enforcement purposes, but only to the extent that disclosure could reasonably be expected to cause one of the harms enumerated in the subparts of the exemption. See 5 U.S.C. § 552(b)(7).  In this case, the harm that could reasonably be expected to result from interfering with enforcement proceedings, invading personal privacy, revealing the identity of confidential sources, revealing sensitive law enforcement techniques, and revealing information which if released could reasonable cause harm and/or endangering the life or physical safety of any individual.  Before an agency can invoke any of the harms enumerated in Exemption 7, it must first demonstrate that the records or information at issue were compiled for law enforcement purposes.  Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.  The various records in the informant's informant file were compiled for criminal law enforcement purposes during the course of the FBI's performance of its law enforcement mission, specifically alleged violations of law including 21 U.S.C. §§ 963, 846, and 952.

(42)    Because the records clearly meet the Exemption 7 threshold, the remaining inquiry is whether their disclosure would interfere with law enforcement proceedings, invade personal privacy, reveal the identity of confidential sources, reveal sensitive law enforcement techniques, and reveal information which if released could reasonable cause harm and/or endangering the life or physical safety of any individual.

## FOIA EXEMPTION (b)(7)(A)

-18-

## PENDING LAW ENFORCEMENT INVESTIGATIONS

(43)    Exemption 7(A), 5 U.S.C. § 552(b)(7)(A), exempts from disclosure:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of such law enforcement
> records or information . . . could reasonably be expected to
> interfere with enforcement proceedings.

(44)    Application of Exemption 7(A) requires that the records in question be compiled

for law enforcement purposes; the existence of a pending or prospective law enforcement

proceeding; and a reasonable expectation that release of the information would interfere with that

enforcement proceeding.  The FBI has determined that the responsive records in this case meet

this test.

(45)    In this case, every document was created as a result of the informant's active

participation in the FBI's informant program.  These documents therefore are law enforcement

records.

(46)    These records are all connected to the informant's activities as a confidential

informant, and will be used to provide evidence for the prospective law enforcement proceedings

against the fugitives.

(47)    Any prospective law enforcement proceedings against the fugitive drug traffickers

will be harmed by any disclosure of the records in this informant file.  Once documents are

released and are in the public domain, the investigated drug traffickers would be able to critically

analyze the information in the documents pertinent to the investigation of themselves.  Such

individuals possess the unique advantage of knowing the details surrounding the investigations,

and could use the released information to their advantage.  Specifically, release of the informant

contact and interview documents could reasonably result in the following harms:

-19-

a. The identification of individuals, sources, and potential
witnesses who possess information relative to the investigation and
possible harm to, or intimidation of these individuals, sources, and
potential witnesses;

b. The premature disclosure of evidence developed against drug traffickers;

c. The use of the information released to evade prosecution or
counteract evidence developed by investigators;

d. The identification of unindicted drug traffickers of investigative
interest; and

e. The destruction of evidence.

(48)   Release of the informant funding documents would disclose the dates of the

informant's activity.  Such a disclosure would reveal what the government knows or does not

know with respect to drug traffickers; and also could reasonably result in the harms identified in

items (a) through (e) in this paragraph.  Finally, the release of the internal FBI informant control

documents would disclose information about the informant's investigative activity, including

dates and other details, that also could reasonably be expected to result in the harms identified in

this paragraph.

### FOIA EXEMPTION (b)(7)(C)
### UNWARRANTED INVASION OF PERSONAL PRIVACY

(49)   Exemption 7(C), 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure:

records or information compiled for law enforcement purposes, but
only to the extent that the production of such law enforcement
records or information . . . could reasonably be expected to
constitute an unwarranted invasion of personal privacy . . . .

(50)   The FBI has invoked Exemption 7(C) in conjunction with Exemption 6 to protect

all the information in the informant file.  In asserting Exemption 7(C) over all the information in

the file, each piece of information was analyzed to determine the nature and strength of the

-20-

privacy interests of the informant. Disclosure of the documents in this file would provide the general public with the details of his participation in the undercover operation. Revealing this information would expose the informant and his family to retaliation (harassment, intimidation, fear, mental and physical harm) at the hands of the drug traffickers who learn that they were under the scrutiny of the FBI. Thus, the informant has significant personal privacy interests in this case.

(51)    In withholding the information, the informant's privacy interests were balanced against the public's interest in disclosure. In making this analysis, the FBI took into consideration the Court's finding in a related case that the plaintiff made a "not overwhelming" showing of public interest in knowing whether the FBI maintained records on Sanchez. Hidalgo II, Mem. Order, Sept. 29, 2005, at 5. In each instance, it was determined that the informant's significant personal privacy interest in his own health and safety and the health and safety of his family outweighed the public interest in disclosure of the information in the file. Thus, the FBI determined that disclosure of this file would constitute an unwarranted invasion of the informant's personal privacy.

(52)    The FBI is also asserting Exemption 7(C) in conjunction with Exemption 6 to withhold from disclosure the names of SAs; names of FBI employees; names and/or identifying information of third parties of investigative interest or who provided information to the FBI; and names and/or identifying information of third parties merely mentioned in the documents. Disclosure of the names and/or identifying information such as telephone numbers of SAs and FBI employees could subject them to unauthorized inquiries by members of the media and the general public who seek access to this type of information. SAs and FBI support personnel could also become the targets of harassment by individual involved in the investigation who carry a

-21-

grudge against the FBI. Disclosure of the identities of the third parties in these documents --

third parties of investigative interest to the FBI, third parties who provided information to the

FBI, and third parties merely mentioned in these records -- could cause unsolicited and

unnecessary attention to be focused on them. Moreover, disclosure may embarrass them. The

records at issue were examined to determine whether there was any public interest that

outweighed the strong privacy interests in not having this information disclosed of the SAs, FBI

employees, third parties of investigative interest or who provided information to the FBI, and

third parties merely mentioned. The FBI could identify no discernible public interest.

