UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,      )
                    )
     Plaintiff,    )
                    )
     v.            )     Civil Action No. 06-1513(JR)
                    )
FEDERAL BUREAU OF    )
  INVESTIGATION,    )
                    )
     Defendant.    )
_____)

**PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, by his undersigned attorney, hereby moves the Court, pursuant to Federal Rule of Civil Procedure 56, to deny the Defendant's Motion for Summary Judgment and grant the Plaintiff's Motion For Summary Judgment on the grounds that no genuine issues as to any material fact exist and that Plaintiff is entitled to judgment as a matter of law.

In support of this motion the Court is respectfully referred to the attached Appendix, the Statement of Material Facts To Which There Is No Genuine Issue, and the Memorandum In Support of the Plaintiff's Cross Motion For Summary Judgment and Opposition to Defendant's Motion for Summary Judgment.

Respectfully Submitted,

s/ Robert-Paul Sagner
_____
Robert-Paul Sagner
(DC Bar # 470219)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C.  20006

Dated:   July 19, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                    )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )    Civil Action No. 06-1513(JR)
                                     )
FEDERAL BUREAU OF                    )
   INVESTIGATION,                    )
                                     )
        Defendant.                   )
_____)

**STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE, PURSUANT TO LOCAL RULE 7(h)**

Pursuant to Local Rule 7(h), Plaintiff submits the following statement of material facts as to which there is no genuine issue:

1.   By letter dated February 3, 2006, Plaintiff Peter Hidalgo made a request to the Miami Field Office of Defendant Federal Bureau of Investigation, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C.A. § 552 (1996 & West Supp. 2004), and the Privacy Act of 1974, 5 U.S.C. § 552a (2000), seeking records related to Manuel Sanchez's criminal history and his status as an informant for the FBI. (*See* App. at 26.) Plaintiff explained in his request that, in response to Plaintiff's previous request for information regarding Mr. Sanchez, the Honorable James Robertson of the United States District Court for the District of Columbia ruled that Defendant could not refuse to acknowledge the existence of documents responsive to Plaintiff's request on the grounds that disclosure would violate Mr. Sanchez's privacy interest.  (*Id.*)

2.    By letter dated March 3, 2006, Defendant informed Mr. Hidalgo that, unless Mr. Hidalgo provided a proof of death of Mr. Sanchez, the FBI would not provide Mr. Hidalgo with the requested documents on the grounds that they were exempt from disclosure pursuant to 5 U.S.C. § 552(b)(6) and/or (b)(7)(C).  (*See* App. at 12.)

3.    On April 26, 2006, pursuant to 28 C.F.R. § 16.9(A) and 5 U.S.C. § 552(a)(6), Mr. Hidalgo filed an administrative appeal of the FBI's denial of his request with the Office of Information and Privacy ("OIP") of the United States Department of Justice.

4.    By letter dated May 9, 2006, OIP acknowledged receipt of Mr. Hidalgo's letter dated April 26, 2006, and assigned case number 06-1908 to his appeal.  (*Id.* at 15.)  OIP also stated in its May 9, 2006 letter that it would be unable to make a determination on the merits of Plaintiff's appeal within the statutorily-prescribed period of 20 working days because of a "substantial backlog of pending appeals."  (*Id.*)

5.    On August 25, 2006, Plaintiff filed the instant lawsuit.  (*See* Complaint for Declaratory and Injunctive Relief, *Hidalgo v. FBI*, No. 06-1513, ¶ 1 (D.D.C. Aug. 25, 2006).)

6.    By letter dated October 27, 2006, the OIP stated that it would inform him of the results of its search for responsive records as soon as possible.  (*See* App. at 16.)

7.    In a November 8, 2006, status conference with Judge Robertson, Defendant acknowledged that it had located 2,993 pages responsive to Mr. Hidalgo's request, and agreed to disclose any

non-exempt pages.  The Court directed Defendant to provide its first written status report to the Court by March 16, 2007.

8.   By letter dated January 29, 2007, Defendant disclosed one page in part, subject to withholdings under 5 U.S.C. § 552, subsections (b)2, (b)6, and (b)7(C).  (*Id.* at 17.)

9.   On March 16, 2007, Defendant filed its Unopposed Proposed Briefing Schedule with the Court.  In its filing, Defendant reported that counsel for the parties had agreed to a briefing schedule for dispositive motions.

9.   By letter dated May 9, 2007, Defendant stated that it had completed its review of the 2,993 responsive documents, and apart from the one document disclosed on January 29, 2007, was withholding the other 2,992 documents in the file pursuant to 5 U.S.C. § 552, subsections (b)(2), (b)6, (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).  (*Id.* at 19.)


Respectfully Submitted,

s/ Robert-Paul Sagner
_____
Robert-Paul Sagner
(DC Bar # 470219)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C.  20006



Dated:    July 19, 2007


3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                     )
                                      )
        Plaintiff,                    )
                                      )
        v.                            )     Civil Action No. 06-1513(JR)
                                      )
FEDERAL BUREAU OF                     )
   INVESTIGATION,                     )
                                      )
        Defendant.                    )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Preliminary Statement**

This case demonstrates the considerable lengths to which the
Government will go to avoid having to comply with the law.
Pursuant to the Freedom of Information Act ("FOIA"), Plaintiff
Peter Hidalgo has submitted to Defendant a request for documents
concerning Manuel ("Manny") Sanchez, a paid government informant.
Mr. Hidalgo seeks information about Mr. Sanchez's relationship
with the Federal Bureau of Investigation ("FBI"), including an
accounting of payments made to Mr. Sanchez by the government, a
history of all of Mr. Sanchez's convictions and arrests, a list
of all claims of misconduct against Mr. Sanchez while he was an
informant, and Defendant's efforts to intervene on Mr. Sanchez's
behalf in law enforcement proceedings.

In its attempt to withhold from Plaintiff documents properly
available to him, Defendant has violated not only the clear
requirements of FOIA, but a direct order from this Court as well.
Defendant has tried every trick in the book to hide these

documents, first denying that there were any responsive documents at all, both to Plaintiff and to this Court, then, after finally acknowledging that it had almost 3,000 responsive documents, disclosing only one meager half-page, partially redacted.

As the Court knows, Plaintiff filed his initial request in December 1999.  For nearly seven years the Government refused even to acknowledge that it had any responsive documents.    In November 2006, Defendant finally acknowledged what had been obvious all along: that it had thousands of responsive documents. But despite this Court's order finding a public interest in disclosure of the documents, Defendant disclosed only one page out of 2,993, or less than one tenth of one percent of the file, and claimed it could withhold the rest pursuant to various FOIA Exemptions.

Defendant tries to distract the Court by suggesting that Plaintiff is interested in uncovering information that is currently confidential, and that disclosing such information could harm the FBI and its law enforcement efforts. But, most of the information sought by Mr. Hidalgo has already been made public in one form or another, including the fact that Mr. Sanchez received regular payments from Defendant, the amounts of those payments, and the fact that Mr. Sanchez has been arrested numerous times.  Plaintiff is merely seeking to confirm the *accuracy* of that information.  Moreover, Plaintiff is not seeking information on the targets of the FBI's investigation or the information that Mr. Sanchez provided; rather, Plaintiff has requested information on Mr. Sanchez's relationship with the FBI.

