## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                    )
                                     )
       Plaintiff,                )
                                     )
   v.                              )    Civil Action No. 06-1513 (JR)
                                     )
FEDERAL BUREAU OF                    )
INVESTIGATION,                       )
                                     )
       Defendant.                )
_____)

**Appendix**

**to Plaintiff's Cross-Motion for Summary Judgment and Opposition to Defendant's Motion
for Summary Judgment**

# TABLE OF CONTENTS

Memorandum Opinion, *Hidalgo v. FBI,* No. 00-0709 (D.D.C. Mar. 16, 2001)··················1

Memorandum Opinion, *Hidalgo v. FBI,* No. 04-0562 (D.D.C. Sept. 29, 2005) ··············4

Letter from William Nifong to FBI (Feb. 7, 2006)·······························································10

Letter from David Hardy to William Nifong (Mar. 3, 2006)·············································12

Letter from Priscilla Jones to William Nifong (May 9, 2006)···········································15

Letter from David Hardy to Peter Hidalgo (Oct. 27, 2006)··············································16

Letter from David Hardy to William Nifong (Jan. 29, 2007)············································17

Letter from Jennifer Toth to Robert-Paul Sagner  (May 9, 2007) ·····································19

Letter from Peter Hidalgo to F.B.I. (Dec. 13, 1999)·························································21

Letter from David Hardy to Peter Hidalgo (Nov. 21, 2003)·············································24

Letter from Peter Hidalgo to F.B.I. (Feb. 3, 2006) ··························································26

Letter from Peter Hidalgo to F.B.I. (Nov. 3, 2003) ·························································29

Second Declaration of David M. Hardy, *Hidalgo v. FBI,* No. 04-562 (Nov. 28, 2005)·····32

Transcript of Motions to Dismiss and Suppress,
  *United States v. Sanchez,* No. 93-81-Cr-DLG (May 28, 1993) ·································38

Transcript of Motions to Suppress and Dismiss and Trial Proceedings,
  *United States v. Sanchez,* No. 93-81-Cr-DLG (Jun. 1, 1993) ··································41

Transcript of Trial Proceedings,
  *United States v. Ferrer,* No. 93-0080-CR-DAVIS (Dec. 14, 1993) ·······················45

Transcript of Testimony of Timothy Flynn,
  *United States v. Sanchez,* No. 93-81-Cr-DLG  (Jun. 2, 1994) ································47

Transcript of Trial Proceedings,
  *United States v. Saavedra,* No. 93-82-CR-NESBITT (Jul. 11, 1994) ····················52

Transcript of Excerpt, Transcript of Jury Trial,
  *United States v. Coronel,* No. 93-85-CR-Marcus (Jun. 11, 1993)·························54

Transcript of Trial Proceedings,
 *United States v. Sanchez,* No. 93-81-Cr-DLG (Jun. 2, 1993) ·········································59

Transcript of Testimony of Special Agent Timothy Flynn,
 *United States v. Sanchez,* No. 93-81-Cr-DLG (Jun. 4, 1993) ·········································66

Bill Moushey, *Few of Case's Twists, Shady Deals Revealed in Court,*
 Pittsburgh Post-Gazette (Nov. 24, 1998) ·······················································································71

Plaintiff's Cross-Motion for Summary Judgment,
 *Hidalgo v. FBI*, No. 04-562 (Apr. 29, 2005) ··················································································78

Defendant's Motion for Summary Judgment,
 *Hidalgo v. FBI*, No. 04-562 (Feb. 23, 2005)·················································································115

*Hidalgo v. FBI,* No. 04-0562, 2006 WL 2716086 (Sept. 22, 2006) ····································131

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                    :
                                     : 
            Plaintiff,               :
                                     :
    v.                               :         Civil Action No. 00-0709 (JR)
                                     :
FEDERAL BUREAU OF                    :
INVESTIGATION,                       :
                                     :         **FILED**
            Defendant.               :

                                               MAR 1 6 2001

### MEMORANDUM OPINION

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Peter J. Hidalgo is a federal inmate who appears pro se.  In this Freedom of Information Act case, he sought records pertaining to Manny Sanchez, who is not a party.  Invoking the Privacy Act, 5 U.S.C. § 552a (b), the FBI refused to process the request without either a waiver by Sanchez or proof of his death.  The FBI also informed Hidalgo that even if the requested records existed, they would be exempt from release under FOIA Exemptions 6 and 7(C).  Now before the Court is the FBI's motion  for summary judgment.

The first asserted ground of that motion, that the Court lacks subject matter jurisdiction because Hidalgo failed to exhaust his administrative remedies,  see Oglesby v. Department of the Army, 920 F.2d 57, 61  (D.C. Cir. 1990), is easily disposed of:  Hidalgo appealed the FBI's refusal to process his request, and the FBI acknowledged receipt of the appeal by letter dated February 8, 2000. Defendant's Exhibit D.

The first of the two reasons given for the FBI's refusal to process Hidalgo's request was not proper.  An agency is required to process a properly submitted FOIA request. 5 U.S.C. § 552

(N)

(a)(3).[1]  The applicable regulation strongly suggested but did not require a waiver or a death

certificate.[2]

   The second stated reason, however--the blanket invocation of FOIA Exemption 6-- must

be sustained.  FOIA Exemption 6 protects information about individuals in "personnel and

medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy." 5 U.S.C. § 552 (b)(6).  All information that "applies to a particular

individual," in this case Manny Sanchez, qualifies for consideration under this exemption.  U.S.

Dep't of State v. Washington Post Co., 456 U.S. 595, 602 (1982); see also  New York Times Co.

v. NASA, 920 F.2d 1002, 1005 (D.C. Cir. 1990) (en banc).  The information is not protected if

the requester establishes an overriding public interest in disclosure.  Such a public interest could

be established by showing that the information is necessary to "shed any light on the [unlawful]

conduct of any Government agency or official." United States Dep't of Justice v. Reporters

Committee for Freedom of the Press, 489 U.S. 749, 772-73 (1989); accord SafeCard Services,

Inc., v. SEC, 926 F.2d 1197, 1206 (D.C. Cir. 1991).

   Hidalgo asserts that Manny Sanchez  served as an FBI informant for ten years and that he

testified as a prosecution witness in numerous criminal trials.  He seeks to expose Sanchez as a

"repeated" perjurer and to demonstrate the FBI's "complacen[cy]" with respect to Sanchez's

---

[1]     "[E]ach agency, upon any request for records which . . . is made in accordance
with published rules stating the time, place, fees (if any), and procedures to be followed, shall
make the records promptly available to any person." 5 U.S.C. § 552 (a)(3)(A).

[2]     "If you are making a request for records about another individual, either a written
authorization signed by that individual permitting disclosure of those records to you or proof that
that individual is deceased (for example, a copy of a death certificate or an obituary) will help the
processing of your request." 28 C.F.R. § 16.3 (a) (emphasis added).

2

alleged perjury specifically about his own criminal history. Plaintiff's Response to Defendant's Reply at 2-3.

Hidalgo's argument has two flaws. First, as a general rule, individuals do not waive their privacy rights merely by testifying at trials. See, e.g., Davis v. United States Department of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992). Second, the public interest exception applies to information necessary to confirm or refute "compelling evidence that the agency denying the FOIA request is engaged in illegal activity." Quinon v. FBI, 86 F.3d 1222, 1231 (D.C. Cir. 1996) (internal citations omitted). Hidalgo's charge of "complacency" is argument, not evidence, and certainly not "compelling evidence," such as that found by Judge Kessler in Bennett v. Drug Enforcement Administration, 55 F. Supp.2d 36, 41 (D.D.C. 1999).

Because the FBI's blanket assertion of Exemption 6 disposes of this case, it is unnecessary to consider the FBI's blanket assertion of Exemption 7(C), which does not.

For the reasons stated, defendant's motion for summary judgment will be granted. A separate Order accompanies this Memorandum Opinion.

Date: March 15, 2001

_____
James Robertson
United States District Judge

3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                          :
                                           :
            Plaintiff,                     :
                                           :
    v.                                     :   Civil Action No. 04-0562 (JR)
                                           :
FEDERAL BUREAU OF INVESTIGATION, :
                                           :
            Defendant.                     :

## MEMORANDUM ORDER

In November 2003, plaintiff, a federal inmate, filed a
FOIA request with FBI Headquarters requesting information on
Manny Sanchez, an FBI informant.  Until very recently, the FBI
refused to confirm or deny the existence of any responsive
records, and made only a so-called "Glomar" response.[1]  Plaintiff
sued to compel production of documents.  Both sides have moved
for summary judgment.

In his motion, plaintiff has produced numerous court
transcripts and other materials demonstrating, at least for some
cases, that Sanchez's status as an FBI informant is publicly
known.  On June 21, 2005, in its opposition to plaintiff's
motion, the FBI acknowledged for the first time that it does have

_____

[1] This is plaintiff's second run at the same documents.  In
the first case, No. 00-0709, I ruled that the government's
blanket assertion of FOIA Exemption 6 was appropriate.
Memorandum of March 16, 2001.  Plaintiff has filed a new FOIA
request since then, however, and this time around he is
represented by counsel who have made a considerably more
substantial factual showing.

4

a duty to respond to plaintiff's request insofar as it touches matters in which Sanchez's role as a cooperator has been officially acknowledged. Def.'s Opp'n at 10. The FBI's brief is vague, but it appears to argue now that the FBI performed a search for those documents whose existence it was willing to confirm or deny and found nothing responsive to plaintiff's FOIA request.[2] See id. at 18 n.4. It has provided no information about that search, and it insists that the Glomar response is still appropriate for all other records.

"[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. U.S. Dept. of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). Further, the agency must file a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." Id. Here, although apparently admitting that it did perform a search, and that it was required to do so, the government has provided none of the required details.

---

[2] The FBI also indicated for the first time that it interpreted plaintiff's FOIA request to apply only to FBI headquarters, and not to any field offices. Plaintiff was still operating pro se at the time of his FOIA request and presumably did not intend his request to be so interpreted, but the FBI is correct that separate FOIA requests are required for headquarters and field offices. 28 C.F.R. § 16.3.

- 2 -

The government continues to assert, for documents that relate to cases in which Sanchez's role has not been publicly acknowledged, that a Glomar response is appropriate. The argument invokes FOIA Exemption 7(C), which provides for the release of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Whether a Glomar response is appropriate under Exemption 7(C) requires "an ad hoc balancing of private and public interests." Nation Magazine v. U.S. Customs Serv., 71 F.3d 885, 893 (D.C. Cir. 1995). The government claims that it issued the Glomar response because "[m]erely affirming that an individual is mentioned in FBI records can have a potentially embarrassing or stigmatizing effect." Hardy Decl. at ¶ 14. Avoidance of such stigma is often a legitimate privacy interest to consider in the ad hoc balancing, see, e.g., Nation Magazine, 71 F.3d at 893, but it is hard to find stigma in this case. The information presented by the FBI shows that Sanchez has a very extensive criminal history, including seven convictions for narcotics, robbery, and escape from prison. See Pl.'s Mot. Summ. J. at 23. He has served as an FBI informant in a number of cases, has been paid a great deal of money for his assistance, and has admitted not paying income taxes. See id. at

- 3 -

23-30.  Sanchez is hardly stigmatized by public confirmation of

the fact that the FBI has files on him.   This is not to say that

Sanchez waived all of his privacy interests completely upon

becoming an informant, see Coleman v. FBI, 13 F. Supp. 2d 75, 80

(D.D.C. 1998) (citing Burge v. Eastburn, 934 F.2d 577, 579 (5th

Cir.1991) for proposition that "[a]n individual who testifies at

trial does not waive this privacy interest beyond the scope of

the trial record"), but only that FBI acknowledgment of the fact

that it has documents on Sanchez does no incremental harm to

Sanchez's reputation.   See Bennett v. DEA, 55 F. Supp. 2d 36, 41-

43 (D.D.C. 1999) ("career" informant gave up privacy rights to

FBI records).

