1

1      1

FILED by _JB_ D. C.

SEP 7 - 1993

C. G. CHELEOTIS
CLERK U S. DIST. CT.
S. D. OF F.A. - MIAMI

```
                    UNITED STATES DISTRICT COURT
2                   SOUTHERN DISTRICT OF FLORIDA
                           MIAMI DIVISION

3    UNITED STATES OF AMERICA,     :      Case No. 93-81-Cr-DLG

4                   Plaintiff,     :

5            -vs-                   :      June 4, 1993
                                          Miami, Florida
6    PEDRO SANCHEZ,                 :
     THOMAS PULGARON,
7    ROBERTO CARVIJAL,             :
     JORGE BRITO,
8                                  :
             Defendants.
9    -   -   -   -   -   -   X
```

10
11
12
13

TRANSCRIPT OF TESTIMONY OF
SPECIAL AGENT TIMOTHY FLYNN
BEFORE THE HONORABLE DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE
and a jury

14

APPEARANCES:

15

(As heretofore stated.)

16
17
18
19
20

Court Reporter:

21
22

Barbara Medina
300 Northeast 1st Avenue
Miami, Florida      33132
(305) 358-4642

23
24
25

66

Flynn - Direct/Healy                                    37

1    monitor the boat and after the cocaine shipment, if it was

2    an air drop or boat to boat, depending on what occurred, the

3    Coast Guard would then stop the vessel and that would also

4    lead us to conclude the information was accurate.

5    Q    All right.

6         Now, inside Manny's Marine, would you describe for

7    the jury what that consisted of?

8    A    Yes.

9         Inside -- what we would also do to corroborate the

10   evidence would be to make tapes.  We would make audio tapes

11   and video tapes.

12        Inside the operation, there was a two story

13   building.  Inside there was an office downstairs, in which

14   Manuel Sanchez had his office.  Inside the office was a

15   video camera.  The video camera is activated by a switch

16   underneath Manuel Sanchez' desk.

17        Upstairs was a high frequency radio, and inside

18   that office also was a concealed camera which could be

19   activated by either Manuel Sanchez or an undercover agent.

20   Q    Now, in this case, who activated the switches?

21   A    In this particular case, the switch would have been

22   activated by Manuel Sanchez.

23   Q    Now, who set up the tapes?  Who set up the taping

24   equipment?

25   A    FBI agents.

                          **67**

Flynn - Cross/Mesnekoff                    89

1    A    I have Exhibits 1 and 2, two copies of the personal
2    services contract.
3    Q    Please take a look at them so you can refresh your
4    recollection --
5              THE COURT:  As to --
6    BY MS. MESNEKOFF:
7    Q    -- as to what you told informant Sanchez as to his
8    eligibility for the potential $250,000.
9    A    Ma'am, this is not exactly what I told him.  This is the
10   agreement that he signed.
11   Q    All right.
12             So that we can be clear then, the answer to the
13   question is you have no reports that would refresh your
14   recollection as to what you told him?
15   A    That's correct.
16   Q    Thank you.
17             You said that Sanchez was receiving $3,500 a month
18   as a salary?
19   A    Yes, ma'am.
20   Q    He was paid in cash?
21   A    Yes, ma'am.
22   Q    The cash was given to him by you?
23   A    Sometimes.
24   Q    By whom on other occasions?
25   A    Other agents would pay him.

1    Q    Which other agents?

2    A    It would either be Joseph Chicarella, Dave Holman,

3    Anabel Gonzalez.

4          There were other agents working on the case also.

5    Q    What other agents?

6    A    Working on the case also.

7    Q    That may have given 3,500 cash money to Manny Sanchez?

8    A    I could just name a few.

9          There was probably four or five that have probably

10   paid him on different occasions.

11   Q    And you obtained the money initially by check?

12   A    Yes.

13   Q    You cashed the check?

14   A    We cashed the check.  We would get the cash.  We would

15   go down.  He would receive the money.

16   Q    And he would sign a receipt?

17   A    Correct.

18   Q    You would put the receipt in your file?

19   A    Correct.

20   Q    You would prepare a report on that?

21   A    Not necessarily, because it was on the personal services

22   contract.  That's just the way it was done.

23   Q    Now, you say you wouldn't necessarily prepare a report.

24          Did you prepare a report each time you cashed a

25   check and gave him money?

                          69

1    A    We would prepare a report prior to cashing a check and

2    paying him money, not afterwards.

3    Q    Every time?

4    A    Every time.

5    Q    You gave additional monies to Sanchez above and beyond

6    the $3,500 a month?

7    A    For what?

8    Q    You tell me.

9         For his services.

10   A    We would -- no, sir.  No, ma'am.  He was paid $3,500 per

11   month for his services.  That was his money.  That's his

12   salary.

13        If you like, if you would like me I will explain,

14   however, when business expenses were to be paid such as

15   rent, utilities, things of that nature, then we would give a

16   check, sometimes cash, to Sanchez and get a receipt in

17   return to pay for those expenses to run the day-to-day

18   operations of the business.

19   Q    That's in addition to the $2,500 per month rent you were

20   paying for Manny's Marine?

21   A    I believe it was $2,600 a month rent.

22        We would pay the 2,600 a month by check.  That

23   would go to the owner of the property.

24        His $3,500 a month was his salary alone.  That

25   didn't have anything to do with business expenses.  That was

Westlaw.                                                            **News**Room

11/24/98 PITTSPOST A12                                                     Page 1


11/24/98 Pitt. Post-Gazette A12
1998 WLNR 3112245

                        Pittsburgh Post-Gazette (PA)
                        Copyright 1998 PG Publishing Co.

                            November 24, 1998

                            Section: NATIONAL

           FEW OF CASE'S TWISTS, SHADY DEALS REVEALED IN COURT

                   BILL MOUSHEY, POST-GAZETTE STAFF WRITER

Federal prosecutors say Peter Hidalgo was a master drug smuggler and deserved the
four life sentences that resulted from his conviction in 1994.

   Hidalgo says his trial was a farce that conniving federal agents and prosecutors
orchestrated.

   The Post-Gazette's investigation found one certainty: Government misconduct at
Hidalgo's trial was so rampant and calculated that nothing resembling the truth
could have emerged.

   Four years have passed since his trial, yet appeals courts have yet to rule on
his challenge. Here's what the Post-Gazette found:

   * Hidalgo was accused of leading a smuggling operation that brought 423
kilograms of cocaine into Miami in 1992. Although discovery rules require it,
Hidalgo wasn't informed that 23 kilograms of cocaine turned up missing after the
bust, but prosecutors had in their possession videotapes showing that individuals
who had contact with the smugglers discussed the missing cocaine and suggested it
had been split among informants and federal agents. Hidalgo believes these
informants and agents conspired against him to hide their misconduct. Prosecutors
violated discovery by not turning the tapes over to Hidalgo's attorneys.

   * Prosecutors withheld other audiotapes and videotapes that included extensive
conversations about the smuggling operation. The limited transcripts prosecutors
provided were marked ``inaudible'' in many places, although Hidalgo later learned
these inaudible conversations were perfectly clear on the tapes. Hidalgo believes
the tapes were withheld and the transcripts abbreviated because his name came up in
none of the conversations. Prosecutors hid them because they showed he had no part
in the operation, he believes.

   * Prosecutors failed to inform Hidalgo that a federal agent who played a key
role in the drug bust committed suicide shortly after Hidalgo's arrest. The agent
was mentioned 43 times at Hidalgo's trial and had told his sister just before his
death that he feared he would be implicated criminally in one of his biggest cases.

   * Prosecutors failed to inform Hidalgo that police reports raised enough
questions about this agent's death that it could have been argued that he was

                                   **71**

             © 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

murdered.

* Hidalgo did not learn until after his trial that some witnesses against him had perjured themselves in earlier trials, that some of these witnesses were convicted murderers and that the government paid some of these witnesses paid huge sums for their services. One man received $500,000.

* Prosecutors failed to tell Hidalgo that a key witness against him had fabricated his testimony and bragged to his cellmates that he expected a substantial cut in his prison time for his lies.

* Prosecutors failed to turn over copies of grand jury transcripts that would have pointed out many of these discrepancies.

Man of modest means

Hidalgo made his living selling, racing and repairing boats in Miami Lakes, Fla.

His skill behind the wheel brought him fame and the attention of drug runners who needed equipment that could outrun law enforcers.

Hidalgo, his wife and 1-year-old daughter lived in a modest rental that he hoped they someday might buy. He considered himself lucky. Hidalgo escaped from Cuba in 1968, and the life he enjoyed in the United States, while modest, seemed a paradise by comparison.

That changed on Sept. 8, 1992.

Federal agents arrested Hidalgo and charged him with being the kingpin behind the drug-smuggling operation that had brought more than 400 kilograms, 880 pounds, of cocaine to the United States from Colombia, via the Bahamas. The cocaine was worth about $6 million wholesale, far more when it hit the streets.

Agents were familiar with Hidalgo. He had been arrested in a 40,000-pound marijuana smuggling case, but all charges against him were dropped. He'd never been convicted of a felony.

The witnesses who would testify against him did not lead Hidalgo's modest lifestyle. They were cartel-level millionaire smugglers, armed robbers, killers and thieves.

The illegal drug trade had treated them well. They wore expensive clothes, drove expensive cars, lived in beautiful homes.

And unlike Hidalgo, federal agents had the voices of these men on tape, discussing the drug deal in telephone conversations. Agents had photographed and videotaped these men in the days before the drug-laden boat arrived and after it reached U.S. soil.

None of the men who would be witnesses against Hidalgo had mentioned his name in their taped conversations, so Hidalgo figured federal agents and prosecutors would see through the ruse, that he was being made a scapegoat so that drug criminals could seek leniency by testifying against him.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Hidalgo was wrong. Federal agents and prosecutors not only ignored the lies and fabricated evidence that came from these witnesses, they made sure no one else in the case would know about them.

There was another difference between Hidalgo and the men who testified against him. Almost all were guilty and eager to cut deals in exchange for reduced sentences. Hidalgo got the same kind of offer.

If Hidalgo would plead guilty, he'd get a maximum sentence of 11 years in prison, prosecutors told him. He might be paroled after nine years or so, and if he would provide ``substantial assistance'' by testifying against others, he might qualify for the Justice Department's biggest prize: an even quicker release and a payment of tens of thousands of dollars, just like those who would eventually testify against him.

Hidalgo said he turned down the deal because he was innocent. Had he taken the government up on its offer, he would soon be a free man.

A strange alliance

The shaky foundation of the government's case against Hidalgo began two years before the drug smuggling sting.

In 1990, a Miami police officer named Ralph Rodriguez arrested two Cuban refugees for selling him 2 kilograms of cocaine in Miami.

After their arrest, the two refugees filed a complaint against Rodriguez. They said that twice in their presence he had sampled the cocaine they were selling, which, if true, would be cause for his dismissal. They also complained he had sex with a material witness in their case, also a violation of department rules.

Lie detector tests supported their charges.

This wouldn't be the first investigation of the agent's conduct. Defense attorneys and defendants had long complained that Rodriguez often broke the law in his efforts to enforce it.

