UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER J. HIDALGO,                   :
                                    :
         Plaintiff,                 :
                                    :
    v.                              :   Civil Action No. 06-1513 (JR)
                                    :
FEDERAL BUREAU OF INFORMATION,      :
                                    :
         Defendant.                 :

## MEMORANDUM

The plaintiff in this Freedom of Information Act dispute is Peter J. Hidalgo, a federal inmate serving multiple life sentences for trafficking quantities of cocaine valued in excess of eight million dollars. He has pursued the documents at issue for a decade, at one point with the pro bono assistance of a former Solicitor General of the United States. See Hidalgo v. FBI, 344 F.3d 1256, 1257 (D.C. Cir. 2003). His quest has been repeatedly rebuffed by the FBI, which has argued failure to exhaust administrative remedies, see id. at 1257-58, attempted to "neither confirm nor deny the existence" of records whose existence could not plausibly be denied, see Hidalgo v. FBI, 04-0562 at [26] (D.D.C. Sept. 29, 2005), harried him from pillar to post, see Hidalgo v. FBI, 04-0562 at [37] (D.D.C. Sept. 22, 2006), and now invokes nearly every law enforcement-related FOIA privilege in the book to avoid disclosure.

Yet the character who is at the heart of this ten-year saga is one Manuel "Manny" Sanchez, the paid FBI informant who

helped to put Hidalgo in prison years ago.  Sanchez was the erstwhile owner and operator of Manny's Marina, an outfit whose principal business was outfitting ocean-going vessels for drug running off the Florida coast.  He operated this business as a front for an undercover FBI investigation, reaping significant financial rewards from the Bureau as a result – Hidalgo estimates his compensation at between $440,000 and $1 million.  The goings-on at Manny's Marina were recorded, and that evidence, together with Sanchez's testimony, resulted in convictions for many defendants including Hidalgo and some of his co-conspirators.  Although the investigation into these matters was closed over a decade ago, the FBI considers the matter "pending," because some of the conspirators remain unindicted and still others are indicted but at large.

      Plaintiff's FOIA request covers all FBI records that relate to Sanchez by name, but, at its core, the request appears to be a demand for payments the FBI made to Sanchez and for documents related to certain interventions by the Bureau on Sanchez's behalf in criminal matters.  The FBI has identified the contents of Sanchez's witness file as responsive, but it has withheld substantially all of the nearly 3000 pages under various FOIA exemptions.[1]  The FBI has identified three broad categories

---

[1]  The FBI has turned over a single page, substantially redacted.

of documents in the file: (1) "Informant Contact and Interview Documents"; (2) "Informant Funding Documents"; and (3) "Informant Management Documents".  I have determined that much of the content of the file is indeed exempt from FOIA, but that certain matters – including documents detailing the FBI's payments to Sanchez and some aspects of the FBI's relationship with Sanchez – should be disclosed.  The parties' cross-motions for summary judgment will thus each be granted in part.

### I.  Funding Information

The first kind of information the FBI seeks to withhold is "information related to the funding of a confidential informant."  See [16] at 7.  It seeks to withhold this information under two exemptions: Exemption 2, for matters "related solely to the internal personnel rules and practices of an agency," 5 U.S.C. § 552(b)(2), and Exemption 7(E), related to law enforcement practices or techniques whose disclosure "could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The FBI's position on these documents is expressed in two conclusory paragraphs in its affidavit:

> [Exemption 2] has been applied to withhold internal documents that track the operational funds of the informant program, including the money that was dispensed to the informant.  Disclosure of this information would give drug traffickers insights into the financial workings of the confidential informant program.

- 3 -

> Revealing such information would be harmful because armed with knowledge of the inner workings of the financial operations of the confidential informant program, drug traffickers could scheme in an attempt to circumvent laws and investigations related to enforcement actions against international drug trafficking through manipulation of the confidential informant program. Disclosure could impede the FBI's effectiveness in administering its operations by enabling drug traffickers to exhaust the FBI's funding of a particular investigation.
>
> . . . .
>
> [Exemption 7(E) has been invoked because] [i]f the FBI were to disclose the procedures used to pay confidential informants during undercover investigation and release details of the payments, it could jeopardize the informant program developed by the FBI by discouraging others from participating in the confidential informant program.  Release of the payment details could also reasonably be expected to alert other individuals about the inner workings of the FBI's informant program and enable them to circumvent laws and investigations related to enforcement actions against international drug trafficking through manipulation of the confidential informant program by undermining the quality information provided by the confidential informant.