Accordingly, the FBI has determined that the privacy interests in the information at issue

outweigh the public interest.

## EXEMPTION (b)(7)(D)
## CONFIDENTIAL SOURCE MATERIAL

(53)    Exemption 7(D), 5 U.S.C. § 552 (b)(7)(D), provides protection for:

> records or information compiled for law enforcement purposes, but
> only to the extent that the production of law enforcement records
> or information . . . could reasonably be expected to disclose the
> identity of a confidential source, including a state, local or foreign
> agency or authority or any private institution which furnished
> information on a confidential basis, and, in the case of a record or
> information compiled by a criminal law enforcement authority in
> the course of a criminal investigation . . . information furnished by
> a confidential source.

(54)    In this case, the FBI gave the informant an express grant of confidentiality.

Exemption 7(D) has been asserted to protect the information provided to the FBI by the

informant an FBI confidential informant. The FBI has learned through experience that

individuals, like the informant, who provide information about subjects under investigation must

be free to do so without fear of reprisal should their identities or the information they provided be

disclosed outside their confidential relationship with the FBI. Individuals who provided

-22-

investigative information must be free to furnish that information with complete candor and
without the understandable tendency to hedge or withhold information out of fear that their
names or the details of their cooperation with the FBI will later be made public. Confidential
informants who provide information in these investigations must be secure in the knowledge that
the details of their assistance and their identities will be held in confidence.

(55)    Exemption 7(D) also has been asserted in conjunction with Exemption 2 to
withhold source symbol numbers and confidential informant file numbers. The disclosure of this
information may likely reveal a confidential source's identity. Releasing the symbol number and
confidential file number, along with the information provided by the source from the source's
personal perspective concerning the matters being investigated by the FBI, would allow an
individual with knowledge of such names to extrapolate the source's true identity. If the identity
of one source is revealed, that revelation has a chilling effect on the activities and cooperation of
other sources. It is only with the understanding of complete confidentiality that the aid of such
sources can be enlisted, and only through this confidence that these sources can be persuaded to
continue providing valuable assistance in the future.

### EXEMPTION (b)(7)(E)
### INVESTIGATIVE TECHNIQUES AND PROCEDURES

(56)    5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> records or information compiled for law enforcement purposes, but only to
> the extent that the production of such law enforcement records or
> information . . . would disclose techniques and procedures for law
> enforcement investigations or prosecutions, or would disclose guidelines
> for law enforcement investigations or prosecutions if such disclosure could
> reasonably be expected to risk circumvention of the law.

(57)    The FBI has asserted Exemption (b)(7)(E) to protect techniques and procedures
regarding the payment of the informant used by FBI SAs during the undercover investigation of

plaintiff and others. If the FBI were to disclose the procedures used to pay confidential informants during undercover investigation and release details of the payments, it could jeopardize the informant program developed by the FBI by discouraging others from participating in the confidential informant program. Release of the payment details could also reasonably be expected to alert other individuals about the inner workings of the FBI's informant program and enable them to circumvent laws and investigations related to enforcement actions against international drug trafficking through manipulation of the confidential informant program by undermining the quality information provided by the confidential informant. Accordingly, the FBI properly withheld this information pursuant to Exemption (b)(7)(E).

## EXEMPTION (b)(7)(F)
## ENDANGERMENT OF LIFE OR PHYSICAL SAFETY OF ANY INDIVIDUAL

(58)    Exemption 7(F), 5 U.S.C. § 552 (b)(7)(F), provides for the withholding of:

> Records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information...could reasonably be expected to endanger the life or physical safety of any individual.

(59)    The FBI is concerned with the harm that could be caused to the informant and his family should these records that reveal him to be an FBI informant and cooperating witness get into the hands of the fugitives and unindicted drug traffickers. There is a serious threat of retaliation against the Mr. Sanchez and his family. In the past, the lives of the informant and his family have been threatened as a result of his cooperation with the FBI. Thus, there is a reasonable expectation that the lives or physical safety of the informant and this family would be endangered if his statements to the FBI and the details of his informant activities were released.

(60)    The FBI is also concerned about retaliation against third parties who provided information to the informant and therefore to the FBI. Given the violence that occurred during the investigation, there is a reasonable expectation that the safety of these individuals is at risk if

the fugitives and unindicted drug traffickers gain access to the information in the informant's informant file.

### CONCLUSION

(61)    The FBI has carefully examined the records related to the informant and has released one page with tailored redactions made pursuant to FOIA Exemptions 2, 6, 7(C), 5 U.S.C. §§ 552 (b)(2), (b)(6), and (b)(7)(C). The FBI has also reviewed the remaining documents responsive to plaintiff's FOIA request for records about the informant. The FBI has determined that those remaining documents should be withheld in full pursuant to FOIA Exemptions 2, 6, 7(A), 7(C), 7(D), 7(E), and 7(F) because disclosure could reasonably be expected to impede the effectiveness of the FBI's internal law enforcement procedures and practices, cause an unwarranted invasion of privacy interest, impede pending law enforcement investigation, disclose confidential source information, disclose techniques and procedures for law enforcement investigations, and endanger the lives of the informant and his family. After extensive review of the documents at issue, I have determined that there is no further reasonably segregable information to be released. The non-exempt information in this confidential informant file is so inextricably intertwined with exempt information that disclosure of the non-exempt information would result in meaningless words and phrases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that Exhibits A through G attached hereto are true and correct copies.

Executed this _9th_ day of May, 2007.

DAVID M. HARDY
Section Chief

Record/Information Dissemination Section
Federal Bureau of Investigation
Washington, D.C.