2

Defendant's attempts to mislead this Court as to Plaintiff's request are but the latest in a series of disingenuous assertions Defendant has made in order to cover up its conduct with respect to Manuel Sanchez.  For example, despite the Court's earlier holding that "Mr. Sanchez's identity as a cooperator is open and notorious," Memorandum Order, *Hidalgo v. FBI*, No. 04-0562, at 6 (Sept. 29, 2005) ("*Hidalgo II Order*") (App. at 6), Defendant continues to claim that the documents may be withheld on the grounds that Mr. Sanchez remains a confidential informant involved in an ongoing investigation.  Yet, the FBI has admitted that the investigation has been closed for more than a decade and Mr. Sanchez lost any confidential status he might have ever so briefly had years ago, when he began testifying in open court on behalf of the FBI.

Moreover, Defendant has not provided a complete *Vaughn* Index sufficient to evaluate its claims of exemptions.  Although Defendant has acknowledged that it has 2,993 pages of documents that are responsive to Plaintiff's FOIA request, the document with the highest bates stamp number identified in the index is Hidalgo III-2412.

This is not the first time that FOIA has been invoked in this Court to expose Government misconduct in relation to a paid narcotics informant.  In *Bennett v. Drug Enforcement Admin.* — a case very similar to this one — the plaintiff sought the Drug Enforcement Administration's files on a confidential informant named Andrew Chambers.  55 F. Supp. 2d 36, 38 (D.D.C. 1999).

3

The plaintiff's submissions showed that Mr. Chambers "earned as much as $4 million" as an informant, *id.* at 42, that the Government had shown "complacency" toward his frequent perjury about his criminal history, *id.*, that "Chambers d[id] not pay taxes on his 'earnings,' and that DEA ha[d] not taken steps to ensure he d[id]," *id.* at 43 n.7.

Here, as in *Bennett*, "[t]he information uncovered by Plaintiff is very compelling, suggesting extensive government misconduct, and the information sought is necessary to confirm whether Plaintiff's findings are backed by the record." *Id.* at 42. Mr. Hidalgo's FOIA request targets serious misconduct by the government in its handling of a highly paid informant.

Accordingly, Mr. Hidalgo respectfully requests that the Court deny the Government's motion for summary judgment and instead grant his cross-motion for summary judgment.

<u>Factual and Procedural Background</u>

**A.    Manny Sanchez's Relationship with the FBI.**

Manny Sanchez is a career criminal turned paid government informant. He has compiled a long list of felony arrests and convictions: for armed robbery in July 1967, for possession with intent to distribute cocaine in October 1975, for selling drugs in June 1976, for escaping from prison in September 1976, for another drug offense in August 1977, and for cocaine possession in September 1983 and again in August 1987. (*See* App. at 100-102, 107-08.) Since 1987, Mr. Sanchez has been arrested at least five times, including once in February 1990 for chasing a cable

company employee with a machine gun and once in April 1992 for
threatening to "hunt down" a police officer during a drunk
driving stop. (*Id.*)

During the late 1980s and early 1990s, Mr. Sanchez agreed to
use his family's reputation in the marine services business to
create a new business, Manny's Marine Service ("Manny's Marine"),
that would serve as an FBI undercover operation investigating
drug trafficking in Miami.  The FBI investigation was called
"VESTRAC."  At Manny's Marine, drug runners bought boats with
secret compartments and enlisted captains to transport drugs.
Mr. Sanchez recorded his conversations with drug runners and then
delivered the recordings to the Government for use in criminal
prosecutions.  Between 1993 and 1996, Mr. Sanchez testified in at
least five federal criminal trials against at least 20 defendants
in the United States District Court for the Southern District of
Florida.  For his assistance, the Government paid Mr. Sanchez at
least $440,000 and possibly as much as $1 million. (*Id.* at 102-
05.)

During those trials, both the Government and Mr. Sanchez
gave conflicting testimony concerning Mr. Sanchez's criminal
history, the amount he was paid for his services, and the length
of time he served as a paid informant. (*Id.*)  Moreover, Mr.
Sanchez testified at least four times over four consecutive years
that he paid no taxes on any of the considerable sums he received
as an informant, even while conceding that his earnings were
taxable and that tax evasion is a crime. (*Id.* at 105-07.)  Mr.
Sanchez acknowledged that the Government has never pursued him

for tax liability.  (*Id.* at 106.)  Finally, although his seven
arrests between 1967 and 1987 yielded seven convictions, not one
of his five arrests since he became a paid Government informant
has resulted in a conviction.  (*Id.* at 107-08.)

**B.   Mr. Hidalgo's Efforts to Obtain the FBI's Records on Mr. Sanchez.**

Although this case arises from the FBI's denial of
Plaintiff's August 25, 2006 request for records related to Mr.
Sanchez, the procedural background of this case stretches back
almost eight years and encompasses three separate actions in this
Court.[1]  Plaintiff submitted his first FOIA request to FBI
headquarters in Washington, D.C., on December 13, 1999, in an
effort to locate the same documents sought in this case.  (*See*
App. at 21.)  Following denial of that request by the FBI,
Plaintiff filed suit in this Court.[2]  This Court granted the
Government's motion for summary judgment on the grounds that the
disclosure of the documents Mr. Hidalgo requested would
constitute an invasion of Mr. Sanchez's privacy and were
therefore protected from disclosure by FOIA Exemption (b)(6).
*See* Memorandum Opinion, *Hidalgo v. FBI*, No. 00-0709 (Mar. 16,
2001).

On appeal to the United States Court of Appeals for the
District of Columbia Circuit, the D.C. Circuit did not reach the
merits, and instead vacated the award of summary judgment and

---

[1]    Relevant documents and briefs from those proceedings are included in the
Appendix attached hereto.

[2]    That suit was assigned file No. 00-0709.

instructed the District Court to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(6) "for failure to exhaust administrative remedies." *Hidalgo v. FBI*, 344 F.3d 1256, 1260 (D.C. Cir. 2003).

On November 3, 2003, Plaintiff submitted another request to FBI headquarters for records related to Mr. Sanchez's criminal history and his status as an informant for the FBI. (*See* App. at 29.) By letter dated November 21, 2003, Defendant informed Plaintiff that the FBI would not process his request for information regarding Mr. Sanchez without proof of his death or receipt of a privacy waiver from him pursuant to 5 U.S.C. § 552(b)(6) and/or (b)(7)(C).

After fully exhausting his administrative remedies with the Office of Information and Privacy ("OIP"), Plaintiff filed suit in this Court on April 8, 2004 ("*Hidalgo II*").[3] On February 23, 2005, Defendant moved for summary judgment on the grounds that the FBI properly refused to confirm or deny the existence of records pertaining to Manny Sanchez pursuant to 5 U.S.C. § 552(b)(7)(C) and 5 U.S.C. § 552(b)(7)(D).

In an order dated September 29, 2005, the Court rejected Defendant's arguments, holding that the Defendant could not refuse to confirm or deny the existence of the records pursuant to Exemption (7)(C) because Plaintiff's showing of a public interest in disclosure of the records outweighed Mr. Sanchez privacy interest. *See Hidalgo II Order* at 4-5 (App. at 7-8). The Court further held that Defendant could not invoke Exemption

---

[3]    That suit was assigned file No. 04-0562.

(7)(D) because "Sanchez's identity as a cooperator is open and
notorious." *Id.* at 6 (App. at 9). The Court therefore ordered
Defendant to "demonstrate that it has searched its records and .
. . either provide the documents requested or produce a *Vaughn*
index." *Id.*

On December 2, 2005, Defendant filed a Renewed Motion for
Summary Judgment, arguing that it had not found any records
responsive to Plaintiff's request.