     Although the government has placed no privacy interest

in the balance, it is the plaintiff who has the burden of

demonstrating that the public interest would be served by

granting his FOIA request.   Plaintiff's interest in overturning

his own conviction has no public interest weight, see Oquaju v.

U.S., 288 F.3d 448, 450 (D.C. Cir. 2002), reversed and remanded

on other grounds, 541 U.S. 970 (2004), but plaintiff has made a

number of disturbing allegations, with evidence to back them up,

relating to the FBI's relationship with Sanchez.   He presents

trial transcripts showing substantial inconsistencies in trial

testimony as to the length of Sanchez's employment by the FBI,

how much he was paid, and his past criminal record.   See Pl.'s

- 4 -

Mot. Summ. J. at 23-28.  The evidence presented also suggests

that Sanchez may have violated the law with impunity while

serving as an informant, see id. at 28-31, even failing to pay

taxes on the money received from the government, with apparent

immunity from prosecution, cf. United States v. Shaffer, 789 F.2d

682, 691 (9th Cir. 1986) (government's failure to pursue income

tax liability indicates "secret deal of leniency" in exchange for

cooperation that negatively impacts witness's credibility).

Plaintiff "must establish more than a bare suspicion in order to

obtain disclosure.  Rather, the requester must produce evidence

that would warrant a belief by a reasonable person that the

alleged Government impropriety might have occurred."  Nat'l

Archives and Records Admin. v. Favish, 541 U.S. 157, 174 (U.S.

2004).  This is a high standard, and a close call, but plaintiff

has satisfied it.  Plaintiff's showing of public interest is not

overwhelming, but it weighs more than nothing.  See Bennett v.

DEA, 55 F. Supp. 2d 36, 41-43 (public interest in exposing DEA

misconduct outweighs privacy interest of "career" informant).

        The government also invokes FOIA Exemption 7(D), for

records or information that "could reasonably be expected to

disclose the identity of a confidential source . . . [or]

information furnished by a confidential source," 5 U.S.C.

§ 552(b)(7)(D), to justify a Glomar response for material

relating to information activities that have not been officially

- 5 -

acknowledged. But the government has not begun to make the showing that is necessary to support its reliance on Exemption 7. Sanchez's identity as a cooperator is open and notorious. The government has not shown that he would in any way be subjected to "harassment and actual danger," Antonelli v. FBI, 721 F.2d 615, 618 (7th Cir. 1983), if the government were to acknowledge the mere existence of records indicating that he is a source in cases that plaintiff does not know about. If the government wishes to exclude specific "information furnished by a confidential source," it may seek a specific 7(D) exemption for that information, with an appropriate Vaughn index.

Both motions for summary judgment [# 16, # 19] are **denied.** The FBI must demonstrate that it has searched its records and must either provide the documents requested or produce a Vaughn index.

It is **SO ORDERED.**


JAMES ROBERTSON
United States District Judge


- 6 -


9

O

# O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

February 7, 2006

Federal Bureau of Investigation
Miami Field Office
16320 N.W. 2nd Avenue
Miami, FL 33169

OUR FILE NUMBER

WRITER'S DIRECT DIAL
(202) 383-5290

WRITER'S E-MAIL ADDRESS
wnifong@omm.com

*In re*: **FREEDOM OF INFORMATION ACT REQUEST**

To Whom It May Concern:

On behalf of my client **Peter J. Hidalgo**, I submit the enclosed Freedom of Information Act ("FOIA") request. As he is currently undergoing treatment at a medical facility in North Carolina and the duration of his stay there is uncertain, we ask that any correspondence regarding this request (including any production of documents responsive to the FOIA request) be sent to the following address:

> Peter J. Hidalgo
> c/o William R. Nifong
> O'Melveny & Myers LLP
> 1625 Eye St. NW
> Washington, DC 20006

For your consideration, I also enclose a September 29, 2005 Order of the Honorable James Robertson, United States District Court, District of the District of Columbia, finding that *no FOIA exceptions apply* to Mr. Hidalgo's request and that disclosure of the documents he seeks is in the public interest. As Judge Robertson's Order pertains to a FOIA request to FBI Headquarters that is, in every material way, identical to the one submitted herein, Mr. Hidalgo is likewise entitled to any responsive documents kept at the Miami field office. (Both Judge Robertson's Order and the earlier FOIA request are enclosed.) Therefore, we ask that you produce the requested documents to Mr. Hidalgo as soon as possible. By this letter, we also agree to compensate your office for any reasonable copying costs and postage associated with this request.

10

Case 1:06-cv-01513-JR    Document 17-2    Filed 07/19/2007    Page 14 of 68
Case 1:06-cv-01513-JR    Document 16-7    Filed 05/16/2007    Page 3 of 6
Case 1:06-cv-01513-JR    Document 3    Filed 08/30/2006    Page 3 of 33

O'MELVENY & MYERS LLP
February 7, 2006 - Page 2


On behalf of Mr. Hidalgo, I thank you in advance for your efforts and look forward to your response.

Sincerely,

William R. Nifong

cc/ Peter J. Hidalgo

U.S. Department of Justice



Federal Bureau of Investigation

*Washington, D.C. 20535*

March 3, 2006

William R. Nifong, Esquire
O'Melveny & Myers LLP
1625 Eye Street, Northwest
Washington, D.C.   20006

Dear Mr. Nifong:

A copy of your letter asking for information maintained by the FBI under the Freedom of Information Act (FOIA) concerning another individual is being returned to you. Your request was forwarded to FBI Headquarters from the Miami Field Office.

Before we commence processing your request for records pertaining to another individual, we ask that you submit to the FBI proof of death about that person. Proof of death can be a copy of a death certificate, obituary or a recognized reference source. Death is presumed if the birth date of the subject is more than 100 years ago.  Without proof of death, the disclosure of law enforcement records or information about another person is considered an unwarranted invasion of personal privacy.  Such records, if they exist, are exempt from disclosure pursuant to Exemptions (b)(6) and/or (b)(7)(C) of the FOIA, Title 5, United States Code, Section 552.

Please note that mail addressed to the FBI is delayed several weeks due to increased security procedures now in place.

In order to ensure an accurate search of our records, please provide your subject's complete name, date of birth and place of birth, if you have not already done so.

Once you have provided us with the necessary information, as described above, we will conduct a search of our records and advise you of the results.

This response should not be considered an indication of whether or not records responsive to your request exist in FBI files.

You may appeal this denial by writing to the Co-Director, Office of Information and Privacy, United States Department of Justice, Suite 11050, 1425 New York Avenue, Northwest, Washington, D. C. 20530-0001, within sixty days from the date of this letter. The envelope and the letter should be clearly marked "Freedom of Information Appeal".

Sincerely yours,

David M. Hardy /deh

David M. Hardy
Section Chief
Records Information
   Dissemination Section
Records Management Division

**All Attached Correspondence Must Be Returned to the FBI With This Letter**

# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006·4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383·5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383·5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

*No request # listed*

April 26, 2006

OUR FILE NUMBER
170446-1256

Co-Director
Office of Information and Privacy
United States Department of Justice
Suite 11050
1425 New York Avenue, N.W.
Washington, D.C. 20530-0001

**OFFICE OF INFORMATION
AND PRIVACY**

**MAY 0 1 2006**

**RECEIVED**

WRITER'S DIRECT DIAL
(202) 383-5190

WRITER'S E-MAIL ADDRESS
wnifong@omm.com

### *In re*: FREEDOM OF INFORMATION APPEAL

To Whom It May Concern:

On behalf of my client Peter J. Hidalgo, I hereby appeal the denial of Mr. Hidalgo's February 3, 2006 Freedom of Information Act ("FOIA") request, submitted to the Miami field office of the FBI. For your reference, I enclose both the March 3, 2006 letter of denial from David M. Hardy and the FOIA request itself (including enclosures).

Mr. Hardy's letter states that the FOIA request was denied because it "concerns another individual" and that "[s]uch records, if they exist, are exempt from disclosure pursuant to Exemptions (b)(6) and (b)(7)(C) of the FOIA." However, a federal district court judge has already ruled that *no such exemptions* apply to Mr. Hidalgo's request for the records described in his February 3, 2006 FOIA request — a fact that Mr. Hidalgo clearly noted in the cover letter accompanying the FOIA request to the Miami field office. Indeed, Mr. Hidalgo even enclosed a copy of the Honorable James Robertson's September 29, 2005 Order, finding that *no FOIA exceptions apply* to Mr. Hidalgo's request for records pertaining to Manuel ("Manny") Sanchez and that disclosure of these documents is in the public interest.

As Mr. Hidalgo's February 3, 2006 request is identical in every material respect to the request addressed by Judge Robertson's Order, the FBI has no good-faith or legal basis for withholding the requested records, and the agency (including both FBI headquarters and the Miami field office) should immediately produce any such documents in its possession that are responsive to Mr. Hidalgo's request. (A copy of Mr. Hidalgo's prior request also was enclosed with the February 3, 2006 request, and it is provided again in this correspondence.) On behalf of Mr. Hidalgo, I respectfully request that the agency reverse its denial of the FOIA request and comply fully with the findings of the federal district court. As before, we also agree to

13

O'MELVENY & MYERS LLP
April 26, 2006 - Page 2

compensate the agency for any reasonable copying costs and postage associated with this request.

As Mr. Hidalgo is currently undergoing treatment at a medical facility in North Carolina and the duration of his stay there is uncertain, we ask that any correspondence regarding this request (including any production of documents responsive to the FOIA request) be sent to the following address:

> Peter J. Hidalgo
> c/o William R. Nifong
> O'Melveny & Myers LLP
> 1625 Eye St. NW
> Washington, DC 20006

On behalf of Mr. Hidalgo, I thank you in advance for your efforts and look forward to your response.

Sincerely,

William R. Nifong

William R. Nifong

cc/ Peter J. Hidalgo

14

Case 1:06-cv-01513-JR     Document 3     Filed 08/30/2006     Page 28 of 33

**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                                    *Washington, D.C. 20530*

William R. Nifong, Esq.
O'Melveny & Myers, LLP
1625 Eye Street, NW                            MAY 0 9 2006
Washington, DC 20006-4001

     Re:  Your letter of April 26, 2006 - Peter J. Hidalgo

Dear Mr. Nifong:

     This is to advise you that your administrative appeal from the action of the Federal Bureau of Investigation was received by this Office on May 1, 2006.