But in August 1992, the two Cuban refugees withdrew their complaints. Instead, they signed a plea agreement that freed them from prison time if they would work undercover for Rodriguez, who by then had taken a job for the federal Bureau of Alcohol, Tobacco and Firearms.

The undercover work the informants performed paid well. For starters, each was given $20,000 to relocate their families.

Within in few years, both of the refugees would purchase ranches in South Florida worth hundreds of thousands of dollars, though they testified that they mowed lawns for a living. No one has explained how their fortunes might have changed so dramatically.

Soon, Rodriguez and the two informants would work together again, this time, helping to orchestrate the drug bust that would snare Hidalgo.

**73**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Infiltrating the deal

The two informants told Rodriguez they knew of a drug operation that another man named Rodriguez was planning. The other Rodriques' first name was Luis, and his nickname, ``Cejas,'' was Spanish for thick eyebrows. He also was a Cuban refugee.

So Agent Rodriguez and his partner in a drug task force, Special Agent Lee Lucas of the U.S. Drug Enforcement Administration, hooked the two informers up with Angel ``Pepe'' Vega, an undercover officer for the Florida Marine Patrol.

They would soon work their way into the drug deal. Here's how it worked.

Cejas and another Miami smuggler named Gilberto Morales arranged for the two government informants and a third man to pick up a boat from Manny's Marina in Fort Lauderdale, Fla.

Manny Sanchez, another long-time drug smuggler, who had struck a great deal with federal agents, owned the marina. In exchange for a cut in his prison time on one of his six convictions, the agents ran drug stings out of his business, which they had wired for sight and sound. In addition, agents paid Sanchez $500,000, although Sanchez would tell the jury at Hidalgo's trial that he only got $250,000. He admitted he paid no taxes on the payments.

When the boat reached the Bahamas, Fernando Fernandez and a crew of Bahamians were waiting. Fernandez was a middle man in smuggling operations between Colombia and the United States.

There were 10 bales of cocaine to pick up, each weighing 40 kilograms, 88 pounds. Fernandez opened one of the bales and gave the Bahamian crew 17 kilograms of cocaine as payment for their work. Twice, he carefully counted the remaining 23 kilograms from the opened bale in front of everyone present.

That opened bale of cocaine - and just how much eventually arrived in the U.S. - would become a key factor in Hidalgo's case but one that would never reach the ears of juror's during his trial.

The deal goes bad

On Sept. 4, 1992, the boat left Freeport, the Bahamas, then made a rendezvous with a vessel that Agent Rodriguez; his partner Lucas; and Vega, the third task force agent, staffed about a mile off the coast of Florida.

Agents Rodriguez and Lucas would later testify that it was a stormy night and ocean swells made transferring the drugs from one vessel to the other difficult. They intimated that the opened bale of cocaine might have fallen into the water.

It wasn't until after his trial that Coast Guard data revealed to Hidalgo that the water that night was tranquil.

Agents Rodriguez and Lucas transported the cocaine to a government warehouse. No one else knew where the drugs were hidden.

The two Cuban informants then called Cejas and Morales on tapped phones to demand payment in cash, $600,000, before they would make final delivery of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

drugs.

Morales and Cejas didn't have the money; they had earlier agreed to pay for the work in drugs. They offered 50 kilograms, but the federal informants turned them down. Then Morales and Cejas offered 100 kilograms. Still, no deal.

Morales and Cejas were getting desperate. The Colombians who had set up the shipment couldn't understand the delay in getting the drugs delivered. Morales made as many as 20 phone calls a day over four days to discuss the 423 kilograms of cocaine. While he later would testify that Hidalgo was his partner, he never mentioned Hidalgo in any of those calls, nor did he suggest that he had to check with anyone else before making new offers to get the drugs delivered.

After four days, the Colombians and their Bahamian confederates began to wonder if Morales and Cejas were stealing from them. They dispatched two contract killers to kidnap Cejas. He would be held hostage until the drugs were released, and if they weren't, Cejas would be killed. Morales knew if that happened, he would be next.

A friend in need

That's where Hidalgo finally entered the picture.

He had known Morales for years. He said Morales asked him to call the Bahamians, since they had purchased boat equipment from Hidalgo's business and trusted his word. Morales asked Hidalgo to tell the Bahamians that Morales and Cejas could be trusted. Nothing more was asked of him, Hidalgo said.

The conversation was never captured on tape, at least prosecutors never produced it at the trial. While investigators had the entire process wired, they said the equipment was not turned on the entire time. Prosecutors also attributed their failure to catch Hidalgo on tape to his careful nature.

Morales would later testify that Hidalgo made the call in an effort to salvage the deal - and his profits.

Hidalgo admits he was stupid to make the call, adding he was simply trying to save the life of someone he knew. ``I knew the Bahamians from the boat business,'' he said in an interview earlier this year at the Federal Detention Center in Miami. ``They knew I was an honest businessman. If I don't do this, Cejas was dead. Morales was dead. I diffused the entire situation.''

Shuttled across country

Here is Hidalgo's definition of hell: knowing government witnesses lied, knowing prosecutors hid evidence favorable to him while allowing fabricated evidence that would convict him, learning about the deceit only after he was convicted and sentenced.

Then being shuttled from prison to prison to prison - diesel therapy, prisoners call it - because, he says, he so aggressively has pressed his contention that federal agents and prosecutors sandbagged him.

In April, he was transferred from Miami to Atlanta; then to Oklahoma City; then

**75**
© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to Leavenworth, a maximum security prison in Kansas, where many convicts with life sentences begin serving their time. Government rules say he should be allowed to stay in the prison closest to the court where his appeal was filed, until that appeal is decided. Hidalgo filed his appeal in Miami. He is 1,460 miles away.

Hidalgo has little money but was able to hire, briefly, an investigator to take a closer look at the government's misconduct, but most of Hidlago's research has been accomplished from his prison cells.  Here are some of the additional things he learned:

* Hidden witness. Federal prosecutors gave Fernandez, the man who handled the drugs in the Bahamas, leniency for his testimony, but they never put him on the stand after he insisted that 23 kilograms of cocaine was missing from the amount he had shipped - the cocaine remaining in the bale used to pay off the Bahamians. This contradicted the government's other witnesses and buttressed Hidalgo's contention that federal agents knew about the missing drugs.

* Paid liars. Hidalgo learned that the government's witnesses against him received more than $3 million in cash or in drug-related property that federal agents had a right to seize but didn't. Most of those payments were never revealed at his trial.

* Great deals. Morales, the man whom Hidalgo saved, faced 24 years in prison for his role in the operation. Federal prosecutors offered to reduce that to 10 years if he'd identify leaders of the drug smuggling operation. Morales knew that fingering real drug kingpins would lead to an early death, so he said nothing that resulted in charges against his contacts in Colombia. He simply told prosecutors he was working for Hidalgo, even though the statement made little sense. If Hidalgo were a drug kingpin, why had he solittle money and lived in a rental house? Morales admitted to making $5 million smuggling drugs during the previous 12 years.

* Mystery man. One of the most mysterious witnesses was Jose Luis Goyriena, who testified he was a distributor for a major drug ring whose leaders included Hidalgo. Goyriena bragged to cellmates that he'd never heard of Hidalgo but had obtained information about Hidalgo's case and fabricated testimony against him so prosecutors would reduce Goyriena's 27-year prison sentence. Even though prosecutors were told of Goyriena's scheme before and after Hidalgo's trial, they said nothing to Hidalgo's lawyers.

* Suicide questions. Angel ``Pepe'' Vega, the agent whose suicide was hidden from Hidalgo, suffered from anxiety attacks and depression after the drug bust. Shortly after telling his sister that he feared he might be arrested in connection with one of his big cases, he was found dead in his car in the parking lot of his Fort Lauderdale, Fla., church. His death was ruled a suicide. He left a note of apology for his wife, but Hidalgo's investigator found discrepancies in Broward County police reports:

* Vega was left-handed, but he shot himself in the right side of the head.

* The downward path of the  9 mm slug that killed him was at an angle that would have been nearly impossible for someone to accomplish with his Glock pistol, with its 6-inch barrel.

* Vega's weapon was found pointing forward between his legs. The weapon's recoil

**76**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

should have sent the gun falling into a back seat.

  * No blood from the wound was found on the hand Vega would have used to pull the trigger.

  Despite those findings, police closed the Vega case as a suicide.

`It's a big price'

  Hidalgo has been in Leavenworth since April. He hopes for a new trial, but the cost of fighting the government is great, he said.

  He realizes that if he'd simply joined forces with the government and lied about others, as they did about him, he might have walked free. He said his conscience would not allow him to do that.

  ``I'm not saying I've had the best associations, but what they're saying I'm involved in, it's bull,'' he said. ``It's a big price. I've lost my family. I have a daughter who I haven't been part of her upraising since she was 10 months old.

  ``These people have broke me financially; they broke up my family. The only thing they won't be able to break is my dignity and my principles. ``(If) they get me a new trial, I'm gonna show what the government has done, that it's out of control.''

PHOTO (2)

  PHOTO Darrell Sapp/Post-Gazette: Peter Hidalgo seemed like a minor player in a major drug deal. Called in by a friend to help defuse a tense situation, Hidalgo ended up being the main target after the key players in the drug deal testified against him. He is facing four life sentences for drug smuggling, even though he never even saw the drugs involved.

PHOTO Darrell Sapp/Post-Gazette: Peter Hidalgo has been frustrated by the many twists in his case, especially the implications surrounding the missing drugs from the deal that sent him to prison for four life sentences. He is also frustrated by the thought that his conviction will keep him helping to raise his daughter.


PART 3 OF 10
  SERIES: WIN AT ALL COSTS Government misconduct in the name of expedient justice

                    ---- INDEX REFERENCES ----

NEWS SUBJECT:  (Violent Crime (1VI27); Crime (1CR87); Social Issues (1SO05))

INDUSTRY:  (Smuggling & Illegal Trade (1SM35))

REGION:  (Cuba (1CU43); Colombia (1CO48); USA (1US73); Americas (1AM92); Oklahoma (1OK58); Florida (1FL79); North America (1NO39); Bahamas (1BA90); Caribbean (1CA06); South America (1SO03); Latin America (1LA15))

Language:  EN

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PETER J. HIDALGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-562 (EGS) |
| | ) | |
| FEDERAL BUREAU OF | ) | |
| INVESTIGATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff, by his undersigned attorneys, hereby moves the Court, pursuant to Federal Rule of Civil Procedure 56, to deny the Defendant's Motion for Summary Judgment and grant the Plaintiff's Motion For Summary Judgment on the grounds that no genuine issues as to any material fact exist and that plaintiff is entitled to judgment as a matter of law.

In support of this motion the Court is respectfully referred to the attached Appendix and Exhibits, the Statement of Material Facts To Which There Is No Genuine Issue, and the Memorandum In Support of the Plaintiffs' Cross Motion For Summary Judgment.