See Declaration of David M. Hardy [16, Attachment 5] at 13, 23-24.  The FBI's position is essentially that the release of information regarding how much it paid to Sanchez would either dissuade future informants from working with the FBI, or allow future drug traffickers to somehow decipher and manipulate the financial aspects of the confidential informant program.  Both prospects are remote – especially the former, as Sanchez's apparently outsized compensation would likely encourage future informants to work with the FBI – and in any event, the Bureau has not come close to making the showing required to justify withholding the documents under either exemption.

Because the internal agency information sought here is non-trivial, the standard under Exemptions 2 and 7(E) is substantially the same: whether "disclosure significantly risks circumvention of agency regulations or statutes."  Crooker v. ATF, 670 F.2d 1051, 1074 (D.C. Cir. 1981) (en banc); see also PHE, Inc. v. Dep't of Justice, 983 F.2d 248 (D.C. Cir. 1993) (noting that subsections (b)(2) and (b)(7)(E) involve the same standard in the case of law enforcement materials).  In its most authoritative statement of the test, the Court of Appeals included the term "significantly" in order to "stress the narrow scope of [its] construction of Exemption 2; in all cases in which the Government relies on Exemption 2, it remains the Government's burden to prove the 'significant risk.'"  Crooker, 670 F.2d at

1074.  There is some question as to whether the Court of Appeals continues to adhere to such a strict enunciation of the test, see, e.g., Tax Analysts v. IRS, 152 F. Supp. 2d 1, 17 n.26 (D.D.C. 2006), but no panel, and certainly no en banc decision, has expressly rejected it.

The FBI has not shown that there is a "significant risk" that its future investigations will be circumvented by disclosing the nature of the payments made to Sanchez in his capacity as a paid informant – indeed, it has not articulated reasons why there is a risk of any sort.  FBI's conclusory affidavit does not even hypothesize the mechanism by which sophisticated drug traffickers might use the Sanchez information to their advantage, other than saying that they "could scheme" to do so or perhaps try to "exhaust the FBI's funding of a particular investigation."  Hardy Declaration [16, Attachment 5] at 13.  But it is hard to imagine how the payments made to Sanchez in an investigation conducted over a decade ago could inform future traffickers seeking more effective strategies for exhausting FBI funding for some different investigation, and the FBI affidavit does even lend its imagination to the task.

Perhaps the FBI's theory is that public release of the amounts it has paid to this informant would move the market for informants by raising its price point.  Even if that is indeed the theory (the circumlocution of the affidavit makes it hard to

tell), and even if that theory were persuasive (it's not: Sanchez's estimated compensation is already a matter of public record), a risk of affecting the market price of informants is not a risk of "circumvention of agency regulations or statutes." Exemptions 2 and 7(E) allow information about law enforcement techniques to be withheld when publication would allow perpetrators to avoid them; it does not allow law enforcement to withhold information simply because it could operate more cheaply in secret.

The FBI does point to two decisions from this Court in which its use of these exemptions to withhold informant funding information has been upheld, but in both cases the FOIA requests were litigated by inmates appearing pro se, and neither decision gives the issue much attention. See Peay v. Dep't of Justice, No. 04-1859, 2007 WL 788871, at *2 (D.D.C. Mar. 14, 2007); Russell v. FBI, No. 03-0611, slip op. at 8 (D.D.C. Jan. 9, 2004). In Russell, the plaintiff never even filed an opposition to the Bureau's motion for summary judgment. In Peay, the FBI submitted a much more detailed affidavit, noting that the plaintiff was seeking information not only on the payments made to the informant, but on the "total dollar amounts of available funds, [] changing balances . . . and the total dollar amount that was requested and/or authorized to be disbursed." Peay, 2007 WL 788871, at *2. Here, the plaintiff only seeks confirmation of an

existing estimate of the amount of money actually paid out to the informant.