Plaintiff submitted his third request for information
regarding Mr. Sanchez on February 7, 2006. (*See* App. at 10.)
Plaintiff explained in his request that this Court had ruled in
response to Plaintiff's previous request for information
regarding Mr. Sanchez that Defendant could not refuse acknowledge
the existence of documents responsive to Plaintiff's request on
the grounds that disclosure would violate Mr. Sanchez's privacy
interest. (*Id.*) Nevertheless, on March 3, 2006, Defendant
informed Plaintiff that, unless Plaintiff provided a proof of
death of Mr. Sanchez, Defendant would not provide Plaintiff with
the requested documents on the grounds that they were exempt from
disclosure pursuant to 5 U.S.C. § 552(b)(6) and/or (b)(7)(C).
(*Id.* at 12.)

On April 26, 2006, pursuant to 28 C.F.R. § 16.9(A) and 5
U.S.C. § 552(a)(6), Plaintiff filed an administrative appeal of
Defendant's denial of his request with OIP. In its May 9, 2006
letter acknowledging receipt of Plaintiff's administrative
appeal, OIP stated that it would be unable to make a
determination on the merits of Plaintiff's appeal within the

statutorily-prescribed period of 20 working days because of a
"substantial backlog of pending appeals." (*Id.* at 15.)

    Plaintiff filed this suit on August 25, 2006. Approximately
one month later, this Court granted Defendant's Renewed Motion
for Summary Judgment in *Hidalgo II*, holding that, although
Defendant had not located any documents responsive to Plaintiff's
request, it had satisfied its burden by conducting "a search that
was 'reasonably calculated to uncover all relevant documents.'"
*Hidalgo v. FBI*, No. 04-0562, 2006 WL 2716086 at *1 (D.D.C. Sept.
22, 2006) (quoting *Weisberg v. United States Dep't of Justice*,
705 F.2d 1344, 1351 (D.C. Cir. 1983)) (App. at 131.).

    Despite Defendant's earlier claim that it could not locate
any responsive documents, Defendant acknowledged in a November 8,
2006, status conference with this Court that it had located 2,993
pages responsive to Mr. Hidalgo's request at the Miami Field
Office and had brought them to Washington, D.C., under armed
guard. Defendant also agreed to disclose any non-exempt pages.
The Court directed Defendant to provide its first written status
report to the Court by March 16, 2007.

    On January 29, 2007, Defendant released one partially
redacted document to Plaintiff, an internal FBI memorandum that
concerns a request by Judge Donald L. Graham of the United States
District Court for the Southern District of Florida to review *in
camera* the file of a confidential witness, presumably Mr.
Sanchez. (App. at 17.) Three months later, Defendant informed
Plaintiff that it had completed its review of the 2,993
responsive documents, and apart from the one document disclosed

9

on January 29, 2007, was withholding the other 2,992 documents in
the file (or 99.9 percent of the file) pursuant to 5 U.S.C. §
552, subsections (b)(2), (b)6, (b)(7)(A), (b)(7)(C), (b)(7)(D),
(b)(7)(E), and (b)(7)(F). (*Id*. at 19.)

## **Argument**

I.  **DEFENDANT HAS NOT CHALLENGED OR REFUTED THE COURT'S FINDING
    THAT THE PUBLIC INTEREST IN DISCLOSURE OF THE INFORMATION AT
    ISSUE OUTWEIGHS MR. SANCHEZ'S PRIVACY INTEREST.**

In response to Plaintiff's November 3, 2003 FOIA request
seeking the same information at issue in this case, Defendant
issued a so-called "Glomar" response, and refused to acknowledge
whether it had any documents concerning Manny Sanchez. *See
Hidalgo II Order* at 1. According to Defendant, "the very
existence or nonexistence of law enforcement records concerning
private individuals is itself information that is exempt from
disclosure under Exemption 7(C)." (App. at 125.)

This Court flatly rejected Defendant's argument, holding
that Exemption 7(C) does not apply if the public interest in the
information outweighs the individual's privacy interest, and that
Plaintiff had demonstrated a sufficient public interest in
Defendant's records concerning Mr. Sanchez to overcome the
Exemption. *Hidalgo II Order* at 4-5 (App. at 7-8). The Court
noted that "Plaintiff's interest in overturning his own
conviction has no public interest weight," *id*. at 4, but found
that Plaintiff had presented a significant amount of evidence of
potential wrongdoing on the part of the FBI in its dealings with
Mr. Sanchez, precisely the type of information that "sheds light
on an agency's performance of its statutory duties," the "core

purpose of the FOIA." *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773, 775 (1989).  As the Court recognized,

> plaintiff has made a number of disturbing allegations, with evidence to back them up, relating to the FBI's relationship with Sanchez.  He presents trial transcripts showing substantial inconsistencies in trial testimony as to the length of Sanchez's employment by the FBI, how much he was paid, and his past criminal record. . . . The evidence presented also suggests that Sanchez may have violated the law with impunity while serving as an informant . . . even failing to pay taxes on the money received from the government, with apparent immunity from prosecution.

*Hidalgo II Order* at 4-5 (App. at 7-8).

Despite the Court's clear ruling that the public interest in disclosure of the documents outweighs Mr. Sanchez's privacy interest under Exemption 7(C), Defendant continues to argue that it may use "Exemption 6 in conjunction with Exemption 7(C) to protect all the information in the informant file."  (Declaration of David M. Hardy ¶ 38 (May 9, 2007) ("Hardy Decl.")); *see also* Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment, No. 06-1513, at 13-19, 25-29 (May 16, 2007)("Def. Memo.").  Defendant claims it may withhold three types of information pursuant to those Exemptions:  "(1) the details of the informant's participation in the investigation; (2) the names and telephone numbers of FBI Special Agents and other employees; and (3) information of other third parties." (Def. Memo. at 26.)

With regard to the first category — the details of Mr. Sanchez's participation in the investigation — Defendant has made

11

no effort whatsoever to refute this Court's previous finding that the public interest outweighs Mr. Sanchez's privacy interest for the purposes of Exemptions 6 and 7(C).[4]  Indeed, in its attempt to justify its application of Exemption 6 to "all the information in the informant file" (Hardy Decl. ¶ 38), Defendant attempts to ignore the Court's earlier findings altogether, arguing that

> the informant's personal privacy interests in not having records from his file disclosed outweigh any post-acknowledgment residue of public interest (*if any exists*), and **no public interest** (as defined by *Reporters Committee*) would be served by actual release of the information at issue.

(Def. Memo. at 19 (emphases added).)  Likewise, in its attempt to justify its application of Exemption 7(C), Defendant argues that the privacy interest in the information "outweighs the post-acknowledgment residue of public interest (*if any*) that might exist in this case."  (*Id*. at 27 (emphasis added).)

Defendant's claims that no public interest "exists" and that "no public interest . . . would be served by actual release of the information at issue" cannot be squared with the Court's earlier decision that "plaintiff has satisfied" the public interest standard of Exemption 7(C).  As discussed, the Court has found a public interest in disclosure of Mr. Sanchez's file because Plaintiff has offered the following evidence of Government misconduct:

---

[4]    As Defendant acknowledges, "Exemption 7(C) and Exemption 6 overlap one another, but the agency bears a *lesser* burden for withholding under Exemption 7(C) than under Exemption 6." (Def. Memo. at 25 (emphasis added).)  Because this Court has ruled that Defendant did not meet its burden for withholding for Exemption 7(C), Defendant plainly did not meet its burden for withholding pursuant to the more stringent burden of Exemption 6.