     The Office of Information and Privacy, which has the responsibility of adjudicating such appeals, has a substantial backlog of pending appeals received prior to yours.  In an attempt to afford each appellant equal and impartial treatment, we have adopted a general practice of assigning appeals in the approximate order of receipt.  Your appeal has been assigned number 06-1908.  Please mention this number in any future correspondence to this Office regarding this matter.

     We will notify you of the decision on your appeal as soon as we can.  We regret the necessity of this delay and appreciate your continued patience.

                      Sincerely,

                      Priscilla Jones
                      Chief, Administrative Staff

U.S. Department of Justice



Federal Bureau of Investigation

*Washington, D.C. 20535*

October 27, 2006

MR. PETER J. HIDALGO
C/O WILLIAM R. NIFONG
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC  20006

Request No.: 1061364-000
Subject: SANCHEZ, MANNY

Dear Requester:

☒    This acknowledges receipt of your Freedom of Information-Privacy Acts (FOIPA) request that was forwarded to FBI Headquarters from the Miami Field Office. The FOIPA number listed above has been assigned to your request.

☐    For an accurate search of our records, please provide the complete name, alias, date and place of birth for the subject of your request. Any other specific data you could provide such as prior addresses, or employment information would also be helpful. If your subject is deceased, please include date and proof of death.

☐    To make sure information about you is not released to someone else, we require your notarized signature or, in place of a notarized signature, a declaration pursuant to Title 28, United States Code 1746. For your convenience, the reverse side of this letter contains a form which may be used for this purpose.

☐    If you want the FBI's Criminal Justice Information System (CJIS) to perform a search for your arrest record, please follow the enclosed instructions in Attorney General Order 556-73. You must submit fingerprint impressions so a comparison can be made with the records kept by CJIS. This is to make sure your information is not released to an unauthorized person.

☒    We are searching the indices to our central records system at FBI Headquarters for the information you requested, and will inform you of the results as soon as possible.

☐    Processing delays have been caused by the large number of requests received by the FOIPA. We will process your request(s) as soon as possible.

Your request has been assigned the number indicated above. Please use this number in all correspondence with us. Your patience is appreciated.

Sincerely yours,

David M. Hardy
Section Chief,
Record/Information
   Dissemination Section
Records Management Division

16

U.S. Department of Justice



Federal Bureau of Investigation

*Washington, D.C. 20535*

JANUARY 29, 2007

WILLIAM F. NIFONG, ESQ.
O'MELVENY & MYERS LLP
1625 EYE STREET, NW
WASHINGTON, DC 20006

Request No.:  1061364- 000
Subject:   SANCHEZ, MANNY

Dear Mr. Nifong:

This is in response to the Freedom of Information Act (FOIA) request concerning Manny Sanchez that you filed on behalf of Mr. Hidalgo.

Pursuant to our January 9, 2007 progress report, we are releasing one document to you. Excisions have been made on this document and the other pages from the file have been withheld in their entirety in order to withhold materials which are exempted from disclosure pursuant to Title 5, United States Code, Section 552, subsections (b)(2), (b)(6), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F).  See the enclosed OPCA Form 16a for an explanation of exemptions.

This case is in litigation, and therefore I am required to inform you that you have the right to appeal any denials in this release.

Sincerely yours,

David M. Hardy
Section Chief
Record/Information
   Dissemination Section
Records Management Division

cc:      Robert-Paul Sanger

Enclosure (2)

## Memorandum



| To | : | SAC, MIAMI [_____] (D-5) (P)  b2 | Date | 6/15/93 |
|---|---|---|---|---|

From :   SA [_____]                b6
                                              b7C

Subject:   **VESTRAC**
           **OCDETF**
           **(OO:  MIAMI)**                    b2

[_____]                                    b6
                                                      b7C

     A trial involving VESTRAC subjects [_____]
ET AL; was conducted in the U.S. Federal Courthouse Miami,
Florida, before Judge DONALD GRAHAM.

     Judge GRAHAM requested to view the CW's file [_____]      b2
for an in camera inspection during June 3, 1993 and June 4, 1993.   b6
After obtaining verbal authorization from ASAC EDMUNDO L.           b7C
GUEVARA, the CW's file was brought to the Judge's chambers by SA
[_____] The Judge perused 1 volume of the file and returned the
file to SA [_____] in the presence of AUSA WILLIAM HEALY.

     The CW files were returned to the CFR room the
following morning.

*Asects*

                                   b2
① - [_____]
TPF:GSM
(1)

                                   b2
                              [_____]

1*

**HIDALGO III-1603**

TOTAL P.02

**U.S. Department of Justice**

Federal Bureau of Investigation

---

Office of the General Counsel                    Washington, D.C. 20535

May 9, 2007

Mr. Robert-Paul Sagner
O'Melveny & Myers L.L.P.
1625 Eye St., N.W.
Washington, D.C. 20006

Re:    Hidalgo v. FBI, No. 06-1513 (D.D.C.)

Dear Mr. Sagner:

In the Status Report filed with the Court on March 16, 2007, in the above-captioned matter, defendant reported that it expected to complete its review of its initial processing determinations for more than 3,000 pages of records responsive to plaintiff's request. The FBI has completed its processing review. I am writing to inform you that apart from the one document partially disclosed to you by letter dated January 29, 2007, the other pages from the file have been withheld in their entirety as those materials are exempt from disclosure pursuant to Title 5, United States Code, Section 552, subsections (b)(2), (b)(6), (b)(7)(A), (b)(7)(C), (b)(7)(D), (b)(7)(E), and (b)(7)(F). See the enclosed OPCA Form 16a for an explanation of exemptions.

Although I am aware that this request is the subject of litigation, I am required by regulation to inform you that you have the right to file an administrative appeal.

Sincerely,

Jennifer U. Toth
Assistant General Counsel

cc:    Kenneth A. Hendricks

19

## EXPLANATION OF EXEMPTIONS

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552

(b)(1)    (A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified to such Executive order;

(b)(2)    related solely to the internal personnel rules and practices of an agency;

(b)(3)    specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld;

(b)(4)    trade secrets and commercial or financial information obtained from a person and privileged or confidential;

(b)(5)    inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency;

(b)(6)    personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(b)(7)    records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information ( A ) could be reasonably be expected to interfere with enforcement proceedings, ( B ) would deprive a person of a right to a fair trial or an impartial adjudication, ( C ) could be reasonably be expected to constitute an unwarranted invasion of personal privacy, ( D ) could reasonably be expected to disclose the identity of confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of record or information compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source, ( E ) would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law, or ( F ) could reasonably be expected to endanger the life or physical safety of any individual;

(b)(8)    contained in or related to examination, operating, or condition reports prepared by, on behalf of, or for the use of an agency responsible for the regulation or supervision of financial institutions; or

(b)(9)    geological and geophysical information and data, including maps, concerning wells.

### SUBSECTIONS OF TITLE 5, UNITED STATES CODE, SECTION 552a

(d)(5)    information compiled in reasonable anticipation of a civil action proceeding;

(j)(2)    material reporting investigative efforts pertaining to the enforcement of criminal law including efforts to prevent, control,  or reduce crime or apprehend criminals;

(k)(1)    information which is currently and properly classified pursuant to an Executive order in the interest of the national defense or foreign policy, for example, information involving intelligence sources or methods;

(k)(2)    investigatory material compiled for law enforcement purposes, other than criminal, which did not result in loss of a right, benefit or privilege under Federal programs, or which would identify a source who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(3)    material maintained in connection with providing protective services to the President of the United States or any other individual pursuant to the authority of Title 18, United States Code, Section 3056;

(k)(4)    required by statute to be maintained and used solely as statistical records;

(k)(5)    investigatory material compiled solely for the purpose of determining suitability, eligibility, or qualifications for Federal civilian employment or for access to classified information, the disclosure of which would reveal the identity of the person who furnished information pursuant to a promise that his/her identity would be held in confidence;

(k)(6)    testing or examination material used to determine individual qualifications for appointment or promotion in Federal Government service the release of which would compromise the testing or examination process;

(k)(7)    material used to determine potential for promotion in the armed services, the disclosure of which would reveal the identity of the person who furnished the material pursuant to a promise that his/her identity would be held in confidence.

FBI/DOJ

REPRODUCED AT THE    NTL ARCHIVES

P E T E R   J.   H I D A L G O
37498-004
U.S. Penitentiary
1300 Metropolitan
Leavenworth, KS 66048


December 13, 1999


TO:  F.B.I.
     Freedom of Information Request
     J.Edgar Hoover Building
     9th and Pennsylvania Ave. N.W.
     Washington, D.C. 20535

IDENTIFICATION OF REQUESTER:
NAME: Peter J. Hidalgo
A.K.A: Pedro J. Hidalgo
DATE OF BIRTH: 8-11-60
PLACE OF BIRTH: Habana, Cuba
F.B.I. NO: 145515W5
SOC. SEC. NO: 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


RE:  MANNY SANCHEZ
     F.B.I. INFORMANT (MM-5177-CW(D))
     FREEDOM OF INFORMATION ACT
     (U.S.C. 552), PRIVACY ACT
     (U.S.C. 552a(d)(1)Request:
     EXEMPTIONS (5 U.S.C. 552(6)(C)
     (B)(7), GENERAL (U.S.C. 552 A
     (J)(2)) OR SPECIFIC (U.S.C.
     552a(k)(2)) NOT APPLICABLE TO
     THIS REQUEST.

# FILED

JUN 2 0 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT


Dear Sir/Ms: F.O.I.A. Officer,

     This letter will serve as my request pursuant to the
provisions of the Freedom of Information Act (5 U.S.C. 552) and
the Privacy Act (5 U.S.C. 552a(d)(1), and the applicable State
Statutes governing Freedom of Information Requests, and state
agency request, for full disclosure and release of all records
and/or data contained in the files of your agency, and
specifically under the name of Manny Sanchez-F.B.I. Informant
(MM-5177-CW(D)) or an identifier assigned to that name.   This
request is sought specifically for amendment, deletion and/or
expungment (5 U.S.C. 552a(d)(2)(a)) of records maintained by
your Agency.   The records sought but not limited to, is the
compiled file containing (1) the complete F.B.I. payment history
and payments by other Federal-State agencies to Manny Sanchez,
(2) complete conviction history and or any and all arrest
records of Manny Sanchez regardless of none prosecution, (3) any
and all accusations of misconduct made against Manny Sanchez while
working as an F.B.I. informant, (B) any records related to Manny
Sanchez none payment of taxes on his earnings to the I.R.S.


21

EXHIBIT A

(C) any and all F.B.I. 302 reports for video tapes V-183 taken September 10, 1992 and V-185 taken on September 14, 1992 case number 245B-MM-49826, (4) arrest records, (5) investigation and/or investigatory reports, (6) reports or evidentiary and/or scientific information findings, (7) wants, warrants, and/or detainers, (8) final and closing investigation reports: and (9) any and/or all information, data, or reports not otherwise exempt by statute (5 U.S.C. 552(6)(c)(b)(7), (5 U.S.C. 552a(j)(2),(k)(2), or law, Tarlton v. Saxbe, 507 F.2d. 1116, 165 U.S. App. D.C. 293 (1974), Menard v. Saxbe, 498 F.2d. 1017, 162 U.S. App. D.C. 284 (1974), Sullivan v. Murphy, 478 F.2d 938, 156 U.S. App. D.C. 28 (1973). Your Agency is advised that the investigation reports in toto are no longer accorded exempt status unless under the specific exemption noted, and only with reference to specific citation of authority, Paton v. La Prade, 524 F.2d. 862, 868-69 (CA3 1975). See also: Bennett v. D.E.A., 55 F.Supp 2d. 36 (D.D.C. 1999) The court [Judge Kessler] stated "[b]y choosing to work as a regular government informant, and by testifying about his activities and earning in open court, Chamber (informant) has chosen to give up his personal privacy interest to this information..."