Respectfully Submitted,


s/ William Nifong

_____
William Nifong
(DC Bar # 470217)
O'Melveny & Myers LLP
1625 I Street NW
Washington, D.C.  20006


s/Jessica Davidson Miller

_____
Jessica Davidson Miller
(DC Bar #457021)
O'Melveny & Myers LLP
1625 I Street NW
Washington, D.C.   20006




Dated:    April 29, 2005




79

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                          )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )    Civil Action No. 04-562 (EGS)
                                           )
FEDERAL BUREAU OF                          )
    INVESTIGATION,                         )
                                           )
        Defendant.                         )
_____)

## STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE, PURSUANT TO LOCAL RULE 7(h)

Pursuant to Local Rule 7(h), defendant submits the following statement of material facts as to which there is no genuine issue:

1.    By letter dated November 3, 2003, Plaintiff Peter Hidalgo made a request to the Defendant Federal Bureau of Investigation, pursuant to the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552 (1996 & West Supp. 2004), and the Privacy Act of 1974, 5 U.S.C. § 552a (2000), seeking records related to Manuel Sanchez's criminal history and his status as an informant for the FBI. (*See* Compl. ¶ 5)

2.    By letter dated November 21, 2003, the defendant informed Mr. Hidalgo that the FBI would not process his request for information regarding Mr. Sanchez without proof of his death or receipt of a privacy waiver from him pursuant to 5 U.S.C. § 552(b)(6) and/or (b)(7)(C).  (*See* Compl. ¶ 6)

3

3.    By letter dated December 11, 2003, Mr. Hidalgo filed an administrative appeal of the FBI's denial of his request with the Office of Information and Privacy (OIP) of the United States Department of Justice.  (*See* Compl. ¶ 7)

4.    By letter dated January 9, 2004, OIP acknowledged receipt of Mr. Hidalgo's letter dated December 11, 2003, and assigned number 04-0713 to his appeal.  (*See* Compl. ¶ 8)

5.    On April 8, 2004, plaintiff filed the instant lawsuit. (*See* Compl. ¶ 1)

6.    The OIP affirmed the FBI's refusal to confirm or deny the existence of records related to Mr. Sanchez pursuant to 5 U.S.C. § 552(b)(7)(C) by letter dated May 5, 2004. (*See* Compl. ¶ 9)

Respectfully Submitted,

s/ William Nifong

William Nifong
(DC Bar # 470217)
O'Melveny & Myers LLP
1625 I Street NW
Washington, D.C.  20006

s/Jessica Davidson Miller

Jessica Davidson Miller
(DC Bar #457021)
O'Melveny & Myers LLP
1625 I Street NW
Washington, D.C.   20006

**81**

Dated:    April 29, 2005

4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                    )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )       Civil Action No. 04-562 (EGS)
                                     )
FEDERAL BUREAU OF                    )
    INVESTIGATION,                   )
                                     )
        Defendant.                   )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S
JOINT OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

### Preliminary Statement

Plaintiff Peter Hidalgo commenced the present action on
April 8, 2004, pursuant to the Freedom of Information Act
("FOIA"), 5 U.S.C.A. § 552, and the Privacy Act of 1974, 5
U.S.C. § 552a (2000), in order to compel the production of
records pertaining to a paid government informant, Manuel
("Manny") Sanchez. Mr. Hidalgo is seeking an accounting of
payments made to Mr. Sanchez by any government agency, a history
of all of Mr. Sanchez's convictions and arrests, a list of all
claims of misconduct against Mr. Sanchez while he was an
informant, and records related to Mr. Sanchez's failure to pay
federal income taxes. The question now before the Court is
whether documents regarding this informant must be disclosed now
that the Government has officially confirmed his status as an

5

informant - and where there is compelling evidence of Government misconduct in using that information, apparently to enhance Mr. Sanchez's credibility as a Government witness in criminal trials.

Manny Sanchez is a career criminal turned paid government informant. He has compiled a long list of felony arrests and convictions: for armed robbery in July 1967, for possession with intent to distribute cocaine in October 1975, for selling drugs in June 1976, for escaping from prison in September 1976, for another drug offense in August 1977, and for cocaine possession in September 1983 and again in August 1987. Since 1987, Mr. Sanchez has been arrested at least five times, including once in February 1990 for chasing a cable company employee with a machine gun and once in April 1992 for threatening to "hunt down" a police officer during a drunk driving stop. (*See infra* Section II.B.1.)

During the late 1980s and early 1990s, Mr. Sanchez ran a Miami undercover operation for the FBI called Manny's Marine Service ("Manny's Marine"). Manny's Marine was a place where drug runners would come to buy boats with secret compartments and enlist captains to transport drugs. Mr. Sanchez would record his conversations with drug runners and then deliver the recordings to the Government for use in criminal prosecutions. Between 1993 and 1996, Mr. Sanchez testified in at least five

6

federal criminal trials against at least 10 defendants in the United States District Court for the Southern District of Florida.  For his assistance, the Government paid Mr. Sanchez at least $440,000 and possibly as much as $1 million.  (*See infra* Section II.B.2.)

During those trials, the Government repeatedly failed to ensure accurate disclosure of Mr. Sanchez's criminal history, even as Mr. Sanchez perjured himself on this subject on the witness stand.  (*See infra* Section II.B.1-2)  In addition, both the Government and Mr. Sanchez made misleading representations favorable to his credibility regarding the amount he was paid for his services and the length of time he served as a paid informant.  (*See infra* Section II.B.2)  Moreover, Mr. Sanchez testified at least four times over four consecutive years that he paid no taxes on any of the considerable sums he received as an informant, even while conceding that his earnings were taxable and that tax evasion is a crime.  Yet the Government has never pursued Mr. Sanchez's tax liability.  (*See infra* Section II.B.3.)  Finally, although his seven arrests between 1967 and 1987 yielded seven convictions, not one of his five arrests since he became a paid Government informant has resulted in a conviction.  (*See infra* Section II.B.4.)

Mr. Sanchez's role as a paid informant and prosecution witness in numerous trials is widely known and has been publicly

7

**84**

reported.  Any residual privacy interest retained by Mr. Sanchez

is substantially outweighed by the fact that Mr. Hidalgo has

produced compelling evidence of Government misconduct in support

of his FOIA request, including repeated and uncorrected perjury

by Mr. Sanchez and official misrepresentations concerning Mr.

Sanchez's criminal history and the amount he was paid for his

service as an informant.  Accordingly, Mr. Hidalgo respectfully

requests that the Court deny the Government's motion for summary

judgment and instead grant his cross-motion for summary

judgment.

### Factual and Procedural Background

The present case arises from the FBI's denial of Mr.

Hidalgo's November 3, 2003 request for records related to the

informant Manny Sanchez.[1]  (*See* Compl. ¶ 5).  Specifically, Mr.

---

[1]    This is actually the second time the FBI has denied Mr.
Hidalgo's FOIA request.  Mr. Hidalgo first wrote the FBI on
December 13, 1999, in an effort to locate the same documents
sought in this case.  *See* App. at 35-38.  Following denial of
that request by the FBI, Mr. Hidalgo filed suit in this Court
(*see* App. at 5-8), which granted the Government's motion for
summary judgment on the grounds that the documents Mr. Hidalgo
requested were protected from disclosure by Exemption 6 (*see*
App. at 1-4).  (N.B. The Government appears to have abandoned
Exemption 6 as a basis for denying Mr. Hidalgo's request.)  On
appeal to the United States Court of Appeals for the District of
Columbia Circuit, the D.C. Circuit did not reach the merits but
vacated the award of summary judgment and instructed the
District Court to dismiss the case pursuant to Fed. R. Civ. P.
12(b)(6) "for failure to exhaust administrative remedies."
*Hidalgo v. FBI*, 343 F.3d 1256, 1260 (D.C. Cir. 2003).  Relevant
documents and briefs from those proceedings are included in the

Hidalgo sought records related to Mr. Sanchez's criminal history and his status as an informant for the FBI. By letter dated November 21, 2003, the defendant informed Mr. Hidalgo that the FBI would not process his request for information regarding Mr. Sanchez without proof of his death or receipt of a privacy waiver from him pursuant to 5 U.S.C. § 552(b)(6) and/or (b)(7)(C). (*See* Compl. ¶ 6).

Prior to initiating the present proceeding on April 8, 2004, Mr. Hidalgo fully exhausted his administrative remedies. By letter dated December 11, 2003, Mr. Hidalgo filed an administrative appeal of the FBI's denial of his request with the Office of Information and Privacy (OIP) of the United States Department of Justice. (*See* Compl. ¶ 7). The OIP affirmed the FBI's refusal to confirm or deny the existence of records related to Mr. Sanchez pursuant to 5 U.S.C. § 552(b)(7)(C) by letter dated May 5, 2004. At this time, Mr. Hidalgo has no other administrative remedy available.

On February 23, 2005, the Government moved for summary judgment on the grounds that the FBI properly refused to confirm or deny the existence of recordings pertaining to Manny Sanchez pursuant to 5 U.S.C. § 552(b)(7)(C) and 5 U.S.C. § 552(b)(7)(D).

---

Appendix attached hereto.

## Argument

The Government's Motion for Summary Judgment fails justify the denial of Mr. Hidalgo's FOIA request and the Government's unwillingness even to confirm or deny the existence of the records sought. First, having already conceded in prior litigation that Mr. Sanchez has been officially confirmed as an FBI informant, *see infra* Section I, the Government may no longer seek refuge behind a so-called *Glomar* response and refuse to confirm or deny the existence of these records. *See Benavides v. Drug Enforcement Admin.*, 968 F.2d 1243, 1246 (D.C. Cir. 1992) ("[W]hen an informant's status *has been* officially confirmed . . . the agency must acknowledge the existence of any records it holds.") (emphasis in original). For that reason alone, the Government's summary judgment motion must fail.

Moreover, as set forth below, neither of the FOIA exemptions on which the Government relies - exemptions 7(C) and 7(D) -- is availing. First, even if Mr. Sanchez's status as an informant had not been confirmed, he still would have no privacy interest sufficient to overcome the public interest in disclosure under these circumstances. By repeatedly testifying in open court about his activities as an informant, Mr. Sanchez waived his privacy in the information sought by Mr. Hidalgo, and none of the cases cited by the Government suggests otherwise.

10

Moreover, there is compelling evidence of Government misconduct that supports granting Mr. Hidalgo's FOIA request, including a pattern of official misrepresentations concerning Mr. Sanchez's criminal history, the length of his service as a paid informant, and the amount he was paid – all apparently intended to enhance Mr. Sanchez' credibility as a government witness in criminal trials. Thus, the public interest in gaining access to this information — information bearing directly (and critically) on the "public understanding of the operations or activities of the government," *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 893 (D.C. Cir. 1995) — far outweighs any privacy interest Mr. Sanchez might have had and therefore precludes invocation of Exemption 7(C).

Second, the Government's reliance on Exemption 7(D) is fatally flawed for the same reason as its *Glomar* responses. Once the Government itself has confirmed the identity of an FBI informant, it obviously cannot refuse to hand over documents sought under a FOIA request because production of those documents might "disclose the identity of a confidential source." 5 U.S.C. § 552(b)(7)(D). In addition, the essential purpose of Exemption 7(D) is to preserve not only the identity of a confidential source but also the confidentiality of

11

information gathered from that source in the conduct and furtherance of a criminal investigation. To the extent that Mr. Hidalgo seeks information concerning Mr. Sanchez's credibility — his prior criminal convictions, the amount of payments made to him by the Government, and his failure to pay taxes on this remuneration — there is no "information *furnished by* a confidential source" that would be needed for law enforcement purposes. 5 U.S.C. § 552(b)(7)(D) (emphasis added). Therefore, Exemption 7(D) is inapplicable under this set of facts, and Mr. Hidalgo is entitled to summary judgment on his FOIA request.