       The better precedent, discussed below, is <u>Bennett v. DEA</u>, 55 F. Supp. 2d 36 (D.D.C. 1999), which required production of funding information where an inmate made convincing claims of malfeasance by the agency itself.  In any event, it is the Bureau's burden to show a significant risk that the law will be circumvented by making the disclosure <u>in this case</u>.  The funding information that plaintiff seeks here is far more narrow than that sought in <u>Peay</u>, and relates to amounts paid during a drug investigation 15 years ago, a time when the priorities of the FBI were markedly different.

       Although I have determined that the FBI cannot withhold the documents it has classified as "related to the funding of a confidential informant" under Exemptions 2 and 7(E), the scope of the required production is narrow.  The FBI has noted that these documents contain permanent source symbol numbers, names and telephone numbers of FBI personnel, file numbers, names of third parties, other private identifying information, and other types of internal agency data in which there is no public interest.  This material may of course be redacted from FBI's disclosures under Exemption 2 and other applicable exemptions, and plaintiff does not seriously maintain otherwise.  <u>See</u> [17] at 17 (arguing

that the FBI's withholding based on these kinds of information is "a strawman" because plaintiff did not request this information).

### II. FBI Handling Information

The second type of information Hidalgo seeks relates to the FBI's handling of certain issues on Sanchez's behalf. The FOIA request specifically refers to allegations that the FBI intervened on Sanchez's behalf to prevent criminal prosecution for tax evasion and other criminal acts committed by Sanchez, and that it allowed Sanchez to perjure himself regarding his criminal record. See Hardy Declaration [16, Attachment 5] at 5. The FBI has not identified exemptions that apply to this material in particular (if such material exists), but it has attempted to withhold the entire file under FOIA Exemptions 6 and 7(C), which apply to private information. Neither ground for withholding is applicable.

Exemption 6 applies to "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), while Exemption 7(C) applies to law enforcement records to the extent that production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 555(b)(7)(C). It is recognized that the withholdings allowed under Exemption 7(C) are "somewhat broader" than those

allowed under Exemption 6.  See Dep't of Justice v. Reporters Committee for Freedom of the Press, 489 U.S. 749, 756 (1989).

Sanchez's personal privacy is at stake here, but his interest is far more limited than that of the typical confidential informant.  It is true that most undercover officers, witnesses, and informants "maintain a substantial interest in not being identified with law enforcement proceedings," Balderrama v. DHS, No. 04-1617, 2006 WL 889778, at *9 (D.D.C. Mar. 30, 2006), but, as I have previously noted, Sanchez's status as a government informant is "open and notorious."  Hidalgo v. FBI, 04-0562 at [26] *6 (D.D.C. Sept. 29, 2005).

These facts make this case substantially similar to Bennett v. DEA, 55 F. Supp. 2d 36 (D.D.C. 1999), which also involved allegations of misconduct by a government agency in the handling of a well-known and well-compensated informant, Andrew Chambers.  Chambers' work for DEA was more extensive than Sanchez's work for FBI, but the allegations of agency misconduct – for exam/ple, allowing open perjury regarding a criminal record and allowing avoidance of income taxes – are strikingly similar.  As Judge Kessler held in Bennett, the public has a strong interest in ascertaining the truth of such serious allegations of government misconduct, and that interest outweighs the more attenuated privacy interest of a well-known, paid and

professional government informant in his criminal record and other aspects of his file.  The crucial fact that distinguishes this case from "the typical case in which one private citizen is seeking information about another," Reporters Committee, 489 U.S. at 773, is that Sanchez's criminal record and other information regarding his relationship with the FBI is important to shed light on allegations of <u>agency</u> misconduct, not to focus unwarranted public scrutiny on Manny Sanchez.  See id. at 774-775 (Exemption 7(C) is applicable to "typical" case involving FBI rap sheets because "the requester does not intend to discover anything about the conduct of the agency that has possession of the requested records").  Because this is the atypical case, like Bennett, where the plaintiff has made enough of a showing to raise questions about possible agency misconduct,[2] the FBI must disclose records reflecting any misconduct in its relationship with Sanchez, its knowledge of his criminal record, its knowledge of administrative complaints regarding his work, and its intervention on his behalf in criminal matters, including any cases of tax evasion.