- ***Misrepresentation of Mr. Sanchez's criminal history.*** Mr. Sanchez testified on May 21, 1993 that he had six criminal convictions between 1967 and 1987; on June 2, 1993, that he had four convictions; and on August 30, 1995, that he had three convictions since 1965. Moreover, on October 4, 1993, the Government filed a discovery response in which it stated that Mr. Sanchez had been convicted of three offenses, while a computerized criminal history record obtained from an Assistant United States Attorney lists seven offenses. (*See* App. at 100-02.)

- ***Misrepresentation of Mr. Sanchez's work history.*** Mr. Sanchez and the government have represented Mr. Sanchez's start date as an informant to be anywhere from October 1987 to November 1989. (*Id.* at 102-05.)

- ***Misrepresentation of Mr. Sanchez's payment history.*** The Government's representations of how much it paid Mr. Sanchez and when are likewise misleading. Agent Gonzalez testified in August 1995 that Mr. Sanchez had been paid $201,000, yet Mr. Sanchez's testimony indicates that he was paid at least $440,000 and possibly as much as $1 million during the course of the investigation. (*Id.*)

- ***Undisclosed intervention protecting Mr. Sanchez from tax liability.*** Although his payment agreement with the FBI made clear that his earnings were taxable income, Mr. Sanchez admitted while under oath that he paid no taxes on the money despite knowing it is a crime not to pay taxes. Mr. Sanchez also confirmed that the Government had never prosecuted him for tax fraud or tax evasion. (*Id.* at 105-07.)

- ***Undisclosed intervention protecting Mr. Sanchez from conviction on offenses charged after 1987.*** The Government's consistent record of convicting Mr. Sanchez on charged felony offenses comes to an abrupt end in 1987, even though Mr. Sanchez's felony arrest record does not. After his last conviction in 1987 for cocaine possession, Mr. Sanchez was arrested in 1990 for threatening a cable company employee with a machine gun; in 1992 with threatening to "hunt down" a police officer during a drunk driving stop; in 1994 for drunk driving; in 1997 for contempt of court; and in 1998 for domestic violence. Mr. Sanchez was not

13

convicted for any of these crimes.  (*Id*. at 107-08.)[5]

Defendant does not dispute or challenge this evidence of misconduct in any way.[6]  Defendant's only explanation for its clear disregard for the Court's earlier ruling is Mr. Hardy's statement that,

> [i]n making this analysis, the FBI considered the Court's finding in a related case that plaintiff had made a 'not overwhelming' showing of public interest in knowing whether the FBI maintained records on the information. . . . In each instance, the FBI determined that the informant's significant personal privacy interests in preventing retaliation against himself and his family outweighed any public interest in disclosure of the information in the file.

(Hardy Dec. ¶ 39; *see also id*. ¶ 51; Def. Memo. at 16.)  In other words, Defendant felt free to ignore the Court's earlier decision and decide that Mr. Sanchez's privacy interest outweighs the public interest because (a) the Court found that Plaintiff's public interest showing was "not overwhelming," and (b) disclosing the documents could put the lives of Mr. Sanchez and his family in danger.

Defendant's rationale is flawed in both respects.  First, the Court's statement that that Plaintiff's public interest

---

[5]    Indeed, Defendant's Vaughn Index lists two letters that could have concerned pending criminal prosecutions against Mr. Sanchez.  (*See* Def. Memo., Ex. G., Hidalgo III-357-358 ("Letter From SAC Gavin to USA Lehitnen re: CW Payments") & Hidalgo III-1573-1574 ("EOUSA to Assistant State Attorney re: Use of CW").

[6]    Plaintiff has also uncovered additional evidence of potential FBI misconduct in the two years since he filed his Motion for Summary Judgment in *Hidalgo II*.  In one case in which Mr. Sanchez testified, the government gave the defendant's attorney information suggesting that Mr. Sanchez was arrested for importing marijuana into the United States in 1981, and either did not tell the FBI about the arrest or the FBI did not tell the Defendant's attorney about it initially.  (*See* App. at 38-40.)

showing was "not overwhelming" concerned only the ease with which Plaintiff met his burden; it does not change the simple fact that the Court found that Plaintiff *did* meet his burden and that the public interest in the documents outweighs Mr. Sanchez's privacy interest.  Second, Defendant's claim that Mr. Sanchez has a privacy interest "in preventing retaliation against himself and his family" (Hardy Dec. ¶ 39), is not consistent with the Court's finding in *Hidalgo II* that Defendant could not rely on Exemption 7(D) because

> Sanchez's identity as a cooperator is open and notorious.  **The government has not shown that he would in any way be subjected to 'harassment and actual danger'.**

*Hidalgo II Order* at 6 (quoting *Antonelli v. FBI*, 721 F.2d 615, 618 (7th Cir. 1983)) (emphasis added).  Defendant's only response to the Court's finding is its nonsensical argument that "[t]he risk of harm to the informant and his family from the drug traffickers with whom he came in contact persists to this day because his cooperation with the FBI *has become publicly known*." (Hardy Decl. ¶ 5 (emphasis added).)  Defendant does not explain how releasing additional information about Mr. Sanchez would put his life in greater danger and therefore has not overcome the Court's earlier, unambiguous holding.[7]

Defendant cites *Judicial Watch, Inc. v. FDA*, 407 F. Supp. 2d 70 (D.D.C. 2005), *aff'd in pertinent part*, 449 F.3d 141 (D.C.

---

[7]      For the same reason, Defendant's claim that it may withhold the documents pursuant to Exemption 7(F) (*see* Def. Memo. at 36-38), is without merit.  Defendant has not shown that disclosure "could reasonably be expected to endanger the life or physical safety of any individual."  5 U.S.C. § 552(b)(7)(F).

Cir. 2005), and *Balderrama v. DHS*, No. Civ.A.04-1617(JR), 2006 WL 889778 at *1 (D.D.C. Mar. 30, 2006), in support of its argument that it may withhold information to protect Mr. Sanchez's privacy interest (Def. Memo. at 16-17), but those cases are easily distinguished.  In *Judicial Watch*, the plaintiff was seeking materials regarding the abortion drug mifepristone.  *Judicial Watch*, 407 F. Supp. 2d at 72-73.  The District Court found that the Food & Drug Administration ("FDA") was entitled to redacting the names of government personnel and other private individuals under Exemption 6 because the agency had found it was necessary to ensure the individuals' safety.  *Id*. at 77.  The D.C. Circuit, however, made clear in its affirmance that this holding was proper **only** because the privacy interests at stake outweighed the public interest in the information.  *See Judicial Watch, Inc. v. FDA*, 449 F.3d 141 (D.C. Cir. 2006).  As the court recognized, "the FDA fairly asserted abortion-related violence as a privacy interest for both the names and addresses of persons and businesses associated with mifepristone." *Id*. at 153.  By contrast, the plaintiff had not demonstrated a public interest in the information:

> The opposing public interest in knowing these
> names and addresses is not immediately
> apparent, though. Judicial Watch argues that
> the public needs the information because
> mifepristone may pose dangerous health risks
> to women who use it. The argument is a non
> sequitur: Even if mifepristone has
> significant health risks, these names and
> addresses prove nothing about the nature or
> even the existence of the risks. In the
> absence of a legitimate public interest, the
> private interest in avoiding harassment or
> violence tilts the scales.