It is further requested that your agency in response to the material requested specifically inform me if and to whom the file and/or any material therein contained has been released to any identifiable individual or agency, their name, title, purpose and need for such information, the date of such release, the specific material that was released, the person within your Agency who released such information, and the specific reference to authority, statute or regulation, governing such release (5 U.S.C. 552a(d)(1), Paton v. LaParde, 524 F.2d 862 (CA3 1975), Tarlton v. Saxbe, 507 F.2d. 1116, 165 U.S. App. D.C. 293 (1974), of Linda R.S. v. Richard D., 410 U.S 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). If for any reason you choose not to send me any of the document or papers requested then please furnish me with a "Vaughn Index" as set forth in Vaughn v. Rosen, 448 F.2d. 820 (D.C. 1973).

It is further requested that your Agency provide me with a copy of specific regulations or your Department as provided by statute (5 U.S.C. 552). so that compliance with such regulations is adhered to except as otherwise provided by law (5 U.S.C. 701 et. seq.).

The request is made under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a)(together with the "alternate means of access"), to permit access to records on file with your Agency. If and for any reason it is determined that portions of the material and records sought is exempt by statute (5 U.S.C.552a(6)(c)(b)(7),(j)(2)(k)(2) or by regulation (Menard v. Mitchell, 430 F.2d. 486, 139 U.S. App. D.C. 113 (1970), Nemetz v. Department of Treasury, 446 F.Supp. 102) I request specific citation to authority for such deletion.

22

-2-

**36**

EXHIBIT A, pg. 2

REPRODUCED AT THE N    ARCHIVES

REPRODUCED AT

TIONAL ARCHIVES

If it should be determined that any material be deemed CONFIDENTIAL due to identification of source, the permission is granted to Agency to delete source identification ONLY from the material for release. <u>Paton v. LaParde</u>, 524 F.2d. 862 (CA3 1975), <u>Chastain v. Kelly</u>, 510 F.2d 1232. I further agree to pay any reasonable costs, on file IN FORMA PAUPERIS if I am indigent, provided by statute or regulation of your agency, for search and copying of the material requested.

Pursuant to Title 5 U.S.C. 552a(6)(A)(I), it is noted that your Agency has ten (10) working days following receipt of this request to provide the information and material sought.

I Peter J. Hidalgo hereby swear under the penalty of perjury that I am requesting all the above information and documents for my personal use.

Respectfully,

Peter J. Hidalgo

December

Given under my hand and Seal of Office this 12 day of 1999.

Notary Public J. Tratt, CSW

My Commission Expires N/A

AUTHORIZED BY THE ACT OF
JULY 7, 1955, AS TITLE TO, TO
ADMINISTER OATHS (5 USC, 3059)



Right Thumb    Right Index

RT            RI

23

-3-

37

EXHIBIT A, pg. 3

 U.S. Department of Justice



**Federal Bureau of Investigation**

*Washington, D.C. 20535*

November 21, 2003

MR. PETER J. HIDALGO
**37498-004
POST OFFICE BOX 1033
COLEMAN, FL 33521-1033

Dear Mr. Hidalgo:

A copy of your letter asking for information maintained by the FBI under the Freedom of Information-Privacy Act (FOIPA) concerning another individual is being returned to you.

Before we commence processing your request for records pertaining to another individual, we ask that you submit to the FBI either proof of death or a privacy waiver from that person. Proof of death can be a copy of a death certificate, obituary or a recognized reference source. Death is presumed if the birth date of the subject is more than 100 years ago. Without proof of death or a privacy waiver, the disclosure of law enforcement records or information about another person is considered an unwarranted invasion of personal privacy. Such records, if they exist, are exempt from disclosure pursuant to Exemptions (b)(6) and/or (b)(7)(C) of the FOIA, Title 5, United States Code, Section 552.

Enclosed is a Privacy Waiver and Certification of Identity form. (You may make additional copies if you are requesting information on more than one individual.) The subject of your request should complete this form and then sign it. Please note that mail addressed to the FBI is delayed several weeks due to increased security procedures now in place. You may fax your response directly to the FOIPA Section at 202-324-3752.

In order to ensure an accurate search of our records, please provide your subject's complete name, date of birth and place of birth, if you have not already done so.

Once you have provided us with the necessary information, as described above, we will conduct a search of our records and advise you of the results.

This response should not be considered an indication of whether or not records responsive to your request exist in FBI files.

Sincerely yours,

David M. Hardy /ds

David M. Hardy
Section Chief,
Record/Information
  Dissemination Section
Records Management Division

Enclosure

24

**All Attached Correspondence Must Be Returned to the FBI With This Letter**

# Privacy Waiver and Certification of Identity

FOIPA Request Number _____

(if known)

Full Name: _____

Current Address: _____

_____

Date of Birth: _____ Place of Birth: _____

(Optional: Prior addresses, employments, aliases, etc., which may assist the FBI in locating the requested information) _____

_____

_____

I hereby waive my right to privacy, and I authorize the FBI to release any and all information relating to me to :

(name, address, & phone of Attorney or other Designee)

_____

_____

_____

_____

Under penalty of perjury, I hereby declare that I am the person described above and understand that any falsification of this statement is punishable under the provisions of Title 18, United States Code (U.S.C.), Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years, or both; and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of Title 5, U.S.C., Section 552a (i)(3) as a misdemeanor and by a fine of not more than $5,000.

Signature:_____    Date: _____

Case 1:06-cv-01513-JR    Document 16-9    Filed 05/16/2007    Page 7 of 17

P E T E R  J.  H I D A L G O

37498-004
F.C.C. Butner
P.O. Box 1600
Butner, N.C. 27509

February 3, 2006

Federal Bureau of Investigation (FBI)
Freedom of Information Request
Miami FBI Field Office
16320 N.W. 2nd Avenue
Miami, Fl 33169

RE: Freedom of Information Act Request on "Manuel (Manny) Sanchez", FBI Informant Number MM-5177-CW(D); under the File name "VESTRAC", OCDETF; OO: Miami; File Number (245B-MM-49826), pursuant to the FOIA/PA. 5 U.S.C. 552; 5 U.S.C. 552a.

Dear Sir/Madame FOIA Officer:

1). This letter will serve as a formal request, pursuant to the provisions of the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a (d)(1) ) and the State Statutes governing Freedom of Information requests, for the full diclosure and release of all "System of Records" and "Data" contained in the Files of your agency. Specifically, under the name of "Manuel (Manny) Sanchez", D.O.B. 1-10-1949, FBI Informant number MM-5177-CW(D), Social Security Number(s) 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/(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), and Florida License number S522540490100, or Identifier assigned to that name. Futhermore, all searches for Sanchezs' requested specific information are to include, but not limited to, Files referencing "VESTRAC": OO: Miami File Number (245B-MM-49826):

2). The Records and Files that are sought for Manuel (Manny) Sanchez, are maintained under the FBIs' agency records structure that includes "Main" Files and "Reference" ("Cross Reference") Files, and that in conjuction employs the following systems, but not limited to: Central Record System ("CRS"); Automated Case Support ("ACS"); Electronic Case File ("ECF"); Universal Index ("UNI"); Investigative Case Management ("ICM"); Universal Case File Number ("UCFN"); and General Indices (Automated and Manual) to access the Files for Manuel (Manny) Sanchez in all FBI Field Offices.

3). The following FOIA request specifically is for the agencys' compiled File of "Manuel Sanchez" and Cross Reference Files under the name "VESTRAC" containing, but not limited to:

(A). Manuel Sanchez, FBI records entailing the exact date when Sanchez officially became a FBI Informant, and Subsequently a FBI paid Informant.

26

(B). Manuel Sanchez, complete FBI payment history, and records of payments or rewards given by other Federal and State agencies to Sanchez while and in the capacity of a FBI Informant.

(C). Manuel Sanchez, FBI records entailing the non-payments of income taxes to the IRS on his Informant earnings and payments made by the FBI agency to Sanchez, or by other Federal and State agencies.

(D). Manuel Sanchez, FBI records entailing the number of times the FBI agency and its agents has intervened on Sanchez behalf to prevent and avoid criminal prosecution(s) in connection to the income tax evasion or other criminal acts committed by Sanchez while working as a FBI Informant.

(E). Manuel Sanchez, FBI records outlining the past 36 years of his criminal career and lengthly criminal conviction(s) history, in addition to any and all arrest records of Sanchez regardless of non-prosecution, as well as any pending criminal cases.

(F). Manuel Sanchez, FBI records entailing any and all accusations of misconduct committed by Sanchez while working as a FBI Informant.

(G). Manuel Sanchez, FBI records of any and all administrative sanctions imposed on Sanchez for dishonesty, false claims, or other type of deceit and misconduct.

(H). Manuel Sanchez, FBI records of all case names, numbers, and Judicial Districts where Sanchez has testified under oath.

(I). Manuel Sanchez, FBI records entailing all investigatory reports, reports or evidentiary and/or Scientific information findings, wants, warrants, and/or detainers, final and closing investigation reports, any and all information, electronic Data associated to Sanchez.

(4). The FBI agency has already confirmed previously the status of Manuel Sanchez as a FBI Informant to the requester herein. "(W)hen an Informants' status has been officially confirmed... the agency must acknowledge the existence of any records it holds". Benavides v. Drug Enforcement Administration, 968 F.2d 1243, 1246 (D.C. Cir. 1992).

(5). No FOIA exception permits the FBI to withhold this information. Specifically Manny Sanchez has no privacy interest in this information, as he has waived such interest through public testimony in multiple criminal trials, and the public interest in disclosure is compelling, because of possible agency misconduct. Bennett v. Drug Enforcement Administration, 55 F. Supp. 2d 36 (D.D.C. 1999).

(6). It is further requested that your agency in response to the material requested specifically inform me if and to whom the file and/or any material therein contained has been released to any identifiable individual or agency, their name, title, purpose and need for such information, the date of such release, the specific material that was released, the person within your agency who released such information, and the specific reference for that

authority, statute or regulation, governing such release (5 U.S.C.
552a(d)(1); <u>Paton v. La Parde</u>, 524 F.2d 862 (CA 3 1975), <u>Tarlton v.
Saxbe</u>, 507 F.2d 1116, 165 U.S. App. D.C. 293 (1974), of <u>Linda RS. v.
Richard D.</u>, 410 U.S. 614, 93 S. Ct. 1146, 35 L.ed. 2d 536 (1973).

7). If for any reason you choose not to send me any of the
information or documents requested, then please furnish me with
a "Vaughn Index" as set forth in <u>Vaughn v. Rosen</u>, 484 F.2d 820
(D.C. 1973).

8). It is further requested that your agency provide me with
a copy of the specific regulations of your Department as provided
by statute (5 U.S.C. 552) so that compliance with such regulations
is adhered to except as otherwise provided by Law (5 U.S.C. 701 et.
seq.).