### I.    The Government May Not Refuse To Confirm or Deny the Existence of Documents When It Has Already Confirmed the Identity of an Informant.

Although the Government purportedly relies on Exemptions 7(C) and 7(D), it does not identify any specific documents that are being withheld pursuant to those provisions, but instead refuses to confirm or deny the existence of any documents in an effort to protect an alleged privacy interest and/or the identity of an informant. *See* 5 U.S.C. § 552(b)(7)(C) (providing an exemption where disclosure of documents would result in an "unwarranted invasion of personal privacy"); 5 U.S.C. § 552(b)(7)(D) (permitting denial of FOIA request that might "disclose the identity of a confidential source"). That

12

response contravenes D.C. Circuit precedent requiring the
Government to confirm or deny the existence of responsive
records where, as here, an individual's status as an informant
has been officially confirmed.

Section 552(c)(2) of FOIA provides:

> Whenever informant records maintained by a criminal
> law enforcement agency under an informant's name or
> personal identifier are requested by a third party
> according to the informant's name or personal
> identifier, the agency may treat the records as not
> subject to the requirements of this section **unless the
> informant's status as an informant has been officially
> confirmed**.

5 U.S.C. § 552(c)(2) (emphasis added).  In *Benavides v. Drug
Enforcement Administration*, 968 F.2d 1243 (D.C. Cir. 1992), the
D.C. Circuit held that § 552(c)(2) means precisely what it says:
a *Glomar* response may be authorized when an informant's status
has not been officially confirmed, but "when an informant's
status *has been* officially confirmed, the requirements of FOIA
govern, and the agency must acknowledge the existence of any
records it holds."  *Id*. at 1246.

*Benavides* involved a convicted drug dealer who challenged
the DEA's *Glomar* response to his request for information on two
Government informants who appeared at his trial.  *See id.* at
1245.  Although the District Court granted summary judgment for
the agency, the D.C. Circuit reversed.  Based on § 552(c)(2)'s

13

**90**

text and legislative history, the Court explained that "Congress did not intend to authorize the use of a *Glomar* response when an informant's status has been 'officially confirmed.'" *Id.* at 1248; *see id.* ("'[A]n agency **must** acknowledge the existence or nonexistence of such records when the informant's status as an informant has been "officially confirmed" '" (quoting legislative history)). This rule makes sense because the privacy interest justifying a *Glomar* response no longer exists once an informant's status has been officially confirmed.

Applying the rule on summary judgment, the Court in *Benavides* observed that the plaintiff had filed a declaration claiming personal knowledge of statements confirming the informants' status made in open court by a DEA agent, by one of the informants, and by a judge. *See id.* at 1249. The Court found the declaration sufficient to raise a triable issue as to whether the informants' status had been officially confirmed. *See id.* On that basis, it concluded that summary judgment for the Government was inappropriate. *Id.*

Here, the evidence of official confirmation previously submitted by Mr. Hidalgo in the District Court (and attached hereto) is even more persuasive than the plaintiff's declaration in *Benavides*. In addition to a declaration claiming personal knowledge of Manny Sanchez's status, Mr. Hidalgo has provided

14

**91**

several transcripts from the United States District Court for the Southern District of Florida where Mr. Sanchez testified that he was a paid Government informant on direct examination by federal prosecutors, *see* App. at 89, 95, 134, 148, and on cross-examination by defense attorneys, *see* App. at 105, 111, 153, 154, 160.   Furthermore, the transcripts include testimony from two FBI agents, including a special agent who worked directly with Mr. Sanchez, confirming that Mr. Sanchez was a paid Government informant.   *See* App. at 92 (testimony of Special Agent Flynn); App. at 147 (testimony of Agent Gonzalez); *see also* App. at 95 (testimony of Mr. Sanchez confirming his association with "Tim Flynn, Special Agent").   Mr. Hidalgo's submissions also include two discovery responses from the Government confirming payments to Mr. Sanchez in exchange for "his work" and "information."   App. at 163, 165.

More importantly, the Government itself conceded in its briefing before the D.C. Circuit that Mr. Sanchez's status as an informant **had been** officially confirmed.   *See* App. at 188 (Gov't Br. at 3 n.1 ("Appellee's motion for summary judgment argued that a Glomar response was appropriate.   In response, appellant provided sufficient information to indicate Mr. Sanchez's status as an informant had been officially disclosed.   5 U.S.C. § 552(c)(2).")).   Given this clear and undisputed admission that

15

**92**

Mr. Sanchez's status as an informant has been officially confirmed,[2] *Benavides* requires the Government now to acknowledge or deny the existence of any responsive documents and, on this ground alone, necessitates denial of the Government's motion for summary judgment.[3]

## II.  BASED ON THE EVIDENCE OF GOVERNMENT MISCONDUCT SUBMITTED BY MR. HIDALGO, THE PUBLIC INTEREST IN DISCLOSURE FAR OUTWEIGHS THE MINIMAL PRIVACY INTERESTS IN THIS CASE.

In addition to asserting a *Glomar* response, the Government has again denied Mr. Hidalgo's request on the ground that any responsive documents, if they exist, are exempt from disclosure under FOIA Exemption (7)(C).[4]  Exemption 7(C) protects from

---

[2]    Tellingly, the Government has never invoked the § 552(c)(2) exclusion in this proceeding.

[3]    Unable to rely on blanket *Glomar* responses, the Government **at the very least** should have provided an item-by-item list of each document withheld: "Under *Vaughn*, [*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)] the government is **required** to provide a detailed index to the requester 'itemizing each item withheld, the exemptions claimed for that item, and the reasons why the exemption applies to that item.'" *Spirko v. United States Postal Serv.*, 147 F.3d 992, 997-98 (D.C. Cir. 1998) (quoting *Lykins v. United States Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984)) (emphasis added).

[4]    Although Mr. Hidalgo's request was also made and denied under the Privacy Act, no separate Privacy Act question exists here.  The relevant Privacy Act provision — "No agency shall disclose any record which is contained in a system of records . . . except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be . . . required under [FOIA]," 5 U.S.C. § 552a(b)(2)— simply begs the question whether disclosure of the records requested by Mr. Hidalgo is required

16

disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

There is no dispute that Mr. Hidalgo is requesting "information compiled for law enforcement purposes" within the meaning of Exemption 7(C). The only question is whether the public interest in knowing the nature of the Government's relationship with, reliance on, and sponsorship of Mr. Sanchez outweighs whatever privacy interests Mr. Sanchez might have. *See McCutchen v. United States Dep't of Health & Human Servs.*, 30 F.3d 183, 185 (D.C. Cir. 1994) ("Exemption[] . . . 7(C) call[s] for a balancing" of privacy interests against the public interest in disclosure). Although the Government blithely concludes that no such balancing is required because the requested documents "would not 'shed light on [the] agency's performance of its duties,'" (Gov't's Br. at 4 (quoting *Reporters Comm.*, 489 U.S. at 773), the evidence of Government

---

under FOIA. The Government does not disagree. *See* App. at 30 ¶ 8; App. at 169 n.2 ("Under the Privacy Act information may be released without the authorization of the individual to whom it pertains, when the release would be . . . required by section 552 (FOIA) . . . .").

17

misconduct submitted by Mr. Hidalgo indicates not only that a balancing is required, but also that the balance emphatically tips in favor of the public interest and supports grant of summary judgment for Mr. Hidalgo.

### A.    Mr. Sanchez Has No Privacy Interest in the Requested Documents.

Federal employees like Mr. Sanchez have "diminishe[d] . . . privacy interests" to begin with, "because of the corresponding public interest in knowing how public employees are performing their jobs." *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984). In this case, Mr. Sanchez's diminished privacy interests have been entirely vitiated by prior disclosures of his status and activities as a paid Government informant:

- Mr. Sanchez's payment history, parts of which have already been disclosed by the Government and Mr. Sanchez in numerous court proceedings, *see infra* at 26-28, is typical of the kind of information in which highly paid federal employees have no privacy interest.[5]

---

[5]    *See, e.g.*, Report of the Secretary of the Senate from April 1, 2002 to September 30, 2002, S. Doc. No. 107-14 (2002) ("Green Book") (listing salary information for Senate staff members); Senate Comm. on Governmental Affairs, 106th Cong., United States Government Policy and Supporting Positions (2000) ("Plum Book") (listing pay plan, type of appointment, and grade, level, or pay of senior officials throughout the Executive Branch); Exec. Order No. 13182, 65 Fed. Reg. 82,879 (Dec. 29, 2000) (listing

18

- Mr. Sanchez has no privacy interest in his criminal history, much of which has already been disclosed in open court. *See infra* at 24-25, 30. In particular, Mr. Sanchez has no privacy interest in the record of arrests and convictions that occurred in the state of Florida. Although the Supreme Court has held that criminal "rap sheets" are exempt under FOIA because of the "practical obscurity" of such information, *Reporters Committee*, 489 U.S. at 780, the Court acknowledged that Florida is one of three states where a person's entire criminal history within the state is "available upon request," *id.* at 753 & n.1 (citing Fla. Stat. § 943.053); *see* Fla. Admin. Code 11C-6.003, -6.004. Indeed, Mr. Sanchez's arrests and convictions in Florida are available to anyone over the Internet for a $23 fee. *See* http://www.fdle.state.fl.us/-CriminalHistory/ (last visited April 27, 2005).

- Mr. Sanchez has no privacy interest in his activities as an informant, including reports or videos he helped assemble, not only because of his status as a public employee but also because many of his activities have already been

---

pay rates for various Government officials, including federal judges and administrative law judges).

disclosed, *see* App. at 86, 89, 95, 109, 153 (testimony describing Mr. Sanchez's work at Manny's Marine), and because he was so highly paid, *see infra* Section II.B.2 (describing total payments between $440,000 and almost $1 million). *Cf. Stern*, 737 F.2d at 92 ("level of responsibility held by a federal employee" bears on extent of privacy interest).

- Mr. Sanchez has no privacy interest in information related to his non-payment of taxes on earnings received from the Government. Mr. Sanchez has repeatedly conceded under oath that he failed to pay taxes on his earnings, *see infra* Section II.B.3, and disclosure of records suggesting Government complicity would not invade his privacy.[6]

As the D.C. Circuit has made clear, prior public disclosure of otherwise confidential information can waive any privacy interest in barring subsequent disclosures.    In *Nation Magazine*, where a FOIA requester sought information from the Customs Service regarding offers by Ross Perot to aid drug

---

[6]    Mr. Hidalgo's FOIA request also sought "any and all accusations of misconduct made against Manny Sanchez while working as an F.B.I. informant." App. at 35. Mr. Hidalgo concedes that disclosure of such accusations would implicate legitimate privacy interests to the extent they are unsubstantiated.    *See McCutchen v. United States Dep't of Health & Human Servs.*, 30 F.3d 183, 187-88 (D.C. Cir. 1994).