      The government's attempt to distinguish Bennett does not acknowledge the recognized facts of this case.  The FBI submits that, here, there is a special "safety-related" privacy

---

[2] See Appendix to Plaintiff's Cross Motion for Summary Judgment [17, Attachments 1-2].

interest related to the confidential informant that was not asserted in <u>Bennett</u> and that this makes withholding appropriate under Exemption 7(C) as well as Exemptions (7)(D) (information that "could reasonably be expected to disclose the identity of a confidential source") and (7)(F) (information that "could reasonably be expected to endanger the life or physical safety of any individual").  But the FBI's briefs and affidavits are utterly silent on how disclosure of information related to the FBI's misconduct in handling Sanchez would <u>further</u> endanger Sanchez's life or reveal his identity as an informant when his identity as an informant is manifest and could not be any clearer to Peter Hidalgo – whose FOIA request even included Sanchez's informant number and social security number.  <u>See</u> [16, Attachment 6] at 4.  The personal privacy interests at issue here are not distinct from those in <u>Bennett</u>, and the FBI must accordingly produce the documents here just as DEA did there.  As with the funding information, these documents remain subject to appropriate redaction to protect internal agency data, contact information, file and source symbol numbers, and information regarding undisclosed third parties.

### III.  Information Provided to FBI by Sanchez

The FBI has made a proper case for withholding or redacting some of the information as to which it asserts FOIA Exemption 7(A).  That provision allows the FBI to withhold law

enforcement records when disclosure "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). The FBI submits that although Manny's Marina was closed and Hidalgo and other co-conspirators were convicted long ago, the search for indicted and unindicted co-conspirators continues and the case is still assigned to a Special Agent. See Hardy Declaration, [16, Attachment 5] at 2-3; Declaration of SA Randy Cortes, [19, Attachment 2] at 2-4. The Information Sanchez provided includes "a significant amount of incriminating evidence against the fugitives and unindicted drug traffickers," Hardy Declaration, [16, Attachment 5] at 3, and the agent currently assigned to the case has identified many ways release of that information could have a deleterious effect on the ongoing investigation and future trials, including allowing fugitives to evade justice. See Cortes Declaration [19, Attachment 2] at 4.

The FBI has satisfied its burden. It need not show that Manny's Marina remains open as an investigative tool, only that "the material withheld relates to a concrete prospective law enforcement proceeding." Bevis v. Dep't of State, 801 F.2d 1386, 1389 (D.C. Cir. 1986) (quoting Carson v. Dep't of Justice, 631 F.2d 1008, 1018 (D.C. Cir. 1980). An ongoing search for – and possible future trials of – indicted and unindicted fugitives satisfies that standard, even if the possibility of actual prosecution is ultimately remote. See Bevis, 801 F.2d at 1389

(applying Exemption 7(A) to FBI investigation of murders in El Salvador despite the fact that "the accepted wisdom has been that no one in El Salvador would ever be brought to trial in any of these murder cases").

For his part, plaintiff acknowledges that his request sought "information on Mr. Sanchez's relationship with Defendant, not the smugglers the government was targeting." Plaintiff's Cross-Motion for Summary Judgment [17] at 20-21. Much of the file is information provided by Sanchez in witness interviews, and these documents are not only subject to the FBI's most convincing claim of exemption, but also appear ancillary to the central dispute. The FBI may withhold any information provided by Sanchez to the Bureau regarding the subjects of the drug-trafficking investigation and any information that is <u>directly</u> related to Sanchez's investigative activities.

\*     \*     \*     \*     \*

It is the information related to the relationship between the FBI and Sanchez – including his remuneration – that the Bureau must produce. If the FBI has difficulty finding the

lines that this memorandum opinion seeks to draw, this Court will consider reviewing responsive documents <u>in camera</u>.

An appropriate order accompanies this memorandum.


                                JAMES ROBERTSON
                           United States District Judge