*Id.* Likewise, in *Balderrama*, the District Court approved the use of Exemptions 6 and 7(C) to protect the identities of certain individuals, but only after finding that "there does not appear to be a strong public interest in the information sought." *2006 WL 889778,* at *9.

In this case, by contrast, the Court has **already** found a public interest in the disclosure of Mr. Sanchez's file, and that that interest outweighs Mr. Sanchez's privacy interest. *Judicial Watch* and *Balderrama* would be relevant to this case only if Defendant had made some effort to show that the Court's previous finding that the public interest outweighs any private interest. As discussed, Defendant has made no attempt to do so. In addition, in *Judicial Watch* the FDA was relying on Exemption 6 only to justify redacting the names of agency personnel, private individuals, and companies, as well as the street addresses of intervenors, rather than an entire informant file. *Judical Watch*, 449 F.3d at 152. The FDA did not withhold 99.9 percent of the responsive documents in total.

Finally, Defendant's claim that it may withhold pursuant to Exemptions 6 and 7(C) some of the documents related to Mr. Sanchez because they contain the names and contact information of FBI Special Agents, FBI employees, and/or third parties (Def. Memo. at 17-18; 27-28), is nothing more than a strawman. In his February 3, 2006 FOIA request, Plaintiff requested records concerning, *inter alia*:

- The exact date Mr. Sanchez became an FBI informant.

- The history of the payments Mr. Sanchez received from the FBI and any other government agencies.

- Mr. Sanchez's failure to pay income tax on the payments he received from the government.

- Mr. Sanchez's criminal history.

- Any efforts by the FBI to intervene in criminal proceedings on Mr. Sanchez's behalf.

(App. at 26.)  Plaintiff did not request any information on the names and contact information of any FBI agents or any third parties.

In sum, Defendant's insistence that it may withhold 2,992 out of the 2,993 responsive documents pursuant to Exemptions 6 and 7(C) is not consistent with this Court's prior ruling that the public interest in disclosure of the documents outweighs Mr. Sanchez's privacy interest.  Defendant attempts to downplay and ignore the Court's earlier decision, but makes no effort to challenge Plaintiff's evidence of government misconduct or bolster its claim that Mr. Sanchez and his family will be put at risk if the documents are disclosed.  For these reasons, Defendant's claim that Exemptions 6 and 7(C) permit it to withhold the responsive documents should be rejected.

## II.  THE INFORMATION PLAINTIFF SEEKS IS RELATED TO A CLOSED INVESTIGATION INVOLVING A KNOWN INFORMANT AND PROPERLY AVAILABLE UNDER FOIA.

Defendant invokes several other FOIA exemptions — many for the first time — to justify withholding virtually the entire set of responsive documents.  None of the exemptions, however, permit the FBI to withhold the nearly 3,000 documents it has admitted are responsive.  First, Exemption 7(A) does not apply as the

18

investigation at issue has closed and Defendant has not specified how disclosure of information concerning Mr. Sanchez's relationship with Defendant could interfere with an ongoing investigation.  Second, Exemption 7(D) does not apply because Mr. Sanchez did not provide information with an expectation of confidentiality and because Plaintiff is not primarily seeking information Mr. Sanchez provided.  Finally, Plaintiff has already demonstrated in earlier cases the substantial amount of specific information requested that is already in the public domain, none of which Defendant has released, and so Defendant's claims under Exemptions 2 and 7(E) must fall short as well.

**A.   Exemption 7(A) Does Not Apply Because the VESTRAC Investigation Is Closed.**

Exemption 7(A), which permits an agency to withhold documents if disclosure "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A), is not relevant to this case because the VESTRAC investigation has been closed for more than a decade, as both the FBI and Mr. Sanchez himself have made clear.  (*See, e.g.*, App. at 45-46 (Special Agent Flynn testifying that "[t]he marina was closed in November of 1992" and that Sanchez "stopped receiving his $3500 a month" in early 1993); *id*. at 59-65 (Special Agent Flynn testifying that Sanchez stopped receiving a monthly salary in February of 1993); *id* at 52-53 (Sanchez testifying that his employment with the federal government terminated "as soon as we closed Manny's Marine").

Though courts will consider that a closed case file may be useful in an open case, "the agency must . . . [show] a rational

19

link between the nature of the document and the alleged likely interference." *Kay v. FCC*, 867 F. Supp. 11, 18 (D.D.C. 1994)(quoting *Bevis v. Dep't of State*, 801 F.2d 1386, 1389 (D.C. Cir. 1986)). For example, in *Owens v. Department of Justice*, the requestor sought "information about the Tanzania and Kenya bombings — specifically, seven categories of 'items already provided by the United States in the course of discovery, or subject to discovery,' in the criminal prosecution of suspected terrorists in federal court in New York." No. 04-1701, 2007 U.S. Dist. LEXIS 21721, at *3-4 (D.D.C. Mar. 9, 2007). Because the plaintiffs in that case were seeking information that the government might use in an ongoing criminal prosecution, the court found that the government was entitled to withhold it under Exemption 7(A). *Id.* at *24-28.

Here, Defendant claims that the investigation is still open, but has not provided any detailed explanation as to how, exactly, disclosure of the information at issue "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). According to Defendant, "[s]ome of the indicted drug traffickers . . . are fugitives," and disclosure of the documents could lead to, among other things, "[t]he identification of individuals, sources, and potential witnesses who possess information relative to the investigation," "[t]he pre-mature disclosure of evidence against drug traffickers," and "[t]he use of the information released to evade prosecution." (Hardy Decl. ¶ 47; *see also* Def. Memo. at 23-24.) Plaintiff, however, seeks information on Mr. Sanchez's relationship with

Defendant, not the smugglers the government was targeting. Disclosure of that information cannot possibly impact the FBI's ability to apprehend and get convictions against other fugitives. To the extent Defendant's concern rests on the fact that disclosure of such information pursuant to FOIA would discredit Mr. Sanchez's testimony in these other cases, such a self-interest by the agency cannot justify a withholding of such information under FOIA.

Defendant's cryptic *Vaughn* Index also provides no basis whatsoever on which to evaluate the link between documents withheld and any pending investigation.  (*See, e.g.*, Hardy Decl. at Ex. G, p. 25 ("re: money paid to CW").)  Unlike in *Owens*, where the government demonstrated how disclosure of the individual items in the *Vaughn* Index could interfere with an ongoing investigation, 2007 U.S. Dist. LEXIS 21721, at *26, the FBI has not come close to showing that release of the documents could be reasonably expected to interfere with specific, ongoing criminal investigations.[8]

Because Defendant has admitted the investigation is over, it cannot properly invoke Exception 7(A), which "protects against disclosure that would harm future proceedings ... in an *ongoing* investigation[.]"  *Phila. Newspapers Inc. v. HHS*, 69 F. Supp. 2d 63, 67 (D.D.C. 1999).  Indeed, Defendant's reading of the

---

[8]    At an absolute minimum, Defendant must provide descriptive, substantive, functional categories, as the government did in *Owens*, which demonstrate a relationship between the document and the interference. *Owens*, 2007 U.S. Dist. LEXIS 21721, at *26-27 (citing categories such as "Documents Containing Information Shared Between the FBI and Foreign Law Enforcement Agencies and the FBI and other U.S. Government Agencies").

exemption suggests that no information concerning the investigations of drug trafficking in Miami could ever be released so long as a drug trafficking still exists.  Such logic undermines the purpose and meaning of FOIA.