9). This request is made under the Freedom of Information Act
(5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a)(together with
the alternate means of access), to permit access to records on file
with your agency. If and for any reason it is determined that port-
ions of the materials and records sought is exempt by statute or
by regulation, I request specific citation to authority for such
deletion.

10). Please send me pursuant to 28 CFR Section 16.6 (A) an
acknowledgment of my request upon receipt and please provide me
with a request number for future reference.

11). Pursuant to Title 5 U.S.C. 552a(6)(A)(i), it should be
noted that your agency has twenty (20) working days following the
receipt of this request to provide the information and materials
requested.

12). I Peter J. Hidalgo, hereby swear under the penalty of
perjury that I am requesting all the above information and docu-
ments in order to prove and expose to the public domain the FBI
agencys' misconduct with its mishandling of a rogue FBI paid
Infomant.

Respectfully Submitted,

Peter J. Hidalgo

28

(3)

P E T E R   J.   H I D A L G O
37498-004
U.S.P. Coleman
P.O. Box 1033
Coleman, Fl 33521-1033

November 3, 2003

Federal Bureau Investigation (FBI)
Freedom of Information Request
J. Edgar Hoover Building
9th Pennsylvania Ave., N.W.
Washington, D.C. 20535

RE:   Freedom of Information Act request on Manny (Manuel)
Sanchez FBI Informant/MM-5177-CW(D), pursuant to the
FOIA/PA, 5 U.S.C. 552; 5 U.S.C. 552a.

Dear Sir/Madame FOIA Officer:

1).   This letter will serve as a formal request pursuant to
the provisions of the Freedom of Information Act (5 U.S.C. 552)
and the Privacy Act (5 U.S.C. 552a(d)(1)), and the State Statutes
governing Freedom of Information requests, for full disclosure
and release of all "systems of records" and data contained in
the files of your agency, specifically under the name of Manny
(Manuel) Sanchez FBI Informant (MM-5177-CW(D)), or identifier
assigned to that name.

2).   The following FOIA request specifically is for the
agency's compiled file of Manny Sanchez containing, but not
limited to:

(A).   Manny Sanchez, FBI records entailing the exact
date when Sanchez officially became a FBI informant, and subse-
quently a FBI paid informant.
(B).   Manny Sanchez, complete FBI payment history, and
records of payments or rewards given by other Federal and State
agencies to Sanchez while and in the capacity of a FBI informant.
(C).   Manny Sanchez, FBI records entailing the non-
payment of income taxes to the IRS on his informant earnings and
payments made by the FBI agency to Sanchez, or by other Federal
and State agencies.
(D).   Manny Sanchez, FBI records entailing the number
of times the FBI agency and its agents has intervened on Sanchez
behalf to prevent and avoid criminal prosecution[s] in connection
to the income tax evasion or other criminal acts committed by
Sanchez while working as a FBI informant.

29

(E). Manny Sanchez, FBI records outlining the past 36 years of his criminal career and lengthly criminal conviction[s] history, in addition to any and all arrest records of Sanchez regardless of non-prosecution, as well as any pending criminal cases.

(F). Manny Sanchez, FBI records entailing any and all accusations of misconduct committed by Sanchez while working as a FBI informant.

(G). Manny Sanchez, FBI records of any and all administrative sanctions imposed on Sanchez for dishonesty, false claims, or other type of deceit and misconduct.

(H). Manny Sanchez, FBI records of all case names, numbers, and Judicial districts where Sanchez has testified under oath.

(I). Manny Sanchez, FBI records entailing all investigatory reports, reports or evidentiary and/or Scientific information findings, wants, warrants, and/or detainers, final and closing investigation reports, any and all information, electronic data associated to Sanchez.

3). The FBI agency has already confirmed previously the status of Manny Sanchez as a FBI Informant to the requester herein."[W]hen an informants' status has been officially confirmed... the agency must acknowledge the existence of any records it holds." Benavides v. Drug Enforcement Administration,968 F.2d 1243, 1246 (D.C. Cir 1992).

4). No FOIA exception permits the FBI to withhold this information. Specifically Manny Sanchez has no privacy interest in this information, as he has waived such interest through public testimony in multiple criminal trials, and the public interest in disclosure is compelling, because of possible agency misconduct. Bennett v. Drug Enforcement Administration, 55 F.Supp. 2d 36 (D.D.C. 1999).

5). It is further requested that your agency in response to the material requested specifically inform me if and to whom the file and/or any material therein contained has been released to any identifiable individual or agency, their name, title, purpose and need for such information, the date of such release, the specific material that was released, the person within your agency who released such information, and the specific reference for that authority, statute or regulation, governing such release (5 U.S.C. 552a(d)(1), Paton v. La Parde, 524 F.2d 862 (CA 3 1975), Tarlton v. Saxbe, 507 F.2d 1116, 165 U.S. App. D.C. 293 (1974), of Linda RS. v. Richard D., 410 U.S. 614, 93 S.Ct. 1146, 35 L.ed. 2d 536 (1973).

6). If for any reason you choose not to send me any of the information or documents requested, then please furnish me with a "Vaughn Index" as set forth in Vaughn v. Rosen, 484 F.2d 820 (D.C. 1973).

(2)

7). It is further requested that your agency provide me with a copy of the specific regulations of your Department as provided by statute (5 U.S.C. 552) so that compliance with such regulations is adhered to except as otherwise provided by law (5 U.S.C. 701 et. seq.).

8). The request is made under the Freedom of Information Act (5 U.S.C. 552) and the Privacy Act (5 U.S.C. 552a)(together with the alternate means of access), to permit access to records on file with your agency. If and for any reason it is determined that portions of the materials and records sought is exempt by statute or by regulation, I request specific citation to authority for such deletion.

9). Please send me pursuant to 28 CFR Section 16.6(A) an acknowledgment of my request upon receipt and please provide me with a request number for future reference.

10). Pursuant to title 5 U.S.C. § 552a(6)(A)(1), it should be noted that your agency has twenty (20) working days following the receipt of this request to provide the information and materials requested.

11). I Peter J. Hidalgo, hereby swear under the penalty of perjury that I am requesting all the above information and documents in order to prove and expose to the public domain the FBI agencys' misconduct with its mishandling of a rogue FBI paid Informant.

Respectfully Submitted,

Peter J. Hidalgo

31

(3)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO                )
                                )
        Plaintiff,              )
                                )
        v.                      )       Civil Action No. 04-562 JR
                                )
FEDERAL BUREAU OF INVESTIGATION, )
                                )
        Defendant.              )
_____)

**SECOND DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section ("RIDS"), Records Management Division ("RMD"), at Federal Bureau of Investigation Headquarters ("FBIHQ") in Washington, D.C. I have held this position since August 1, 2002. Prior to joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my current capacity as Section Chief, I supervise the Freedom of Information/Privacy Acts ("FOIPA") Litigation Support Unit. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my

**32**

official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the treatment which has been afforded the FOIA request of plaintiff, Peter J. Hidalgo, which seeks access to records pertaining to Manny Sanchez.

(4)    The purpose of this declaration is to provide the Court and plaintiff with an explanation of the procedures used to search for records responsive to plaintiff's request, as well as the results of that search for records pertaining to Manny Sanchez.

## CORRESPONDENCE RELATING TO PLAINTIFF'S REQUEST

(5)    As stated in my first declaration, Mr. Hidalgo submitted a FOIA request to FBIHQ dated November 3, 2003. See Declaration of David M. Hardy, dated February 23, 2005 (hereinafter "First Hardy Declaration") at ¶ 5. Generally, this request sought access to all systems of records and data concerning Manny (Manuel) Sanchez. Plaintiff specifically requested access to the following four items: (1) an accounting of payments made to Mr. Sanchez by any government agency; (2) a history of all of Mr. Sanchez's convictions and arrests; (3) a list of all claims of misconduct against Mr. Sanchez while he was an informant; and, (4) all records related to Mr. Sanchez's failure to pay income taxes.

(6)    A full description of all of the correspondence related to plaintiff's request is set forth in my first declaration, so it will not be repeated here. See First Hardy Decl. at ¶ 5-9.

-2-

## EXPLANATION OF THE FBI'S CENTRAL RECORDS SYSTEM

(7)    The Central Records System ("CRS"), which is utilized by the FBI to conduct

searches in response to FOIA and Privacy Act requests, enables it to maintain all information

which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The

records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other

files compiled for law enforcement purposes. This system consists of a numerical sequence of

files broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter. Certain

records in this CRS are maintained at FBIHQ. Records that are pertinent to specific field offices

of the FBI are maintained in those field offices.

(8)    Access to the CRS is obtained through the General Indices, which are arranged in

alphabetical order. The General Indices consist of index cards on various subject matters that are

searched either manually or through the automated indices. The entries in the General Indices

fall into two categories:

> (a) A "main" entry: "Main" entries, or a "main" file, carries the name
> corresponding with a subject of a file contained in the CRS.

> (b) A "reference" entry: "Reference" entries, sometimes called "cross-
> references" or "cross reference files" are generally only a mere mention or
> reference to an individual, organization, or other subject matter, contained in a
> document located in another "main" file on a different subject matter.

(9)    Access to the CRS files in FBI field offices is also obtained through the General

Indices (automated and manual), which are likewise arranged in alphabetical order, and consist

of an index on various subjects, including the names of individuals and organizations. Searches

-3-

34

made in the General Indices to locate records concerning a particular subject, such as Manny

Sanchez, are made by searching the subject requested in the index. FBI field offices have

automated indexing functions.

(10)    On or about October 16, 1995, the Automated Case Support ("ACS") system was

implemented for all Field Offices, Legal Attaches ("Legats"), and FBIHQ. Over 105 million

records were converted from automated systems previously utilized by the FBI. ACS consists of

three integrated, yet separately functional, automated applications that support case management

functions for all FBI investigative and administrative cases:

(a) Investigative Case Management ("ICM") – ICM provides the ability to open,

assign, and close investigative and administrative cases as well as set, assign, and track leads.

The Office of Origin ("OO"), which sets leads for itself and other field offices, as needed, opens

a case. The field offices that receive leads from the OO are referred to as Lead Offices ("LOs") –

formerly known as Auxiliary Offices. When a case is opened, it is assigned a Universal Case

File Number ("UCFN"), which is utilized by FBIHQ and all FBI field offices and Legats that are

conducting or assisting in the investigation. For example, using the file number "91-HQ-

115432" an explanation of the UCFN is as follows: "91" indicates the classification for the

specific type of investigation which in this instance is "Bank Robbery;" "HQ" is the abbreviated

form used for the OO of the investigation, which in this example is FBI Headquarters; and

"115432" denotes the individual case file number for the particular investigation.

(b) Electronic Case File ("ECF") – ECF serves as the central electronic repository

for the FBI's official text-based documents. ECF supports the universal serial concept, in that

–4–

35

only the creator of a document serializes it into a file. This provides a single-source entry of serials into the computerized ECF system. All original serials are maintained in the OO case file.