20

interdiction efforts, the Court explained that although an
agency typically must redact names or other identifiers from
investigatory files in order to protect privacy, "[r]edaction of
Perot's name from any responsive documents . . . would not serve
any useful purpose in protecting his privacy" because "Perot
himself ha[d] made several public statements indicating that he
ha[d] offered to aid the federal government in hostage rescue
and drug interdiction operations." 71 F.3d at 896. "[T]hese
public disclosures effectively waive[d] Perot's right to
redaction of his name from documents on events that he ha[d]
publicly discussed." *Id.*; *see also Bennett v. Drug Enforcement
Admin.*, 55 F. Supp. 2d 36, 42 (D.D.C. 1999) (discussed *infra* at
Section II.B.4). Similarly here, Mr. Sanchez has waived any
privacy interest in the matters to which he has testified
repeatedly under oath in open court.

**B.    Any Privacy Interests in This Case Are Outweighed by
the Substantial Public Interest in Disclosure of
Government Misconduct.**

In contrast to the negligible privacy interests at stake,
the public interest in disclosure in this case is substantial.
To begin with, what Mr. Sanchez did as an informant *paid by the
fisc* is plainly a matter of public interest. His activities
were not those of a private citizen; thus, this is not a case
like *Reporters Committee* "in which one private citizen is

21

seeking information about another," 489 U.S. at 773. Moreover, the information sought here concerns much more than the activities of Mr. Sanchez. It concerns misrepresentations by the Government in a series of criminal trials regarding Mr. Sanchez's criminal history, the length of time the Government has employed him as an informant, and the amount the Government has paid him. It also concerns possible intervention by the Government to shield Mr. Sanchez from prosecution for tax evasion and other criminal liability. In short, the public's interest in knowing "what their government is up to," *Reporters Committee*, 489 U.S. at 773 (internal quotation marks and citation omitted), requires disclosure in this case.

The D.C. Circuit has held that "when . . . governmental misconduct is alleged as the justification for disclosure, the public interest is insubstantial unless the requester puts forward compelling evidence that the agency denying the FOIA request is engaged in illegal activity and shows that the information sought is necessary in order to confirm or refute that evidence." *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992) (internal quotation marks and citation omitted). In satisfaction of that standard, Mr. Hidalgo has offered the following evidence of Government misconduct:

22

### 1. *Misrepresentation of Mr. Sanchez's criminal history.*

In a criminal trial before the United States District Court for the Southern District of Florida, Mr. Sanchez testified on May 21, 1993 that he had *six* criminal convictions between 1967 and 1987. *See* App. at 86-87.[7] This testimony was elicited on direct examination by the Government. Less than two weeks later, on June 2, 1993, in a different trial before the same court, Mr. Sanchez testified that he had *four* convictions. *See* App. at 94. This testimony was also elicited, and not corrected, on direct examination by the Government. Later the same year, on October 4, 1993, in yet another criminal trial before the same court, the Government filed a discovery response in which it stated that Mr. Sanchez had been convicted of *three* offenses. *See* App. at 164. On August 30, 1995, before the same court, Mr. Sanchez testified that he had *three* convictions since 1965. *See* App. at 149. This testimony was again elicited, and not corrected, on direct examination by the Government. Finally, Mr. Hidalgo's submissions include a computerized criminal history record obtained from an Assistant United States Attorney corroborating the six convictions to which Mr. Sanchez

---

[7]    Mr. Sanchez admitted to a robbery in 1967, drug possession in 1975, narcotics distribution in 1976, escape from prison in 1976, and cocaine possession in 1983 and 1987.

23

testified on May 21, 1993 and listing a **seventh**. *See* App. at 77-79.[8]

   It is well-established that the Government's knowing use of false evidence, even if it "goes only to the credibility of the witness," violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The same result obtains when the [Government], although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* As of May 21, 1993, the Government knew from its own questioning that Mr. Sanchez had at least **six** convictions. *Cf. Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that conduct of prosecutor is attributable to Government as a whole). Yet in three subsequent proceedings, the Government represented Mr. Sanchez as having only **three** or **four** convictions. Moreover, the Government clearly possessed or had access to criminal history information indicating that Mr. Sanchez had **seven** prior convictions. "[W]hether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor." *Id.*[9]

---

[8]   The seventh was a narcotics offense in August 1977. *See* App. at 79.

[9]   Here the misrepresentations are especially egregious because they were made not just by prosecutors in the same United States Attorney's office, but in two instances by the same Assistant United States Attorney ("AUSA"). AUSA William Pearson served on the two-person prosecution team that elicited Mr. Sanchez's testimony to **six** convictions on May 21, 1993 and

24

Indeed, the Government's failures confirm the Eighth Circuit's observation in a similar case where federal prosecutors misrepresented an informant's criminal history:

> This is unfortunately not the first case we have seen where the government has failed to successfully complete a routine background check. Such carelessness is unacceptable, particularly in light of the technological advances which make record retrieval readily accessible. We strongly condemn the government's haphazard approach to its own trial preparation and to its duty to serve and facilitate the truth-finding function of the courts.

*United States v. Duke*, 50 F.3d 571, 578 n.4 (8th Cir. 1995).

**2. Misrepresentation of Mr. Sanchez's work and payment history.** On May 21, 1993, Mr. Sanchez testified on direct examination by the Government that he began working as an informant in **November 1989** and had been paid $154,800 since then. *See* App. at 89. Six weeks later, FBI Special Agent Flynn testified in a different case that Mr. Sanchez was documented as an informant in **January 1989**. *See* App. at 92. In the same case, Mr. Sanchez testified that he received $5,000 from the Government in **1988** "[b]ecause I gave some information." *See*

---

on the two-person team that elicited his testimony to **four** convictions on June 2, 1993. *See* App. at 85-87, 93-94. AUSA Richard Getchell elicited Mr. Sanchez's testimony to **three** convictions on August 30, 1995, *see* App. at 146, 149, consistent with the Government's discovery response in the same case, *see* App. at 164. But Mr. Getchell later provided Mr. Hidalgo with a computerized criminal history indicating **seven** convictions between 1967 and 1987. *See* App. at 58, 77-79.

25

App. at 115.  Four months later, on October 4, 1993, the

Government filed a discovery response in yet another case

stating that Mr. Sanchez had been paid almost $163,000 since

*1988* for his work.  *See* App. at 163.  Four days later, the

Government revised its figure upward, stating that Mr. Sanchez

had been paid almost $190,000 since *1988* and that he was

eligible for an additional $250,000.  *See* App. at 165.

Subsequently, on August 30, 1995, FBI Agent Gonzalez testified

on direct examination by the Government that Mr. Sanchez became

an informant in *October 1987* and had been paid approximately

$201,000 since then.  *See* App. at 147.

        As Mr. Hidalgo said in a brief opposing summary judgment

before this Court in 2000, "[c]ertainly the FBI must have in

existence trustworthy, reliable information delineating when

Sanchez actually became a FBI informant."  App. at 69.  Yet the

Government has represented Mr. Sanchez's start date to be

anywhere from October 1987 to November 1989.  The

inconsistencies, whether intentional or negligent, go to Mr.

Sanchez's credibility:  The earlier the date, the less he was

paid on an annual basis.  The less he was paid, the more

credible he appears.

        The Government's representations of how much it paid Mr.

Sanchez and when are likewise misleading.  Although Agent

26

Gonzalez said in August 1995 that Mr. Sanchez had been paid
$201,000,[10] that figure cannot be squared with Mr. Sanchez's
admission that he received a cashier's check from the Government
in *October 1994* for *$250,000*, see App. at 158 — a payment coming
one year after the Government acknowledged that he had already
been paid almost $190,000, see App. at 165.    Thus, as of October
1994, Mr. Sanchez had been paid at least an amount near $440,000
(*i.e.*, $190,000 + $250,000), more than twice the $201,000
acknowledged by the Government through Agent Gonzalez's
testimony in August 1995.

The total amount paid to Mr. Sanchez may be even higher.
In July 1994, Mr. Sanchez testified that he received an advance
"about three months ago" from the DEA against a sum of up to
$250,000.    App. at 143-44.    That $250,000 sum is not the same as
the $250,000 cashier's check he received in October 1994.[11]
Furthermore, in August 1995, Mr. Sanchez testified on direct
examination by the Government that he remained eligible for an

---

[10]    Whatever records substantiate this figure are uniquely in
the hands of the Government because the Government paid Mr.
Sanchez in cash.    See App. at 154; see also App. at 155
(testimony of Mr. Sanchez) ("Q:    The Government has been paying
you?    They know how much they have been paying you?    They keep a
record?"    "A:    Yes.").

[11]    Were they the same, the cashier's check would have been
less than $250,000 to reflect the advance paid to him by the
DEA.

27

additional $250,000.  *See* App. at 148.  If the Government paid

Mr. Sanchez the full $250,000 mentioned in July 1994 and the

$250,000 mentioned in August 1995, then the two sums (if

distinct) would push Mr. Sanchez's total payments up to nearly

$1 million ($440,000 + $250,000 + $250,000).  The transfer of

such enormous sums from the Government to a seven-time convicted

felon, as well as the Government's lack of candor regarding the

total amount, directly implicates the public's interest in

knowing "what their government is up to."

   3.  *Undisclosed intervention protecting Mr. Sanchez from*

*tax liability*.  While receiving large sums from the Government,

Mr. Sanchez paid no taxes on the money despite knowing it is a

crime not to pay taxes.[12]  Mr. Sanchez admitted this fact in June

1993,[13] in July 1994,[14] again in August 1995,[15] and yet again in

June 1996.[16]  While claiming that he was "working on paying the

---

[12]   Mr. Sanchez's payment agreement with the FBI made clear
that his earnings "constitute taxable income."  App. at 106.

[13]   *See* App. at 106-07 (no taxes paid on 1989, 1990, or 1991
earnings); App. at 108 (no tax return filed in 1990, 1991, 1992,
or 1993); App. at 107 (testimony of Mr. Sanchez admitting he
"know[s] it's a Federal crime to not pay taxes").

[14]   *See* App. at 142 (no taxes paid on $200,000; last return
filed in 1989).

[15]   *See* App. at 155 ("Last time I filed it was from '89 to
'90.").

[16]   *See* App. at 160 (no taxes paid on $250,000 received in
October 1994).

28

taxes," App. at 107 (June 1993) and "plan[ned] to get around to
it sometime," App. at 155 (August 1995), Mr. Sanchez confirmed
that the Government had never prosecuted him for tax fraud or
tax evasion.  *See* App. at 155, 160.  Notably, Mr. Sanchez is not
an habitual tax evader; he paid taxes jointly with this wife
"from 1964 . . . up until 1989."  App. at 108.