> **B.    Sanchez Is No Longer and Was Only Briefly, If Ever, a *Confidential* Informant, and Thus Information From Him and About His Role in the Investigation Cannot Be Withheld.**

In *Hidalgo II*, this Court found that Defendant could not rely on Exemption 7(D) because "Sanchez's identity as a cooperator is open and notorious."  *Hidalgo II Order* at 6. Oddly, Defendant does not address the Court's finding at all, and continues to claim that it may withhold the records at issue pursuant to that Exemption.  (*See* Def. Memo. at 29-33.)  Because Defendant has not provided the Court with any reason to doubt its earlier finding that Exemption 7(D) does not apply, Defendant's argument falls flat.

First, Mr. Sanchez can hardly claim to still be a confidential informant considering that he has testified in open court numerous times.  *See, e.g.*, App. at 52-53 (Sanchez testifying as to his role in the investigation); *id.* at 54-58 (same); *id.* at 59-65 (same).  In addition, Mr. Sanchez's name has been broadcast in the press as an informant or cooperating witness, and thus protection of his identity can no longer serve a law enforcement purpose.  *See, e.g.*, Bill Moushey, *Few of Case's Twists, Shady Deals Revealed in Court*, Pittsburgh Post-Gazette, Nov. 24, 1998 ("Manny Sanchez, another long-time drug smuggler, who had struck a great deal with federal agents, owned the marina.") (App. at 71-77).

Second, to be a confidential informant, the person providing information must have an expectation that the information will be kept confidential. *DOJ v. Landano*, 508 U.S. 165, 169 (1993). Mr. Sanchez had precisely the opposite expectation. Shortly after signing up with the FBI to become a confidential informant, Sanchez chose to change his status from confidential informant to cooperating witness. Sanchez's motivation for the willingness to testify is simple: After December 1989, when he became a cooperating witness, thus identifying himself and abrogating confidentiality protection, he became eligible for a $250,000 award. (*See* App. at 47-51.) As Special Agent Flynn stated, "[o]nce he agreed to testify at a trial or at hearings, then he was willing to, basically, identify himself. Once that occurred, he becomes a cooperating witness." (*Id.* at 49.) Thus, the sworn testimony of one of Defendant's own agents demonstrates that, through much of the period Mr. Sanchez worked for the FBI, he had no expectation of confidentiality. Unlike most cooperating witnesses who have seen a violent crime and who "fear disclosure of their identities," *Palacio v. DOJ*, No. 00-1564, 2002 U.S. Dist. LEXIS 2198, at *24 (D.D.C. Feb. 11, 2002), Mr. Sanchez affirmatively, readily, and voluntarily agreed to "identify himself." (App. at 49.)

This dramatically distinguishes the cases cited by Defendant, which emphasize the role exemption 7(D) can play to protect an *unknown* informant's identity. (*See* Def. Mem. at 30-31.) Sanchez's choice to exchange confidential treatment for the position of giving information ***with the full knowledge that he***

23

**had already agreed to testify to such information in open court**
eliminated the possibility that his information could be given
with an expectation that it would be treated as confidential.

Third, even if Mr. Sanchez had not deliberately waived any
right to or expectation of confidentiality, Defendant's blanket
assertion that Mr. Sanchez received a grant of confidentiality,
(*see* Hardy Decl. ¶ 54), is not sufficient to demonstrate that the
witness had an expectation of confidentiality.  *See Goldstein v.
Office of Indep. Counsel*, No. 87-2028, 1999 U.S. Dist. LEXIS
22969 at *46  (D.D.C. Jul. 29, 1999) (finding showing under 7(D)
"insufficient" where agent "never explains why he knows that
certain persons were given express assurances of confidentiality
and the documents themselves do not establish this").

    **C.   Some of the Information Sought by Plaintiff Already Has
Been Disclosed Numerous Times in Open Court and Is Not
Protected by Any Alleged Promises of Confidentiality.**

Defendant claims that it may withhold information revealing
internal practices, investigative techniques, informant file
numbers, and confidential information provided by a confidential
informant pursuant to Exemptions 2 and 7(E).  (Def. Memo. at 6-
12, 33-36.)  This is a rhetorical red herring.  As discussed in
Section I, *supra*, Plaintiff is not seeking information "related
solely to the internal personnel rules and practices of an
agency,"  5 U.S.C. § 552(b)(2), or information on the FBI's
"techniques and procedures for law enforcement investigations or
prosecutions," *id*. at § 552(b)(7)(E).  Rather, Plaintiff has
requested information regarding special treatment or favors done
for Mr. Sanchez by the FBI.

In any event, much of the information concerning the mechanical set-up of the investigation and various investigatory techniques has already been revealed in open court. For example, Mr. Sanchez has testified as to details regarding his payment, the use of the business, his role in luring drug traffickers to the business, and the surveillance equipment used there by the FBI. *See, e.g.*, App. at 52-53 (Sanchez testifying as to how much he was paid, when and for how long); *id.* at 54-58 (Sanchez testifying as to when he was employed by the FBI, who paid him, what information he provided, and what surveillance equipment the FBI installed at the marina); *id.* at 59-65 (Sanchez testifying as to how he facilitated importation of drugs for the sting, who owned the vessels used, how much he was paid, and how the vessels were used to pick up drugs). "[T]he government cannot rely on a otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'" *Davis v. DOJ*, 968 F.2d 1276, 1279 (D.C. Cir. 1992). Thus, the significant amount of information Plaintiff has already identified as being in the public domain (*see* App. at 100-08), cannot be withheld pursuant to any exemptions.

Furthermore, while it is true that informant codes are sometimes withheld because "disclosure [of them] may lead to discovery of the informant's identity," *Palacio*, 2002 U.S. Dist. LEXIS 2198 at *15, such a result is impossible here ***where both the witness's identity and his confidential informant number are widely known***. As this Court has recognized, "Sanchez's identity as a cooperator is open and notorious." *Hidalgo II Order* at 6.

And Plaintiff himself provided Defendant with Mr. Sanchez's FBI informant number (MM-5177-CW(D)) in all three of his FOIA requests. (*See* App. at 21, 29, and 10.) Thus, information cannot possibly be withheld to protect his identity.

Exemptions 2 and 7(E) are also inapplicable because the FBI has not demonstrated how disclosure of this information "could reasonably be expected to risk circumvention of the law," 5 U.S.C. 552(b)(7)(E), given what has already been disclosed in open court. Many details of how the sting was set up have already been revealed in published court transcripts. This includes detailed information regarding how Mr. Sanchez was paid and what his role was in the investigation. (*See, e.g.*, App. at 59-65.) For just one example, given that Special Agent Flynn has already testified how much Mr. Sanchez was paid, there is no reason the FBI cannot confirm this amount, and disclose such facts as are necessary to make such representations accurate. The amount he was paid and how he was paid is either confidential or not. Flynn's testimony and Sanchez's testimony in open court demonstrate that it is not. Such specifics have also been reported in the media and are thus in the public domain.

### III. DEFENDANT HAS FAILED TO SEGREGATE THE SUBSTANTIAL AMOUNT OF NON-PROTECTED INFORMATION RESPONSIVE TO PLAINTIFF'S REQUEST.

Section 552(b) requires a government agency withholding documents pursuant to one of the FOIA Exemptions to provide "[a]ny reasonably segregable portion of a record . . . to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b). In the D.C. Circuit, "[i]t has long been a rule . . . that non-

exempt portions of a document must be disclosed unless they are **inextricably intertwined** with exempt portions." *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977).