(c) Universal Index ("UNI") – UNI continues the universal concepts of ACS by providing a complete subject/case index to all investigative and administrative cases. Only the OO is required to index; however, the LOs may index additional information as needed. UNI, an index of approximately 91 million records, functions to index names to cases, and to search names and cases for use in FBI investigations. Names of individuals or organizations are recorded with identifying applicable information such as date or place of birth, race, sex, locality, Social Security number, address, and/or date of event.

(11) The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the FBI Special Agent ("SA") assigned to work on the investigation, the Supervisory SA ("SSA") in the field office conducting the investigation, and the SSA at FBIHQ. The FBI does not index every name in its files; rather, it indexes only that information considered to be pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this enormous amount of data, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve the mandated mission of the FBI, which is to investigate violations of federal criminal and national security statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter or individual, i.e., Manny Sanchez.

-5-

36

## SEARCHES FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST

(12)    In response to plaintiff's request, FBIHQ searched the CRS in order to locate any main investigatory files maintained at FBIHQ that were responsive to his request. A search of the CRS by using the name "Manny Sanchez" would cover a two-way phonetic breakdown of the name. For example, this search would locate records using the phonetic sounds of each last and first name relating to the following names: "Sanchez, Manny" and "Sanchez, M.". FBIHQ also used Mr. Sanchez's date of birth, which was provided by Mr. Hidalgo, to facilitate the identification of responsive records. This search failed to locate any records responsive to plaintiff's specific request.

(13)    It is the policy of the FBI, in the absence of a specific request for a search of cross-references at the administrative level, to search for and identify only "main" files responsive to FOIPA requests. In this case, at the administrative level, plaintiff did not specifically request that a search be conducted for cross-references. However, the FBI has searched its HQ indices and has located no main files or cross reference files responsive to plaintiff's specific request.

Under penalty of perjury, I declare the foregoing to be true and correct.

Executed this ___28ᵗʰ___ day of November 2005.


DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

37

VOL. 2-1

1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2                MIAMI DIVISION

3    UNITED STATES OF AMERICA,     :    Case No. 93-81-Cr-DLG

4              Plaintiff,          :

5         -vs-                     :    Miami, Florida
                                        May 28, 1993
6    PEDRO SANCHEZ,                :
     THOMAS PULGARON,
7    ROBERTO CARVIJAL,             :
     JORGE BRITO,

8                                  :

9    _  _  _  _  _  _  _   x

```
FILED by ___ D. C.

   SEP 7 - 1993

   T. G. CHELEOTIS
CLERK U. S. DIST. CT.
 S. D. OF F.A. - MIAMI
```

10        TRANSCRIPT OF MOTIONS TO DISMISS
                  AND SUPPRESS
11       BEFORE THE HONORABLE DONALD L. GRAHAM
                UNITED STATES DISTRICT JUDGE
12
                      VOLUME 2
13

14   APPEARANCES:

15   For the Government:          WILLIAM HEALY and
                                  WILLIAM PEARSON,
16                                Assistant U.S. Attorneys
                                  155 South Miami Avenue
17                                Miami, Florida   31330

18

     For Defendant Sanchez:      WILLIAM AARON Esquire
19

20   For Defendant Pulgaron:     WENDALL GRAHAM, Esquire

21

22

23

24

25

VOL. 2-113

1      can drop dead."

2              I don't think --

3              THE COURT:  Is that a killing?

4              MR. AARON:  No --

5              THE COURT:  I will read your motion.

6              MR. AARON:  The pages are attached.  It involves

7      the killing of an individual.  It has nothing to do with

8      this case or a conspiracy.

9              THE COURT:  What's the other pending issue?

10             MR. AARON:  Well, I would like to request, make a

11     Brady demand at this time, because we were provided with a

12     1981 importation that Manuel Sanchez was involved in.  On

13     Friday, we were provided with it, which had not been

14     provided to us prior to that.

15             THE COURT:  "Friday" meaning today?

16             MR. AARON:  Last Friday, I think.

17             The inference being that when Manny Sanchez was

18     initially debriefed and interviewed, he either held back or

19     lied about it, or the Government didn't provide it to us for

20     some other reason.

21             If he held back and was untruthful with the

22     Government about his criminal past, we are entitled to that.

23     We are entitled to know that so we can cross examine him

24     about it.

25             THE COURT:  I will ask Mr. Healy to respond to

39

VOL. 2-114

1    that.

2         MR. HEALY:  Your Honor, as soon as I learned about

3    that incident in speaking with Mr. Sanchez, I turned it

4    over.

5         THE COURT:  The question is whether or not it

6    reflects that the person was untruthful with the Government.

7    That's really the issue.

8         MR. AARON:  In other words, the agent interviewed

9    him a couple of years ago and debriefed him.  According to

10   what the agent testified to at an earlier motion, if he

11   didn't tell the agent about it, then he was untruthful with

12   with the agent.  Then we are entitled to know that.

13        THE COURT:  You all can discuss that.

14        MR. AARON:  Of course, we haven't concluded the

15   motion to dismiss.

16        MS. MESNEKOFF:  Your Honor, in terms of the motion

17   to dismiss, in reviewing the Wilson case, I noted the Court

18   of Appeals mentioned that there was a problem that Mr.

19   Wilson had in providing the Court of Appeals with an

20   adequate complete record, because certain portions of the

21   documents provided at trial had been redacted.

22        Based on that, and Your Honor's direction this

23   morning, I would specifically request we be provided with a

24   copy of the informant's contracts or agreements not

25   redacted.          **40**

BARBARA MEDINA, Official Court Reporter, U.S. District Court

VOL. 3-1

1

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2                MIAMI DIVISION

3    UNITED STATES OF AMERICA,      :    Case No. 93-81-Cr-DLG

4                Plaintiff,         :

5           -vs-                    :    Miami, Florida
                                         June 1, 1993
6    PEDRO SANCHEZ,                 :
      THOMAS PULGARON,
7    ROBERTO CARVIJAL,              :
      JORGE BRITO,
8                                   :
                Defendants.
9    -   -   -   -   -   -   -   x

10        TRANSCRIPT OF MOTIONS TO SUPPRESS AND DISMISS
                     AND TRIAL PROCEEDINGS
11         BEFORE THE HONORABLE DONALD L. GRAHAM
                 UNITED STATES DISTRICT JUDGE
12                     AND A JURY

13                      VOLUME 3

14

     APPEARANCES:
15
     For the Government:              WILLIAM HEALY and
16                                    WILLIAM PEARSON,
                                      Assistant U.S. Attorneys
17                                    155 South Miami Avenue
                                      Miami, Florida    31330
18

19   For Defendant Sanchez:          WILLIAM AARON Esquire

20

     For Defendant Pulgaron:         WENDALL GRAHAM, Esquire
21

22

23

24

25                      41

FILED by [signature] D. C.

SEP 7 - 1993

T Q CHELEOTIS
CLERK U S. DIST. CT.
S. D. OF F.A. · MIAMI

FORM CSR - LASER REPORTERS PAPER & MFG. CO. 800-626-6313

VOL. 3-12

1    independent issues because I don't gather the same

2    inferences from the statement that you get from it.

3         THE COURT:  Well, it's a statement that's made in

4    furtherance of the conspiracy.  Quite frankly, I am not sure

5    exactly what the statement means.

6         I am not going to strike it but I am not going to

7    allow any explanation of it as 404(b) material.  Whatever it

8    states and whatever inferences you can make independent of

9    any 404(b) explanation, you gentlemen may handle it

10   accordingly, but, please, Mr. Healy, the witness will not

11   come in and provide any 404(b) evidence as it relates to

12   this matter or any other you haven't produced in the

13   discovery phase.  Be very careful about that.  If you have

14   prepared your witness and haven't covered that, please do so

15   before he testifies.

16        MR. AARON:  My last minor motion, Your Honor, would

17   be an ore tenus Brady request which was again raised by a

18   pleading I received from the Government most recently,

19   advising that Manuel Sanchez, the Government's informant,

20   had brokered a marijuana importation to Beaumont, Texas.

21        This is something we had not been provided with

22   prior to that, although we had been provided with some bad

23   acts that Manuel Sanchez did commit prior to that.

24        So the inference is, or at least one that needs

25   explanation is that when Manuel Sanchez was initially

**42**

1    debriefed by the FBI, as Agent Flynn testified, as he did,

2    three years ago, he probably did not tell them, and held

3    back about that particular marijuana importation, and if he

4    did, then that's evidence of his being dishonest, untruthful

5    and it goes to his credibility as a witness in talking with

6    an agent, particularly because it potentially could be a

7    1001 violation for which he has not been prosecuted, and if

8    that's the case, we are entitled, I believe, to know exactly

9    when he was debriefed so he can be properly cross-examined

10   as to that, who debriefed him, and the fact he did not tell

11   them about that importation and it wasn't until X-number of

12   years later that it came to light, and if there are any

13   other such wrong acts that he lied to them about, we are

14   entitled to know that for the same reason.

15        THE COURT:  Well, if the Government has information

16   that a witness was untruthful, then that would be

17   discoverable.

18        Is there any evidence that the witness was

19   untruthful in that regard?

20        MR. HEALY:  No, sir, there is no evidence he has

21   been untruthful.

22        In this regard what happened was, Agent Flynn

23   initially debriefed Manuel Sanchez and Sanchez mentioned the

24   situation in Beaumont, Texas.

25        Agent Flynn mistakenly thought it was part of the

43

BARBARA MEDINA, Official Court Reporter, U.S. District Court

1    arrests, the arrest which we had turned over.

2        When I spoke to him, it became clear that this was

3    not part of any arrests of his previous arrest history for

4    which he had been convicted.  When that was determined, we

5    determined it was essentially something separate.  That's

6    when I turned it over.

7        It wasn't a situation where he failed to tell him.

8    He told him, Agent Flynn listened, and thought it was part

9    of the arrest.

10       THE COURT:  All right.

11       Well that explanation is presented.  In the

12   Government's view it is not Brady.  They provided you with

13   the information and the circumstances.  If you probe the

14   area on cross examination and a different response occurs,

15   you will pursue it.

16       MR. AARON:  I would just bring out, our information

17   is, there was an arrest in 1977 and an arrest in 1983.  I

18   can't imagine what the '81 marijuana importation could have

19   been a part of or how the Government could have thought

20   that.  The 1981 is not '77 and it is not '83.

21       I would request we be provided with those

22   debriefings to see what was said about it and maybe he gave

23   the wrong date.  Maybe he gave the date of '77 and '83, and

24   that's why the agent thought it was part of the arrest.

25       I can't imagine how he could think it was part of

44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO. 93-0080-CR-DAVIS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Miami, Florida |
| NICK FERRER, | ) | Tuesday, 9:00 a.m. |
| ISRAEL BOLANO, | ) | December 14, 1993 |
| | ) | |
| Defendants. | ) | |
| ———————————————— | ) | VOLUME 1 |

TRANSCRIPT OF TRIAL PROCEEDINGS

BEFORE THE HONORABLE EDWARD B. DAVIS
AND A JURY

APPEARANCES:

For the Government:                    ROSA C. RODRIGUEZ-MERA, ESQ.
                                       Assistant U. S. Attorney
                                       9245 N.W. 53rd Street
                                       Miami, Florida  33166

For Defendant Ferrer:                  GEOFFREY FLECK, ESQ.
                                       5975 Sunset Drive
                                       South Miami, Florida  33143

For Defendant Bolano:                  FRANK QUINTERO, ESQ.
                                       3400 Coral Way
                                       Miami, Florida  33145

Court Reporter:                        LARRY HERR
                                       Federal Justice Building
                                       99 Northeast 4th Street
                                       Miami, Florida   33132
                                       (305) 530-8476

- - - - -

45

LARRY HERR, OFFICIAL REPORTER, U.S. DISTRICT COURT

Flynn - direct/Rodriguez                    Vol. 1-45

1    A    No, that was it.

2    Q    Aside from $3500 that he was receiving every month, did

3    he get paid any other money?