It is unusual, to say the least, that an individual with at
least $440,000 in acknowledged income and no prior history of
tax evasion would persist in refusing to pay taxes, while
repeatedly admitting his dereliction under oath, on the record,
in open court, four years in a row (from 1993 to 1996), before
numerous federal judges and several federal prosecutors.  Common
sense suggests, as Mr. Hidalgo has previously argued, that
"someone had to have intervened on Sanchez's behalf with the
IRS, as he was never prosecuted for not filing tax returns for
over a[n] [sic] eight year period, when he had several hundred
thousand . . . dollars in income."  App. at 66.  Clearly,
whatever interest the Government had in prosecuting Mr. Sanchez
was in conflict with its interest in maintaining his cooperation
and credibility as a witness in multiple criminal trials.

In light of Mr. Sanchez's repeated and unabashed admissions
that he stopped paying taxes in 1989 — after a 25-year history
of payment — the ineluctable inference is that he was told,

29

explicitly or implicitly, that he would not be prosecuted for non-payment.  *See United States v. Shaffer*, 789 F.2d 682, 691 (9th Cir. 1986) (finding Government's failure to pursue informant's tax liability probative of "a secret deal of leniency").  Yet an undisclosed agreement of this sort is flatly inappropriate in the context of criminal proceedings.  *See Giglio*, 405 U.S. at 154 (finding that a promise of non-prosecution affects witness credibility, and that failure to disclose can warrant new trial).  Full disclosure of the information sought here is necessary to confirm or refute the strong inference of misconduct arising from the evidence submitted by Mr. Hidalgo.

   **4.  *Undisclosed intervention protecting Mr. Sanchez from conviction on offenses charged after 1987.***  Just as Mr. Sanchez's non-payment of taxes starting in 1989 marks an abrupt change from his prior record of payment, the Government's consistent record of convicting Mr. Sanchez on charged felony offenses comes to an abrupt end in 1987, even though Mr. Sanchez's felony arrest record does not.  After his last conviction in 1987 for cocaine possession, Mr. Sanchez was arrested in 1990 for aggravated assault.  *See* App. at 79, 82. The arrest report stated that Mr. Sanchez had threatened a cable company employee with a machine gun.  *See* App. at 109-10; *see*

30

*also* App. at 116, 118-19, 125-26.  That charge resulted in "no

action taken."  App. at 82.  Subsequently, in 1992, Mr. Sanchez

was charged with threatening to "hunt down" a police officer

during a drunk driving stop.  *See* App. at 79, 82-83, 111, 119-

20.  That charge was "dismissed."  App. at 83.  Since then, Mr.

Sanchez has been arrested at least three more times:  for drunk

driving in March 1994, for contempt of court in August 1997, and

for domestic violence in August 1998.  *See* App. at 79, 83.[17]

None appears to have resulted in conviction.  Against the

backdrop of a virtually unbroken string of seven felony

convictions on offenses charged between 1967 and 1987, the

absence of any convictions on two felonies and three

misdemeanors charged after Mr. Sanchez became an informant gives

rise to a strong inference of undisclosed and improper

Government intervention.

                    *    *    *

    Notably, this is not the first time that FOIA has been

invoked in this Court to expose Government misconduct in

relation to a paid narcotics informant.  In *Bennett v. Drug*

*Enforcement Administration* — a case very similar to this one — a

FOIA requester sought "[DEA informant Andrew] Chambers' criminal

---

[17]    Mr. Sanchez also admitted to an arrest in 1993 for
violating an open container law.  *See* App. at 149.

history . . . , a list of all monies paid to him in his capacity

as DEA informant, all records of instances where DEA intervened

on his behalf to assist him in avoiding criminal prosecution,

and all records of administrative sanctions imposed on him for

dishonesty, false claims, or other deceit." 55 F. Supp. 2d at

38. Plaintiffs' submissions showed that Mr. Chambers "earned as

much as $4 million" as an informant, id. at 42, that the

Government had shown "complacency" toward his frequent perjury

about his criminal history, id., that "Chambers d[id] not pay

taxes on his 'earnings,' and that DEA ha[d] not taken steps to

ensure he d[id]," id. at 43 n.7. The Court found it "clear from

. . . the activities and collaboration of Chambers and DEA that

there [wa]s a substantial public interest in exposing any

wrongdoing in which these two parties may have engaged." Id. at

42. As for Mr. Chambers' privacy interests, the Court said:

> He appears to have made a career out of serving as a
> government informant and, if Plaintiff's allegations
> are true, he has earned substantially more than the
> vast majority of other, more traditional, federal
> employees. By choosing to "work" as a regular
> government informant, and by testifying about his
> activities and "earnings" in open court, Chambers has
> chosen to give up his personal privacy interests to
> this information.

Id. Rejecting the Government's reliance on Exemption 7(C), the

Court ordered the DEA to release the requested material with the

names of DEA agents redacted. See id. at 43.

Here, as in *Bennett*, "[t]he information uncovered by
Plaintiff is very compelling, suggesting extensive government
misconduct, and the information sought is necessary to confirm
whether Plaintiff's findings are backed by the record." *Id*. at
42. Mr. Hidalgo's FOIA request targets not only the misdeeds of
a single highly paid informant, but serious misconduct by the
Government in its handling of that informant. And far from
seeking to "expos[e] a single, garden-variety act of
misconduct," *Oguaju v. United States*, 288 F.3d 448, 451 (D.C.
Cir. 2002), his FOIA request targets a demonstrated pattern of
Government misrepresentations and improper interventions.[18] The
public interest implicated here was aptly described by the Ninth
Circuit in *United States v. Bernal-Obeso*:

---

[18]    The Government's handling of Manuel Sanchez would be a
matter of substantial public interest even if it did not involve
misconduct. Surely the public has an interest in knowing that
its Government employs informants with multiple felony
convictions, has paid one such informant between $440,000 and $1
million, and has ignored that informant's refusal to pay any
taxes on his earnings. Disclosure of these matters
" 'contribut[es] significantly to public understanding *of the
operations or activities of the government*,' " long recognized
as "the core purpose of the FOIA." *United States Dep't of
Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749,
775 (1989); *see id.* at 773 ("Official information that sheds
light on an agency's performance of its statutory duties falls
squarely within [FOIA's] purpose."). Regardless of whether the
Government's relationship with Mr. Sanchez was lawful, "[o]ne
basic general assumption of the FOIA is that, in many important
public matters, it is for the public to know and then to judge."
*Stern v. FBI*, 737 F.2d 84, 94 (D.C. Cir. 1984).

> The use of informants to investigate and prosecute
> persons engaged in clandestine criminal activity is
> fraught with peril. . . .  Because the government
> decides whether and when to use such witnesses, and
> what, if anything, to give them for their service, the
> government stands uniquely positioned to guard against
> perfidy.  By its actions, the government can either
> contribute to or eliminate the problem.  Accordingly,
> we expect prosecutors and investigators to take all
> reasonable measures to safeguard the system against
> treachery.  This responsibility includes the duty as
> required by *Giglio* to turn over to the defense in
> discovery **all** material information casting a shadow on
> a government witness's credibility.

989 F.2d 331, 333-34 (9th Cir. 1993) (citations omitted).  Here,

out of mischief or complacency, the Government repeatedly failed

in that duty in a series of criminal trials in the Southern

District of Florida involving Manny Sanchez.

In sum, the public interest in disclosure substantially

outweighs the privacy interests in this case.  This Court should

so hold and both deny the Government's motion for summary

judgment and grant summary judgment in favor of Mr. Hidalgo.

### III. EXEMPTION 7(D) PROTECTS INFORMATION COLLECTED BY CONFIDENTIAL SOURCES IN THE COURSE OF A CRIMINAL INVESTIGATION, NOT BACKGROUND INFORMATION ON PAID INFORMANTS AND EVIDENCE OF GOVERNMENT MISCONDUCT.

FOIA Exemption 7(D) protects "records or information

compiled for law enforcement purposes . . . in the course of a

criminal investigation" that "could reasonably be expected to

disclose the identity of a confidential source" and that were

"furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).

34

Although the Government is not precluded from raising a 7(D)

defense to a FOIA request at this juncture, it bears noting that

neither the FBI (in its initial denial of Mr. Hidalgo's FOIA

request) nor the Office of Information and Privacy (in affirming

the FBI's denial) has ever before relied on Exemption 7(D) in

its response to Mr. Hidalgo.  *See* Def. Statement of Material

Facts #2 and #6.  As Exemption 7(D) was and continues to be

inapplicable to the information Mr. Hidalgo seeks, the

Government's Exemption 7(D) must fail.

As an initial matter, the Government has already confirmed

Mr. Sanchez's status as an informant.  *See supra* at 14.

Therefore, disclosing documents regarding his criminal past,

payments made to him by the Government, and the other documents

sought by Mr. Hidalgo could not, by definition, result in the

disclosure of a confidential informant.  In that respect,

Exemption 7(D) offers no legitimate basis for the Government's

refusal to respond to Mr. Hidalgo's FOIA request.

Second, Exemption 7(D) applies to documents and other

evidence **furnished by** (*i.e.*, collected from or with the help of)

a confidential source in furtherance of a criminal

investigation.  None of the documents or information sought by

Mr. Hidalgo was "furnished by" Mr. Sanchez.  *Compare Hale v.*

*United States Dep't of Justice*, 226 F.2d 1200, 1204 (10th Cir.

2000) (upholding a 7(D) exemption for interviews of members of a

35

**112**

small community in which a kidnapping and murder had occurred);
*Grand Cent. P'ship, Inc. v. Cuomo*, 166 F.3d 473, 488 (2d Cir.
1999) (considering a 7(D) exemption for a private citizen's
letter to HUD regarding an incident of abuse).

In addition, in *Davis v. United States Dep't of Justice*,
the D.C. Circuit held that Exemption 7(D) protection can be
waived where material otherwise subject to Exemption 7(D) is the
"'exact information' to which the [confidential] source actually
testified" in court. 968 F.2d at 1281.  In such a case, "[t]he
government is obliged to disclose" the evidence.  Therefore,
even if the criminal history, payment records, and other
documents requested by Mr. Hidalgo had been furnished by Mr.
Sanchez in furtherance of a criminal investigation – and the
Government has proffered no evidence to that effect – his
testimony regarding this "exact information" in court would
require their disclosure.  The Government's claim of an
Exemption under 7(D) must be rejected.

### Conclusion

For the reasons set forth above, as well as the supporting
documents attached hereto, Mr. Hidalgo respectfully requests
that Defendant's motion for summary judgment be denied and that
Plaintiff's cross-motion for summary be granted.