Here, Defendant claims that it is able to segregate only **one** page (and only a portion of the page at that) out of the 2,993 documents it has identified as responsive to Plaintiff's request. In support of its decision, Defendant's declarant, David M. Hardy, states as follows:

> After extensive review of the documents at issue, I have determined that there is no further reasonably segregable information to be released.  The non-exempt information in this confidential informant file is so inextricably intertwined with exempt information that disclosure of the non-exempt information would result in meaningless words and phrases.

(Hardy Decl. ¶ 61.)  Defendant's justification thus "merely parrot[s] the language of the statute," or in this case the D.C. Circuit's rule, standing in direct violation of the D.C. Circuit's clear holding that an agency may not simply "recite the statutory standards." *Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.D. Cir. 1987) (quoting *Allen v. CIA*, 636 F.2d 1287, 1298 (D.C. Cir. 1980)).

Defendant's "sweeping, generalized claims of exemptions," *Mead*, 566 F.2d at 260, stands in stark contrast to the explanation offered by the defendant in *Church of Scientology v. Dep't of State.*  493 F.Supp. 418, 421 (D.D.C. 1980).  In that case, the State Department "set forth specific descriptions of each deleted portion and . . . explained the reasons for each

27

deletion." *Id.* Here, by contrast, Defendant has merely stated that "the non-exempt information in this confidential informant file is so inextricably intertwined with exempt information" that disclosure is not possible (Hardy Decl. ¶ 61), without offering any specific descriptions of the documents.

Defendant's segregability argument is further undermined by the fact that the agency apparently has failed to include many of the responsive documents in its *Vaughn* Index:  While Defendant admits that there are 2,993 pages of documents that are responsive to Plaintiff's FOIA request, the document with the highest bates stamp number identified in the index is Hidalgo III-2412.  (*See* Hardy Decl., attach. G at 31.)  Moreover, on the first page alone, the index jumps from Hidalgo III-4 to Hidalgo III-35 and then from Hidalgo III-45 to Hidalgo III-59; there are also no entries for documents Hidalgo III-2, -3, -38, -39, or -44.  (*Id.* at 2.)  Defendant has provided no explanation for the missing documents.[9]  Without even brief entries describing these documents, neither Plaintiff nor the Court has any way of fully evaluating Defendant's segregability claim.

Furthermore, Defendant's claim is belied by the fact that it did disclose a portion of one page:  If Defendant could segregate a substantial portion of that one document, it is likely that

---

[9]     It does not appear that the missing documents can be explained by the possibilities that Defendant has listed only the bates stamp number for the first page of each document or that the missing documents are duplicates.  For the documents that are longer than one page, Defendant has provided the bates stamp numbers for the corresponding span of pages (*see, e.g.*, Hardy Decl., attach. G at 3 (listing "Hidalgo III-78-82"), and the FBI has listed numerous duplicates in the index (*see, e.g., id.* at 3 (listing "Removed, duplicate to Bates 60-62" in the exemption column for Hidalgo III-64-65).)

there are other, similar documents in the file.  Although

Plaintiff cannot say for certain whether Defendant's claim is

accurate without access to the actual documents,[10] it seems

unlikely, to say the least, that Defendant can segregate only a

portion of one page out of 2,993.

## IV. IN THE ALTERNATIVE, THE COURT SHOULD CONDUCT AN *IN CAMERA* REVIEW OF THE WITHHELD RECORDS BECAUSE THE FBI'S AFFIDAVIT IS NOT SUFFICIENTLY DETAILED AND THERE IS CONSIDERABLE EVIDENCE THAT THE FBI HAS RESPONDED TO THE FOIA REQUEST IN BAD FAITH.

Even if the Court declines to grant Plaintiff's Motion for

Summary Judgment at this time, Plaintiff respectfully requests

that the Court use its discretion to review the non-disclosed

records *in camera* in order to be able to make a *de novo*

determination on whether all but half a page of the 2,993 pages

identified by the FBI can be properly withheld pursuant to a FOIA

exemption.  Congress amended FOIA in 1974 to specifically provide

that the district court "may examine the contents of such agency

records *in camera* to determine whether such records or any part

thereof shall be withheld."  5 U.S.C. § 552(a)(4)(B).

Interpreting this provision, the D.C. Circuit has held

repeatedly that "[t]he decision to conduct an *in camera* review is

committed to the 'broad discretion of the trial court judge.'"

*Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (quoting *Lam

Lek Chong v. DEA*, 929 F.2d 729, 735 (D.C. Cir. 1991); *accord

Spirko v. U.S. Postal Service*, 147 F.3d 992, 996 (D.C. Cir.

---

[10]   As the D.C. Circuit has noted, "[w]e recognize that the question of segregability is completely dependent on the actual content of the documents themselves and that the requesting party is helpless to counter agency claims that there is no non-exempt and reasonably segregable material within a withheld document."  *Mead*, 566 F.2d at 260.

1998).  While the D.C. Circuit has stated that "*in camera* review should not be resorted to as a matter of course, simply on the theory that 'it can't hurt,'" *Quinon*, 86 F.3d at 1228 (citing *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978)), it further recognizes that *in camera* review may be necessary to enable a district judge to fulfill his duty of fully evaluating whether all the withheld materials are covered by an exemption.

In order to guide district courts' discretion, the D.C. Circuit has held that "*in camera* review may be particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency." *Quinon*, 86 F.3d at 1228.  While the Court could still review the withheld materials *in camera* even if it found neither of these circumstances present, *see Spirko*, 147 F.3d at 996, both factors strongly point to the need for an *in camera* review of the responsive records Defendant has failed to disclose.

A.    **The FBI's Affidavit Is Insufficiently Detailed to Allow the Court to Perform a Meaningful Review of the Claimed Exemptions.**

The D.C. Circuit has emphasized that *in camera* review may be necessary "if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Quinon*, 86 F.3d at 1227 (quoting *Hayden v. National Security Agency/Central Security Service*, 608 F.2d 1381, 1387 (D.C. Cir. 1979)).  The "documents and justifications for withholding" must be "described in sufficient detail to demonstrate that the claimed exemption applies." *Carter*, 830 F.2d at 392.  In order

to enable the court to determine whether exemptions are applicable, the agency is obliged to "'itemize[] each item withheld, the exemptions claimed for that item, and the reason why the exemption applies to that item.'"  *Spirko*, 147 F.3d at 997-98 (quoting *Lykins v. DOJ*, 725 F.2d 1455, 1463 (D.C. Cir. 1984)).

Here, Defendant has failed to describe each withheld document in the kind of detail that would allow the Court to determine whether all of the 2,992 pages that Defendant has withheld in full are properly exempt from disclosure. Defendant's *Vaughn* Index describes the vast majority of the withheld documents in only the vaguest terms, relying on sweeping labels like "From SAC to FBIHQ re: CW" and "re: CW payment."  The *Vaughn* Index also simply lists all the exemptions it is claiming for each document and makes no effort to meet its burden of explaining **why** the exemptions apply to each item.

Moreover, as discussed in Section III, *supra*, it appears that Defendant did not include many of the responsive documents in the *Vaughn* Index. The Court cannot possibly conduct a meaningful review of the claimed exemptions if the *Vaughn* Index is not complete.

Defendant's failure to adequately describe the withheld documents frustrates this Court's duty to determine whether the Defendant has properly claimed the various FOIA exemptions, making *in camera* review particularly appropriate.