4    A    He was paid money just for the expenses to run the

5    business which, in effect, did not go to him but went to the

6    operation of the business.  If we needed to purchase

7    equipment, things of that nature, he was given the money and

8    then he would return with the receipt.

9    Q    Now, Mr. Sanchez' participation, did it end at some

10   time at Manny's Marina?

11   A    Yes, it did.  The marina was closed in November of

12   1992.

13   Q    At that time did he receive any type of payment?

14   A    He was still receiving his $3500 per month; and then in

15   1993, early 1993, he stopped receiving his $3500 a month and

16   received a payment of approximately $15,000 so he could move

17   and relocate his family.

18   Q    Now, is Mr. Sanchez eligible for any sort of money or

19   reward of any type?

20   A    Yes, he is.

21   Q    What is that?

22   A    He is eligible up to a -- a lump sum payment up to

23   $250,000.

24   Q    And what is that money for?

25   A    Well, it's for various things.  It's for the success of

46

Vol. 1 -1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

UNITED STATES OF America,          :          Case No. 93-81-Cr-DLG

      Plaintiff,          :

    -vs-          :

                    June 2, 1993
PEDRO SANCHEZ, et al.,          :          Miami, Florida

      Defendants.          :

- - - - - - - - x

FILED by _____ D.C.

MAY 12 1994

T. G. CHELEOTIS
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

TRANSCRIPT OF TESTIMONY OF
SPECIAL AGENT TIMOTHY FLYNN
BEFORE THE HONORABLE DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE
and a jury

APPEARANCES:

(As heretofore noted.)

Court Reporter:

           Barbara Medina
           Federal Justice Building
           Suite 1067
           99 Northeast 4th Street
           Miami, Florida          33132
           (305) 358-4642

PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED BY COMPUTER

47

Flynn - Cross/Aaron                                        Vol. 1 -15

1    that he had been paid by the FBI, correct?

2    A    That's what it says in this ledger, yes.

3    Q    If we then add the $17,500 to the 155,000 we get 172,500

4    that he has been paid, correct?

5    A    Well, sir, that's including services and expenses.

6    Q    No, it is not including expenses.

7    A    I beg to differ.

8    Q    Where is it including expenses?  I thought the only

9    thing he got paid was for services?

10   A    No, sir.  Services and expenses.

11   Q    Then what part of the $155,000 was services -- if he was

12   getting $3,500 a month and that started in November of

13   '89 --

14   A    '89.

15   Q    -- and continued until when?

16   A    Until February of '93.

17   Q    So, we've got 12 months in '90?

18   A    The February payment would be for services and expenses.

19   Q    You mean --

20   A    The February of 1993 payment would be for services and

21   expenses.

22   Q    But services would be $3,500, correct?

23   A    Can I see that?

24   Q    (Handing.)

25   A    Thank you.

                                48

BARBARA MEDINA, Official Court Reporter, U.S. District Court

1    that date?

2    A    This is all semantics, basically.

3    Q    If you had to put a label on it?

4    A    That was the official Bureau, bureauese name.

5    Q    Cooperating witness?

6    A    Yes.

7             Once he agreed to testify at a trial or at

8    hearings, then he was willing to, basically, identify

9    himself.  Once that occurred, he becomes a cooperating

10   witness.

11   Q    Prior to that, what was he referred to in FBI bureauese,

12   as you said?

13   A    Since late 1989 he was a cooperating witness and prior

14   to that he was a confidential informant.

15   Q    I must admit I am confused.

16            You say that as of June, 1990 his status changed.

17   He became a cooperating witness?

18   A    As I explained earlier on --

19   Q    Tell me yes or no, so I can keep this straight in my

20   mind.

21   A    If you will let me explain, I will explain so maybe you

22   can understand.

23   Q    Let's establish what you said and then you can explain

24   it.

25   A    Okay.

                            **49**

Flynn - Cross/Kesheneff                                              Vol. 1 -49

```
 1   Q    We are not asking a hypothetical question.  You had a
 2   very specific question here.
 3              Given the facts of this case, this informant and
 4   this activity --
 5   A    Based on this case alone?
 6   Q    Yes.
 7   A    I would not make a recommendation at that time for a
 8   $250,000 reward.
 9   Q    The question is was he eligible?
10   A    Yes, he would be eligible.
11   Q    Even though he was not yet a cooperating witness?
12   A    He was a cooperating witness then.
13   Q    You are saying he became a cooperating witness in
14   December of '89.
15   A    As I explained earlier, Miami started a cooperating
16   witness program.
17              What this allowed was for people who wanted to
18   testify, it gave them a separate category than confidential
19   informant.  A confidential informant is someone who does not
20   want to testify.
21              In 1989 the Miami Division started this cooperating
22   witness program.
23              In 1989 Manuel Sanchez came into the cooperating
24   witness program for purposes of FBI Miami.
25              In June the FBI, the overall FBI, started that
```

**50**

Flynn - Cross/Mesnekoff                                                    -50

1    program.

2            That's the best I can explain it.

3    Q    So that as of December 1989 he was a cooperating

4    witness?

5    A    Yes, ma'am.

6    Q    In terms of Miami?

7    A    Yes, ma'am.

8    Q    As of June, '90 in terms of the national FBI?

9    A    Yes, ma'am.

10   Q    Prior to December, '89 would he have been eligible for

11   the $250,000 award?

12   A    No, ma'am.

13   Q    You talked about some requests for services of Manny's

14   Marine.

15           You, personally, did not receive any such requests?

16   A    No, ma'am.  I wasn't an undercover agent.

17   Q    All of the information you received about that was based

18   on requests of Manny Sanchez?

19   A    Manny Sanchez or an undercover agent.

20           MS. MESNEKOFF:  Nothing further, Your Honor.

21                     REDIRECT EXAMINATION

22   BY MR. HEALY:

23   Q    Agent Flynn, did you advise Manny Sanchez of the amount

24   of money which he had made?

25   A    Yes.

                            51

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

UNITED STATES OF AMERICA,     .     CASE NO. 93-82-CR-NESBITT
                              .
                PLAINTIFF,    .     MIAMI, FLORIDA
                              .     MONDAY, JULY 11, 1994
                V.            .     9:55 A.M.
                              .
JOSE JESUS SAAVEDRA,          .
                              .
                DEFENDANT.    .
.  .  .  .  .  .  .  .  .  .  .  .  .

- - - - -

TRANSCRIPT OF TRIAL PROCEEDINGS HAD

BEFORE THE HONORABLE LENORE C. NESBITT,

UNITED STATES DISTRICT JUDGE, AND A JURY.

- - - - -
VOLUME 3
- - - - -

APPEARANCES:

FOR THE GOVERNMENT:    RICHARD E. GETCHELL,
                       ASSISTANT U.S. ATTORNEY
                       99 N.E. 4TH STREET
                       MIAMI, FLORIDA   33132

FOR THE DEFENDANT:     SHELDON R. ZILBERT. ESQ.
                       701 BRICKELL AVENUE, SUITE 2080
                       MIAMI, FLORIDA   33131

COURT REPORTER:        FRANCINE C. SALOPEK, R.M.R.
                       OFFICIAL COURT REPORTER
                       UNITED STATES DISTRICT COURT
                       301 N. MIAMI AVENUE, ROOM 340
                       MIAMI, FLORIDA   33128
                       (305)579-0906

52

SANCHEZ - CROSS

1  Q.   WERE ANY DRUGS FOUND ON YOU?

2  A.   NO, SIR.

3  Q.   IS THAT A VIOL' ION OF YOUR AGREEMENT WITH THE FEDERAL

4  GOVERNMENT?

5  A.   I'M NOT WORKING FOR THE FEDERAL GOVERNMENT ANYMORE.

6  Q.   WHEN WAS YOUR EMPLOYMENT WITH THE FEDERAL GOVERNMENT

7  TERMINATED?

8  A.   AS SOON AS WE CLOSED MANNY'S MARINE.

9  Q.   ARE YOU STILL RECEIVING PAYMENTS BY THE GOVERNMENT?

10  A.   EXPENSES.

11  Q.   WELL, TELL US WHAT EXPENSES ARE.

12  A.   THE RENT, MY HOUSE RENT, THE LIGHT.

13  Q.   WHY IS THAT EXPENSES?  THAT'S A -- WELL, LET ME

14  REPHRASE THAT.  EXCUSE ME.

15       HOW MUCH ARE YOU RECEIVING A MONTH IN EXPENSES?

16  A.   TWO THOUSAND.

17  Q.   THAT'S $500 A WEEK IN EXPENSES?

18  A.   SOMETIMES 1,500 AND 2,000, IT ALL DEPENDS.

19  Q.   IT DEPENDS ON HOW WELL THE FEDERAL GOVERNMENT IS DOING?

20  A.   AS I NEED IT.

21  Q.   SO IF YOU NEED MORE MONEY, THE FEDERAL GOVERNMENT JUST

22  GIVES YOU MORE MONEY?

23  A.   NO, SIR, I WAS TOLD NO.

24  Q.   WELL, HAVE YOU ASKED?

25  A.   YES.                    53

<pre>
 1                   UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
 2                         MIAMI DIVISION

 3   UNITED STATES OF AMERICA,    )   CASE NO.   93-85-CR-Marcus
                                  )
 4                Plaintiff,      )
                                  )
 5   vs.                          )
                                  )
 6   CARLOS CORONEL,              )
                                  )
 7                Defendant.      )
     _____)

 8
                                         Miami, Florida
 9                                       June 11, 1993
                                         10:38 a.m.
10

                             EXCERPT
11                   TRANSCRIPT OF JURY TRIAL
                BEFORE THE HONORABLE STANLEY MARCUS
12
     APPEARANCES:
13

     PLAINTIFF:               LAURENCE M. BARDFELD, ESQ.
14                            WILLIAM PEARSON, ESQ.
                              KENNETH P. NOTO, ESQ.
15                            Assistant United States Attorneys
                              155 South Miami Avenue
16                            Miami, Florida  33130

17   DEFENDANT:               JAMES McGUIRK, ESQ.
                              PAUL P. PENICHET, ESQ.
18                            201 Alhambra Circle
                              Suite 511
19                            Coral Gables, Florida  33134

20   REPORTER:                ROBERT A. RYCKOFF
                              301 North Miami Avenue
21                            Fifth Floor
                              Miami, Florida  33128
22                            305-374-7153

23

24

25
</pre>

EXHIBIT

"C"

1   Q   How are you employed?

2   A   If I am currently?

3   Q   Yes.

4   A   No, sir.  I am not employed now.

5   Q   You are unemployed?

6   A   I am unemployed, yes.

7   Q   How were you employed in 1991?

8   A   In Manny's Marine Service.

9   Q   What is Manny's Marine Service?

10  A   It was a boat business.

11  Q   What kind of boat business?

12  A   Working on boats, repairing engines, docking boats on

13  the river.