Respectfully submitted,


s/ William Nifong

_____
William Nifong
(DC Bar # 470217)
O'Melveny & Myers LLP
1625 I Street NW
Washington, D.C.  20006


s/Jessica Davidson Miller

_____
Jessica Davidson Miller
(DC Bar #457021)
O'Melveny & Myers LLP
1625 I Street NW
Washington, D.C.   20006

Dated:  April 29, 2005

37

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                    )
                                     )
        Plaintiff,                   )
                                     )
        v.                           )    Civil Action No. 04-562 (EGS)
                                     )
FEDERAL BUREAU OF                    )
   INVESTIGATION,                    )
                                     )
        Defendant.                   )
                                     )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, by its undersigned attorneys, hereby moves the
Court, pursuant to Federal Rule of Civil Procedure 56, for an
order granting summary judgment on the grounds that no genuine
issue as to any material fact exists and that defendant is
entitled to judgment as a matter of law.[1]

---

[1] Plaintiff should take notice that any factual assertions
contained in the declaration submitted in support of this motion
will be accepted by the Court as true unless the plaintiff
submits his own affidavit or other documentary evidence
contradicting those assertions.  See Neal v. Kelly, 963 F.2d 453,
456-57 (D.C. Cir. 1992); Fed. R. Civ. P. 56(e); L. Cv. R. 7(h).
Rule 56(e) of the Federal Rules of Civil Procedure provides:

> Supporting and opposing affidavits shall be made on
> personal knowledge, shall set forth such facts as would
> be admissible in evidence, and shall show affirmatively
> that the affiant is competent to testify to the matters
> stated therein.  Sworn or certified copies of all
> papers or parts thereof referred to in an affidavit
> shall be attached thereto or served therewith.  The
> court may permit affidavits to be supplemented or
> opposed by depositions, answers to interrogatories, or
> further affidavits.  When a motion for summary judgment
> is made and supported as provided in this rule, an
> adverse party may not rest upon the mere allegations or
> denials of the adverse party's pleading, but the
>                                         (continued...)

-2-

In support of this motion, the Court is respectfully
referred to the Declaration of David M. Hardy, Section Chief,
Record/Information Dissemination Section, Records Management
Division, Federal Bureau of Investigation; the Statement of
Material Facts as to Which There is No Genuine Issue; and the

---

[1](...continued)
adverse party's response, by affidavits or as otherwise
provided in this rule, must set forth specific facts
showing that there is a genuine issue for trial.   If
the adverse party does not so respond, summary
judgment, if appropriate, shall be entered against the
adverse party.   Fed. R. Civ. P. 56(e).

-3-

Memorandum of Points and Authorities in Support of Defendant's

Motion for Summary Judgment, all filed herewith.

Respectfully submitted,


_____
KENNETH L. WAINSTEIN
(DC Bar #451058)
United States Attorney


_____
R. CRAIG LAWRENCE
(DC Bar #171538)
Assistant United States Attorney


Dated:  February 23, 2005    _____
GRAHAM L. BARRON
(DC Bar #475312)
Attorney-Advisor
Office of Information and Privacy
United States Department of
   Justice
Flag Building, Suite 570
Washington, DC   20530-0001
(202) 616-5463

117

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                          )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )  Civil Action No. 04-562 (EGS)
                                           )
FEDERAL BUREAU OF                          )
    INVESTIGATION,                         )
                                           )
        Defendant.                         )
_____)

### STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
### IS NO GENUINE ISSUE, PURSUANT TO LOCAL RULE 7(h)

        Pursuant to Local Rule 7(h), defendant submits the following
statement of material facts as to which there is no genuine
issue:

        1.  By letter dated November 3, 2003, plaintiff made a
request to the Headquarters Office of the Federal Bureau of
Investigation (FBIHQ), pursuant to the Freedom of Information Act
(FOIA), 5 U.S.C.A. § 552 (1996 & West Supp. 2004), and the
Privacy Act of 1974, 5 U.S.C. § 552a (2000), seeking law
enforcement records related to Manny Sanchez.  (See Complaint
¶ 5; Declaration of David M. Hardy, Section Chief,
Record/Information Dissemination Section, Records Management
Division, FBIHQ [hereinafter Hardy Decl.], filed herewith, ¶ 5 &
Ex. A.)  Specifically, plaintiff sought records related to
Sanchez's alleged criminal activities and Sanchez's alleged
status as an informant for the FBI.  (See Hardy Decl. & Ex. A.)

-2-

2.  By letter dated November 21, 2003, defendant acknowledged receipt of plaintiff's letter of November 3, 2003, and informed plaintiff that the FBI would not process plaintiff's request for information concerning any third party without proof of death or a privacy waiver from that person pursuant to 5 U.S.C. § 552(b)(6) and/or (b)(7)(C).  (See Compl. ¶ 6; Hardy Decl. ¶ 6 & Ex. B.)

3.  By letter dated December 11, 2003, plaintiff filed an administrative appeal of the FBI's action on his request with the Office of Information and Privacy (OIP) of the United States Department of Justice.  (See Compl. ¶ 7; Hardy Decl. ¶ 7 & Ex. C.)

4.  By letter dated January 9, 2004, OIP acknowledged receipt of plaintiff's letter dated December 11, 2003, and assigned number 04-0713 to his appeal.  (See Compl. ¶ 8; Hardy Decl. ¶ 8 & Ex. D.)

5.  On April 8, 2004, plaintiff filed the instant lawsuit. (See Compl. ¶ 1.)

6.  By letter dated May 5, 2004, OIP responded to plaintiff's appeal by affirming the action of the FBI in refusing

-3-

to confirm or deny the existence of any records responsive to plaintiff's request to the FBI pursuant to 5 U.S.C. § 552(b)(7)(C). (<u>See</u> Hardy Decl. ¶ 9 & Ex. E.)

Respectfully submitted,

KENNETH L. WAINSTEIN
(DC Bar #451058)
United States Attorney


R. CRAIG LAWRENCE
(DC Bar #171538)
Assistant United States Attorney


Dated:  February 23, 2005

GRAHAM L. BARRON
(DC Bar #475312)
Attorney-Advisor
Office of Information and Privacy
United States Department of
  Justice
Flag Building, Suite 570
Washington, DC  20530-0001
(202) 616-5463

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                       )
                                        )
        Plaintiff,                      )
                                        )
        v.                              )    Civil Action No. 04-562 (EGS)
                                        )
FEDERAL BUREAU OF                       )
    INVESTIGATION,                      )
                                        )
        Defendant.                      )
_____ )

MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Preliminary Statement

    Plaintiff commenced this action on April 8, 2004, pursuant

to the Freedom of Information Act (FOIA), 5 U.S.C.A. § 552 (1996

& West Supp. 2004), and the Privacy Act of 1974, 5 U.S.C. § 552a

(2000),[1] seeking the production of records pertaining to a third

party, Manny Sanchez, that he believes are maintained by

defendant, the Federal Bureau of Investigation (FBI).[2]

    Based upon the accompanying Declaration of David M. Hardy,

Section Chief, Record/Information Dissemination Section, Records

Management Division, FBI [hereinafter Hardy Declaration], the

entire record herein, and for the reasons set forth below,

defendant respectfully submits that there exists no genuine issue

_____

    [1] Although plaintiff cites the Privacy Act of 1974 in his
Complaint, he has stated no cause of action under the Privacy Act
of 1974.  (See Complaint ¶ 1.)

    [2] The Department of Justice, not the FBI, is the proper
party defendant to this FOIA lawsuit.  See 5 U.S.C.
§ 552(a)(4)(B); see also Peralta v. United States Attorney's
Office, 136 F.3d 169, 173-74 (D.C. Cir. 1998).

**121**

-2-

of material fact and that defendant is entitled to judgment as a
matter of law pursuant to Rule 56 of the Federal Rules of Civil
Procedure.

### Factual and Procedural Background

By letter dated November 3, 2003, plaintiff made a request
to the Headquarters Office of the FBI (FBIHQ), pursuant to the
FOIA and the Privacy Act, seeking records related to Manny
Sanchez.  (See Compl. ¶ 5; Hardy Decl. ¶ 5 & Ex. A.)
Specifically, plaintiff sought law enforcement records concerning
Sanchez's alleged criminal history and Sanchez's alleged status
as an informant for the FBI.[3]  (See Hardy Decl. & Ex. A.)

By letter dated November 21, 2003, defendant acknowledged
receipt of plaintiff's letter of November 3, 2003, and informed
plaintiff that the FBI would not process plaintiff's request for
information concerning any third party without proof of death or
a privacy waiver from that person pursuant to 5 U.S.C.
§ 552(b)(6) and/or (b)(7)(C).  (See Compl. ¶ 6; Hardy Decl. ¶ 6 &
Ex. B.)

---

[3] It should be noted that plaintiff previously sought the
same types of records regarding Mr. Sanchez in prior litigation
with defendant.  The Court of Appeals for the District of
Columbia Circuit, however, found that Mr. Hidalgo had failed to
exhaust his administrative remedies in that case.  Hidalgo v.
FBI, 344 F.3d 1256, 1259 (D.C. Cir. 2003).  The Court of Appeals
remanded the case to the District Court with instructions that
the case be dismissed.  Id. at 1260; see also Hidalgo v. FBI, No.
00-0709 (JR) (D.D.C. Dec. 9, 2003) (order dismissing case on
remand) (copy attached hereto).

-3-

By letter dated December 11, 2003, plaintiff filed an administrative appeal of the FBI's action on his request with the Office of Information and Privacy (OIP) of the United States Department of Justice.  (<u>See</u> Compl. ¶ 7; Hardy Decl. ¶ 7 & Ex. C.)  On April 8, 2004, plaintiff filed the instant lawsuit under the FOIA and Privacy Act.  (<u>See</u> Compl. ¶ 1.)  By letter dated May 5, 2004, OIP responded to plaintiff's appeal by affirming the action of the FBI in refusing to confirm or deny the existence of any records responsive to plaintiff's request to the FBI pursuant to 5 U.S.C. § 552(b)(7)(C).  (<u>See</u> Hardy Decl. ¶ 9 & Ex. E.)

<u>Argument</u>

<u>NO AGENCY RECORDS HAVE BEEN IMPROPERLY WITHHELD</u>

I.    The FBI properly refused to confirm or deny the existence of records concerning Manny <u>Sanchez pursuant to 5 U.S.C. § 552(b)(7)(C)</u>

Exemption 7(C) of the FOIA protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  To properly invoke Exemption 7(C), an agency must first demonstrate that the records in question, if they exist, were compiled for law enforcement purposes.  <u>See</u> 5 U.S.C. § 552(b)(7).  To satisfy this threshold requirement, an agency must show that the records were generated for the purpose of enforcing matters of civil, criminal, or administrative law.

-4-

See, e.g., Ctr. for Nat'l Policy Review on Race & Urban Issues v.
Weinberger, 502 F.2d 370, 373 (D.C. Cir. 1974); Rural Hous.
Alliance v. USDA, 498 F.2d 73, 81 & n.46 (D.C. Cir. 1974).  It is
clear that, in this case, the threshold would be satisfied by
records responsive to the request, if any exist, due to the
nature of the function of the FBI as a law enforcement agency and
the type of records requested.

The remaining consideration under Exemption 7(C) is whether
confirming or denying the existence of responsive law enforcement
records concerning Manny Sanchez "could reasonably be expected to
constitute an unwarranted invasion of personal privacy."  In most
cases, this determination necessitates a balancing of the
individual's right to privacy against the public's interest in
disclosure.  See United States Dep't of Justice v. Reporters
Comm. for Freedom of the Press, 489 U.S. 749, 762 (1989); see
also SafeCard Servs. v. SEC, 926 F.2d 1197, 1205 (D.C. Cir.
1991).