**B.    Considerable Evidence That the FBI Has Responded to Plaintiff's FOIA Request in Bad Faith Strongly Supports *In Camera* Review.**

One of the key considerations counseling *in camera* review is whether there is any evidence that the agency has responded to a FOIA request in bad faith.  As the D.C. Circuit has stated, "if there is evidence of agency bad faith . . . *in camera* inspection may be necessary to insure that agencies do not misuse the FOIA exemptions to conceal non-exempt information."  *Carter*, 830 F.2d at 393.  The D.C. Circuit has instructed district courts to consider evidence of agency bad faith when deciding whether to review records *in camera* because "[w]here there is evidence of bad faith on the part of the agency, the representations of the agency lose all trustworthiness."  *Allen*, 636 F.2d at 1298.

In *Carter*, the court provided an example of the kind of situation that would warrant *in camera* review, stating that there would be evidence of bad faith "if information contained in agency affidavits is contradicted by other evidence in the record."  *Carter*, 830 F.2d at 393.  *McGehee v. CIA*, 697 F.2d 1095, 1113-14 (D.C. Cir. 1983) further clarifies this consideration.  There, the court remanded the matter to the district court with instructions to conduct an *in camera* review, based in large part on the court's finding that the agency had acted in bad faith on the basis of evidence that (1) it took the agency two and a half years to process the request, failing to make any substantive response until compelled by court order; and (2) the agency failed to inform the plaintiff of the cut-off date it applied in responding to his request.  *Id*. at 1113.

Here, there is considerable evidence that Defendant has responded to Plaintiff's FOIA request in bad faith.  First, Defendant has previously represented to the Plaintiff and the Court that FBI Headquarters contains no records regarding Manuel Sanchez.  (*See* Hardy Decl. ¶ 3, n.1.)  There are, however, approximately 62 entries listed throughout Defendant's *Vaughn* Index that document communications between the FBI Headquarters and the FBI Miami Field Office regarding Sanchez, casting serious doubt on the truthfulness of the Defendant's previous representations.  (*See, e.g.*, *id.*, attach. G at 3 (one document described as "From FBIHQ to SAC re: handling of CW," two documents described as "From FBIHQ to SAC re: CW," and three documents described as "From SAC to FBIHQ re: CW").)

In fact, the FBI agent who supervised Mr. Sanchez, Timothy Flynn, has testified that he was required to communicate regularly with FBI headquarters regarding on the status of the case, and that the FBI would send additional funds to pay Mr. Sanchez only after evaluating Agent Flynn's reports.  (*See* App. at 59-65 (testifying that memoranda gave "the Bureau an update of what is occurring so they can make a determination whether to send more money down or not").)  Agent Flynn's testimony directly contradicts Defendant's prior representation that the FBI Headquarters did not have any records regarding Mr. Sanchez.  If FBI Headquarters was receiving memoranda regarding and approving additional payments to Mr. Sanchez, it almost certainly kept such records.

Defendant also failed to conduct comprehensive searches for

33

records responsive to Plaintiff's requests.  Although Plaintiff

asked Defendant for all documents related to "Manuel Sanchez" in

its November 3, 2003 FOIA request (*id*. at 29) (requesting

documents "specifically under the name of Manny (Manuel) Sanchez

FBI Informant (MM-5177-CW(D)), or identifier assigned to that

name"), Defendant used only the name "Manny Sanchez" in its

search of the FBI's CRS database:

> A search of the CRS by using the name "Manny
> Sanchez" would cover a two-way phonetic
> breakdown of the name.  For example, this
> search would locate records using the
> phonetic sounds of each last and first name
> relating to the following names:  ***"Sanchez,***
> ***Manny" and "Sanchez, M."***

(Second Decl. of David M. Hardy, *Hidalgo II*, ¶ 12 (emphasis

added); *see also Hidalgo v. FBI*, 2006 WL 2716086 (D.D.C. Sept.

22, 2006) (noting that FBI searched for "Manny Sanchez" and "M.

Sanchez").)  Based on this limited search, Defendant represented

to the Court in *Hidalgo II* that it had "conducted an adequate

search."  And the Court relied on Defendant's claim in granting

its motion for summary judgment.  *See Hidalgo*, 2006 WL 2716086.

By contrast, in response to Plaintiff's most recent FOIA

request, Defendant conducted the following search:

> A search conducted by using the name "***Manuel***
> Sanchez" would cover a search with a six-way
> phonetic breakdown of Sanchez's first and
> last name, in addition to a basic search
> using the exact spelling of the name provided
> by plaintiff. . . . In particular, this name
> search looked for records relating to
> ***"Sanchez, Manuel," "Sanchez, M," and***
> ***"Sanchez, Manny."***

(Hardy Decl. ¶ 21 (emphasis added).)  Only after this second,

more comprehensive search did Defendant locate the 2,993

34

documents presently at issue.  Defendant has not explained why it did not use the name "Manuel" in its original search.[11]

Defendant's inability to find the 2,993 documents concerning Mr. Sanchez in *Hidalgo II* is especially puzzling given that Plaintiff provided Defendant with Mr. Sanchez's FBI informant number, MM-5177-CW(D), in all three of his FOIA requests (December 13, 1999; November 3, 2003; and February 3, 2006). (*See* App. at 21, 29, and 10.)  Defendant also has not explained why it could not immediately locate the relevant documents by using that file number.

Second, the FBI maintains that the case in which Sanchez served as an informant "is dormant, but remains open and pending" in an attempt to justify a blanket application of Exemption 7(A) to all responsive materials.  (Hardy Decl. ¶ 4.)  The FBI's *Vaughn* Index, however, notes the existence of a document that it describes as "From SA to SAC re: **Closing** CW case."  (Hardy Decl., attach. G at 30 (emphasis added).)  Indeed, the investigation's case agent, Special Agent Timothy Flynn, has repeatedly testified under oath that the undercover operation in which Sanchez was involved — Manny's Marine — was closed in November of 1992 and that Sanchez stopped receiving a salary in February of 1993. (*See, e.g.*, App. at 45-46 (Special Agent Flynn testifying that "[t]he marina was closed in November of 1992" and that Sanchez "stopped receiving his $3500 a month" in early 1993); *id.* at 59-

---

[11]    While the Court noted in its September 22, 2006 decision that Defendant did not need to search for "Manuel Sanchez" because its search for "M. Sanchez" "ensured that records for either name would be found," *Hidalgo*, 2006 WL 2716086, at *1 it is telling that Defendant was able to locate the 3,000 responsive documents only after it used the more formal name.

65 (Special Agent Flynn testifying that Sanchez stopped receiving a monthly salary in February of 1993); *id*. at 52-53 (Sanchez testifying that his employment with the federal government terminated "as soon as we closed Manny's Marine").

As the D.C. Circuit found in *McGehee*, "[t]he cumulative weight of this evidence of bad faith is enough to vitiate the credit to which agency affidavits are ordinarily entitled."  697 F.2d at 1113.  It is thus particularly important for the Court to review the withheld documents *in camera* in order to determine whether the FBI is misusing the FOIA exemptions to conceal non-exempt information.

<u>**Conclusion**</u>

For the reasons set forth above, as well as the supporting documents attached hereto, Plaintiff respectfully requests that Defendant's motion for summary judgment be denied and that Plaintiff's cross-motion for summary be granted.

Respectfully Submitted,

s / s

_____
Robert-Paul Sagner
(DC Bar # 470219)
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C.  20006

Dated:    July 19, 2007

36