14  Q   How did you make your money?  Who paid you while you

15  were working at Manny's Marina?

16  A   The Government.  The F.B.I.

17  Q   And why did the Government do that?

18  A   Because we wanted to find out who were the people that

19  were importing drugs into the United States and facilitating

20  the dockage, the offloading, the parts.

21  Q   In 1991 who particularly paid your salary?

22  A   In 1991?

23      The F.B.I.

24  Q   And why did the F.B.I. do that?

25  A   To find out who were the people who were importing drugs

1    into the United States.

2    Q    What was your position with the F.B.I.?

3    A    I was an informer.

4    Q    You were a confidential informant?

5    A    A confidential informer, yes.

6    Q    When did you begin working for the F.B.I.?

7    A    In 1988, somewhere around --

8    Q    As a confidential informant working at Manny's Marina,

9    what did you do?

10   A    I would provide the people with the offloading place.  I

11   would get them parts --

12   Q    What people would you provide?

13   A    The people that were importing drugs into the United

14   States by boats.

15   Q    What else would you do?

16   A    Fix their boats.  Just help them all around.

17   Q    How else would you help them?

18   A    How else?

19   Q    Yes.

20   A    Well, I would tell them the best ways to get to the

21   Bahamas and just help all around, fix the boats, provide

22   them with fuel.

23   Q    Did you provide any kind of services?

24   A    As what?

25           MR. PENICHET:  Objection, Your Honor.

Sanchez - Direct                                    5

```
 1              THE COURT:  Basis.

 2              MR. PENICHET:  I will let him finish his question.

 3    Q    Did you provide supplies?

 4    A    Yes.

 5    Q    What kind of supplies?

 6    A    Fuel, fuel tanks, false compartments.

 7    Q    What else?

 8    A    Radios.

 9    Q    Okay.

10    A    Probe, water.

11    Q    Did you supply boats?

12    A    Boats also.

13    Q    And when did you stop working as a confidential

14    informant?

15         You now said you are unemployed?

16    A    Yes, I am unemployed now.

17    Q    When did you stop working?

18    A    I think it was November, 1992.

19    Q    And you started in about 1988 is what you said?

20    A    Yes, sir.

21    Q    During that time frame that you were working for the

22    F.B.I., how much did you get paid?

23    A    I was getting paid $3,500 a month.

24    Q    What's the total amount that you have been paid by the

25    Government of the United States?
```

Sanchez - Direct

1    A    $154,800.

2    Q    And what were you paid for?

3    A    For?

4         To provide services to the people that were importing

5    drugs.

6    Q    Can you describe what Manny's Marina looked like?

7    A    Well, it had a dockage in the back.  It was on the

8    river.

9    Q    A what in the back?

10   A    A dockage on the river.

11   Q    Which river was it on?

12   A    Sir?

13   Q    Which river?

14   A    In this river, in the Miami River.

15   Q    How else?  What was the building like?

16   A    It was a building.  We had two offices, one upstairs,

17   and one downstairs.

18   Q    Were the offices equipped with anything?

19   A    Yes.

20   Q    And what were they equipped with?

21   A    With a video tape.

22   Q    What kind of video tape?

23   A    It was a VHS.

24   Q    Was there a camera?

25   A    Yes.

58

VOL. 4-1

1 | 1

2

```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
                          MIAMI DIVISION
```

3      UNITED STATES OF AMERICA,       :    Case No. 93-81-Cr-DLG

4                    Plaintiff,        :

5               -vs-                   :    Miami, Florida
                                            June 2, 1993
6      PEDRO SANCHEZ,                  :
       THOMAS PULGARON,
7      ROBERTO CARVIJAL,               :
       JORGE BRITO,
8                                      :
                    Defendants.
9      -    -    -    -    -    -    x

10              TRANSCRIPT OF TRIAL PROCEEDINGS
          BEFORE THE HONORABLE DONALD L. GRAHAM
11            UNITED STATES DISTRICT JUDGE
                      AND A JURY
12

13                      VOLUME 4

14

15     APPEARANCES:

16     For the Government:              WILLIAM HEALY and
                                        WILLIAM PEARSON,
17                                      Assistant U.S. Attorneys
                                        155 South Miami Avenue
18                                      Miami, Florida      31330

19     For Defendant Sanchez:          WILLIAM AARON, Esquire

20

       For Defendant Pulgaron:         WENDALL GRAHAM, Esquire
21

22

23

24

25                      59
```

M. SANCHEZ - DIRECT/HEALY                           VOL.  4-43

1    the other one.

2    Q    Now, are you familiar with a business called Manny's

3    Marine?

4    A    Yes.

5    Q    Okay.

6         How are you familiar with that?

7    A    I used to -- I used to manage it.

8    Q    Who did you manage it for?

9    A    For the FBI.

10   Q    And for whom in the FBI were you associated with?

11   A    Tim Flynn, Special Agent.

12   Q    Now, when did you first get involved in Manny's Marine?

13   A    Late '89.

14        It's a lease that I signed.  The date should be on

15   that lease.

16   Q    Okay.

17        You say late '89?

18   A    Late '89.

19   Q    And what was your job in working at Manny's Marine?

20   A    Well, I tried to find out the people that were importing

21   drugs into the United States and facilitate them, the marina

22   and the parts, whatever they needed.

23   Q    You say, "facilitate," what do you mean by that?

24   A    If they want to offload at the marina, if they need work

25   to be done in the boats.  That's all.  Give them services.

60

M. SANCHEZ - DIRECT/HEALY                           VOL. 4-44

1   Q    Now, did you own any boats there?

2   A    Did I own any boats?

3   Q    Yes, sir?

4   A    No, sir.

5   Q    And were there vessels there?

6   A    Yes.

7   Q    Okay.

8        Whose vessels were they?

9   A    The owners?

10  Q    Yes, sir.

11  A    One blongs to the Government, the other one --

12       MR. AARON:  Excuse me, I didn't hear that.  I'm

13  sorry.

14  A    One vessel was owned by the Government, the FBI, and the

15  other vessel was owned by the title, by Brito, and the other

16  vessel was owned by -- I forgot his name, and -- and the

17  other one, I also forgot the name of the owner.

18  BY MR. HEALY:

19  Q    Okay.

20       Now, when you worked for Manny's Marine what salary

21  did you receive, if any?

22  A    $3,500 a month.

23  Q    Now, what did that include?

24  A    That included my salary only.

25  Q    Now, in the course of while Manny's Marine was open, how

61

BARBARA MEDINA, Official Court Reporter, U.S. District Court

M. SANCHEZ - DIRECT/HEALY                    VOL. 4-59

1    like a small yacht, 28-footer, the other one was a Hatteras,

2    a 40-footer Hatteras.

3    Q    And what were you to do with these boats?

4    A    Keep them there and keep maintenance on it to make sure

5    they were running in good condition, seaworthy.

6    Q    Okay.

7         And how did you do that?

8    A    I had a mechanic there working, and I make sure that he

9    check the boats, change the oil, whatever is needed,

10   whatever was needed to be done.

11   Q    And what did you -- what was the purpose of having those

12   boats there?

13   A    The main purpose?

14   Q    Yes, sir.

15   A    To go and pick up loads.

16   Q    When you say "to go and pick up loads" what does that

17   mean?

18   A    Drugs, cocaine.

19   Q    And how would this be accomplished?

20   A    Could you ask me that question again?

21   Q    Sure.

22        How would going and picking up the loads be

23   accomplished?

24   A    Could you rephrase that question for me, please?

25   Q    Sure.

                         62

M. SANCHEZ - DIRECT/HEALY                    VOL. 4-60

1              How were the loads picked up?

2    A    How?

3    Q    Yes.

4    A    With the boats.

5    Q    Where would the boats go?

6    A    Oh, different places.

7             On the Bahamas, most of the time on the Bahamas.

8    Q    And --

9         MR. AARON:   Your Honor, I have an objection.

10        I would like a sidebar.

11        THE COURT:   All right, come sidebar.

12    (Sidebar proceedings on the record.)

13        THE COURT:   I am not sure it is necessary to

14   entertain a sidebar, but in an abundance of caution, I will.

15        What is your objection?

16        MR. AARON:   The Government has now elicited

17   testimony from this witness regarding other smuggling

18   ventures my client, apparently, has been involved in.  These

19   are matters that have not been provided under 404(b) --

20        THE COURT:   Well, I can't make that determination

21   based on the testimony thus far.  I am not even sure what he

22   is talking about.  The questions are so vague I am not sure

23   what he is talking about.

24        If your objection is, it's vague, I will sustain

25   the objection, because I don't really know if it relates to

63

M. SANCHEZ - DIRECT/HEALY                    VOL. 4-93

1      I would once again ask the Court to order the

2    Government to produce for the Court, for an in-camera

3    inspection for us, all of their reports because they simply

4    don't know what we are entitled to or they are holding back

5    intentionally.  It's one of those two.

6          THE COURT:  Have I seen everything other than the

7    matters you have discussed?

8          MR. PEARSON:  Yes, Judge.

9          What I submitted to the Court, are the 302s

10   prepared in this case.  What you asked us to do is, do a

11   further search.  Once we have identified there was internal

12   memorandum created by this agent to his office for

13   accounting purposes, we had the agent go back and search his

14   files.  He has pulled out all his reports, reports that were

15   his, generated by him or generated by Agent Ciccarelli.  My

16   understanding is, those are the two agents responsible for

17   maintaining the payments to the informant.  So, to this

18   point you have seen everything, Judge.

19         THE COURT:  Agent, have I seen all of the 302s and

20   internal memorandum today related to payments in the case?

21         AGENT FLYNN:  Your Honor, you have seen all the

22   memos that I have generated.

23         There are teletypes that go to the Bureau.  Other

24   than that -- the only thing I can do is bring down the file.

25         THE COURT:  When you say "teletypes" what,

                                   64

BARBARA MEDINA, Official Court Reporter, U.S. District Court

M. SANCHEZ - DIRECT/HEALY                    VOL. 4-94

1    generally speaking --

2              AGENT FLYNN:  They are purely administrative

3    goings-on as to payments, as far as requesting money from

4    the Bureau, that type of thing.

5              The Bureau sends the money down to an account and

6    that's where we draw the money out of that account.

7              If you would like to see --

8              THE COURT:  Anything about the testimony --

9              AGENT FLYNN:  Excuse me.

10             THE COURT:  These are teletypes generated by you?

11             AGENT FLYNN:  Either myself or Joseph Ciccarelli or

12   some of the other agents involved in the case.

13             THE COURT:  Would they be explaining what is

14   happening in the case?

15             In other words, if you debriefed a cooperating

16   witness and you have a 302, would you then send a teletype

17   regarding that debriefing?

18             AGENT FLYNN:  No, sir.

19             What it would be is, a summation, so to speak, and

20   it would cover an entire time period of -- that the

21   cooperating witness -- it may include statistics that would

22   have occurred.  It gives the Bureau an update of what is

23   occurring so they can make a determination whether to send

24   more money down or not.

25             THE COURT:  All right.

                              65

BARBARA MEDINA, Official Court Reporter, U.S. District Court