However, no such balancing is necessary when a request seeks
law enforcement records concerning a private individual if those
records would not "shed[] light on [the] agency's performance of
its statutory duties."  Reporters Comm., 489 U.S. at 773.  As the
Supreme Court has held, such records are categorically exempt
from disclosure under Exemption 7(C).  See id. at 780 (holding
"as a categorical matter" that a request seeking "law enforcement
records or information about a private citizen can reasonably be

-5-

expected to invade that citizen's privacy, and when that request

seeks no 'official information' about a Government agency, . . .

the invasion of privacy is unwarranted"); see also Nation

Magazine v. United States Customs Serv., 71 F.3d 885, 893 (D.C.

Cir. 1995) (concluding that "where it is clear that the request

will not contribute significantly to public understanding of the

operations or activities of the government and seeks law

enforcement information on private individuals, the court need

not undertake a balancing test . . . before it decides that the

documents are exempt from disclosure").

　　　Furthermore, and particularly significant here, the very

existence or nonexistence of law enforcement records concerning

private individuals is itself information that is exempt from

disclosure under Exemption 7(C). See, e.g., Senate of P.R. v.

United States Dep't of Justice, 823 F.2d 574, 588 (D.C. Cir.

1987) (finding that "[t]here is little question that disclosing

the identity of targets of law-enforcement investigations can

subject those identified to embarrassment and potentially more

serious reputational harm" and that "[o]ther persons involved in

the investigation--witnesses, informants, and the investigating

agents--also have a substantial interest in seeing that their

participation remains secret"). Therefore, when a FOIA request

seeks law enforcement records concerning a private individual, a

law enforcement agency such as the FBI properly responds by

refusing to confirm or deny the existence of responsive records

-6-

(also known as a "Glomar response").  See, e.g., Nation Magazine,
71 F.3d at 893 ("[A] Glomar response may be issued in place of a
statement acknowledging the existence of responsive records but
withholding them, if confirming or denying the existence of the
records would associate the individual named in the request with
criminal activity."); Antonelli v. FBI, 721 F.2d 615, 618 (7th
Cir. 1983) (affirming the use of a Glomar response, and stating
that "revealing that a third party has been the subject of FBI
investigations is likely to constitute an invasion of that
person's privacy").

In this case, plaintiff seeks criminal law enforcement
information concerning Manny Sanchez, a private individual.  As
Mr. Hardy attests, the FBI will neither confirm nor deny the
existence of law enforcement records concerning private
individuals like Mr. Sanchez because "[m]erely affirming that an
individual is mentioned in FBI records can have a potentially
embarrassing or stigmatizing effect."  (Hardy Decl. ¶ 14.)
Therefore, and in light of the D.C. Circuit's recognition that
"individuals have an obvious privacy interest in keeping secret
the fact that they were the subjects of a law enforcement
investigation," Nation Magazine, 71 F.3d at 894, the FBI properly
refused to confirm or deny the existence of responsive records
concerning Mr. Sanchez in order to protect his privacy on the
basis of Exemption 7(C).

-7-

Moreover, confirming or denying the existence of any such records would reveal nothing about the FBI's performance of its statutory duties.  Indeed, plaintiff requested records about Mr. Sanchez that he assumes are in the possession of the FBI.  As such, plaintiff's request "seeks no 'official information' about a Government agency, but merely records that the Government [may be] storing."  Reporters Comm., 489 U.S. at 780.  In sum, plaintiff seeks records that, if they exist, would associate Manny Sanchez with criminal activity yet would reveal nothing about the FBI's performance of its statutory duties.  As discussed above, the very existence or nonexistence of such records is itself information that is exempt from disclosure under Exemption 7(C).  Thus, defendant respectfully submits that the its refusal to confirm or deny the existence of responsive records concerning Manny Sanchez pursuant to Exemption 7(C) was proper.

II.   The FBI properly refused to confirm or deny the existence of certain records concerning Manny Sanchez pursuant to 5 U.S.C. § 552(b)(7)(D)

Exemption 7(D) of the FOIA protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source . . . and . . . information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  To properly invoke Exemption 7(D), an agency must first

-8-

demonstrate that the records in question, if they exist, were compiled for law enforcement purposes under the same circumstances as outlined above in applying Exemption 7(C).  See 5 U.S.C. § 552(b)(7).

In his FOIA request, plaintiff specifically stated that he seeks records concerning "the exact date when Sanchez officially became a FBI informant . . . the non-payment of income taxes to the IRS on [Sanchez's] informant earnings . . . all accussations [sic] of misconduct committed by Sanchez while working as a FBI informant," among other items.  (Hardy Decl. ¶ 5 & Ex. A.)  Such specificity makes this an inherently self-defeating request in this respect.  When, as here, a FOIA request on its face seeks records the very existence of which are per se protected by an exemption, an agency has no choice but to rely on a Glomar response in order to protect not only the contents of any existing file, but the fact of its existence or nonexistence as well.  Unless an alleged confidential informant status has been officially confirmed, an agency must of course respond to such requests (regardless of whether the individual is in fact an informant) by neither confirming nor denying the existence of responsive records.  See Antonelli, 721 F.2d at 618 (affirming the FBI's use of a Glomar response in reply to a request for files concerning alleged confidential informants, and recognizing that "if the FBI denies a request for a specific third party's records on the ground that disclosure might reveal a confidential

-9-

source (Exemption 7(D)), this denial itself may give the requester enough information to expose the subject of the inquiry to harassment and actual danger").

Although it did not do so at the administrative level, because of the nature of this portion of plaintiff's request, defendant could have relied upon Exemption 7(D) as well as Exemption 7(C) in refusing to confirm or deny the existence of the records plaintiff requested.[4]  Plaintiff, by the very terms of his FOIA request, seeks to obtain specific records (informant files) that, even if they exist, would be exempt from disclosure pursuant to Exemption 7(D); most significantly, the very fact of their existence, and the corresponding official informant status that plaintiff is attempting to ferret out, is itself sensitive exempt information.  (See Compl. ¶ 5; Hardy Decl. ¶ 11 n.1 & Ex. A.)  Accordingly, defendant respectfully submits that its refusal to confirm or deny the existence of any responsive records concerning Manny Sanchez pursuant to Exemption 7(D) is entirely appropriate as well.

---

[4] Because the FOIA directs district courts to review agency actions de novo, an agency is not barred from invoking a particular exemption in litigation merely because that exemption was not cited in responding to the request at the administrative level.  See 5 U.S.C. § 552(a)(4)(B); see also Young v. CIA, 972 F.2d 536, 538-39 (4th Cir. 1992) ("an agency does not waive FOIA exemptions by not raising them during the administrative process" (citing Dubin v. Dep't of Treasury, 555 F. Supp. 408, 412 (N.D. Ga. 1981)), aff'd, 697 F.2d 1093 (11th Cir. 1983)).

-10-

## Conclusion

In sum, because its Glomar response was proper pursuant to both Exemptions 7(C) and 7(D), defendant properly refused to confirm or deny the existence of any records responsive to plaintiff's request.

For the foregoing reasons, and based upon the entire record herein, defendant respectfully requests that its motion for summary judgment be granted.

Respectfully submitted,


_____
KENNETH L. WAINSTEIN
(DC Bar #451058)
United States Attorney


_____
R. CRAIG LAWRENCE
(DC Bar #171538)
Assistant United States Attorney


Dated:   February 23, 2005

_____
GRAHAM L. BARRON
(DC Bar #475312)
Attorney-Advisor
Office of Information and Privacy
United States Department of
   Justice
Flag Building, Suite 570
Washington, DC  20530-0001
(202) 616-5463

Westlaw.

Not Reported in F.Supp.2d                                            Page 1
Not Reported in F.Supp.2d, 2006 WL 2716086 (D.D.C.)
**(Cite as: 2006 WL 2716086 (D.D.C.))**

Only the Westlaw citation is currently available.

United States District Court,
District of Columbia.
Peter J. HIDALGO, Plaintiff,
v.
FEDERAL BUREAU of INVESTIGATION,
Defendant.
**Civil Action No. 04-0562 (JR).**

Sept. 22, 2006.
Jessica Davidson Miller, William R. Nifong,
O'Melveny & Myers LLP, Washington, DC, for
Plaintiff.

Anne Davis Work, U.S. Department of Justice,
Washington, DC, for Defendant.

*MEMORANDUM*

JAMES ROBERTSON, District Judge.

*1 In November 2003, plaintiff, a federal inmate,
filed a FOIA request with FBI Headquarters (FBIHQ)
seeking information on Manny Sanchez, an FBI
informant. For some time, the FBI refused to confirm
or deny the existence of any responsive records,
making what is known as a "Glomar" response.
Plaintiff sued to compel production of documents,
and both sides moved for summary judgment. On
September 29, 2005, I denied both motions for
summary judgment, stating that "the FBI must
demonstrate that it has searched its records and must
either provide the documents requested or produce a
Vaughn index." Mem. Order at 6. Pursuant to that
order, the FBI conducted a search of its records. The
search returned no matching documents, and the FBI
has renewed its motion for summary judgment [29].

*Analysis*

In response to a FOIA request, an agency must
conduct a search of its records that is "reasonably
calculated to uncover all relevant documents."
Weisberg v. United States Dep't of Justice, 705 F.2d
1344, 1351 (D.C.Cir.1983). To demonstrate the
adequacy of its search, the agency must provide the
court with "affidavits of responsible agency officials
which are relatively detailed, non-conclusory, and
submitted in good faith." Greenberg v. United States
Dep't of Treasury, 10 F.Supp.2d 3, 12-13

(D.D.C.1998). Summary judgment is appropriate if
the affidavit's description of "what records were
searched, by whom, and through what processes"
establishes that the agency conducted an adequate
search. Steinberg v. United States Dep't of Justice, 23
F.3d 548, 552 (D.C.Cir.1994).

The second declaration of David Hardy, submitted
by the FBI with its renewed motion, describes in
detail the methods used by the FBI to search its
records. In response to the September 29, 2005 order,
FBIHQ searched its main record system, the Central
Records System (CRS), for records pertaining to
Manny Sanchez. Second Hardy Decl. ¶ 12. Any
responsive records located at FBIHQ would be
contained in the CRS because that system "enables
[the FBI] to maintain all information which it has
acquired in the course of fulfilling [its] mandated law
enforcement responsibilities." Id. ¶ 7. FBIHQ
performed the search using phonetic combinations of
the name "Manny Sanchez" and "M. Sanchez," and
the date of birth provided by plaintiff. Id. ¶ 12.
According to the affidavit, none of its more than 100
million records maintained by FBIHQ matched those
search terms. Id.

The Hardy affidavit reflects a search that was
"reasonably calculated to uncover all relevant
documents." Weisberg, 705 F .2d at 1351. Plaintiff
questions whether the FBI searched for "Manny
Sanchez" or the more formal "Manuel Sanchez." By
searching for "M. Sanchez," however, the FBI
ensured that records for either name would be found.
Plaintiff also questions why Sanchez's social security
number and the name of his operation were not used
in the search. Adding these additional query terms
would only have further limited the number of
responsive records. Plaintiff himself provided
Sanchez's date of birth, and the FBI was under no
obligation to perform a search that did not use that
query term.

*2 Defendants' Motion for Summary Judgment
(Renewed) [29] will be **granted.** An appropriate
order accompanies this memorandum.

Not Reported in F.Supp.2d, 2006 WL 2716086
(D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.